1  SMITH, MCDOWELL & POWELL,
   A LAW CORPORATION
2  C. Jason Smith, SBN 237966
   Brandon T. Wright, SBN 294305
3  100 Howe Avenue, Suite 208 South
   Sacramento, CA 95825
4  Telephone: (916) 569-8100
   Facsimile: (916) 848-3777

5

6  Attorneys for Plaintiff,
   HALE BROS. INVESTMENT COMPANY, LLC

7

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10                 SACRAMENTO DIVISION

11 HALE BROS. INVESTMENT COMPANY,        )  Case No.: 2:16-cv-02284-JAM-EFB
   LLC, a California limited liability company, )
12                                        )
                                          )  DECLARATION   OF   BRANDON   T.
13          Plaintiff,                    )  WRIGHT   IN   SUPPORT   OF
                                          )  PLAINTIFF'S   OPPOSITION   TO
14 vs.                                    )  DEFENDANTS'   MOTION   FOR
                                          )  SUMMARY JUDGMENT
15                                        )
16 STUDENTSFIRST INSTITUTE, a District of )
   Columbia      non-profit      corporation; )
17 STUDENTSFIRST, a District of Columbia non- )  Hearing Date:  January 30, 2018
   profit corporation; 50CAN, INC., a Connecticut )  Hearing Time:  1:30 p.m.
18 corporation; and DOES 1 through 50 inclusive. )  Department:   Courtroom 6
                                          )  Judge:        The Honorable John A. Mendez
19                                        )
          Defendants.                     )  Trial Date:     April 30, 2018
20                                        )
21 STUDENTSFIRST INSTITUTE, et al.,       )
                                          )
22          Counterclaimants,             )
                                          )
23 vs.                                    )
                                          )
24 HALE  BROS.  INVESTMENT  COMPANY, )
   LLC,                                    )
25                                        )
                                          )
26          Counterdefendant.             )
                                          )
27 ///

28

                          1

DECLARATION OF BRANDON T. WRIGHT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
       DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, Brandon T. Wright, declare as follows:

1.    I am a member of the bar of the State of California and the law firm Smith, McDowell & Powell, a Law Corporation, counsel of record in this action for Plaintiff Hale Bros. Investment Company, LLC, a California limited liability company.

2.    The contents of this declaration are made from my personal knowledge, except where stated on information and belief, and as to those matters I believe them to be true.

3.    If called and sworn as a witness I could and would competently and truthfully testify to the facts set forth in this declaration.

4.    Attached hereto as Exhibit No. 1 are true and correct copies of excerpts from Chris Tessone's deposition transcript from his deposition taken on November 29, 2017.

5.    Attached hereto as Exhibit No. 2 are true and correct copies of excerpts from Kellen Arno's deposition transcript from his deposition taken on December 4, 2017.

6.    Attached hereto as Exhibit No. 3 are true and correct copies of excerpts from Deanna Lord's deposition transcript from her deposition taken on December 4, 2017.

7.    Attached hereto as Exhibit No. 4 is a true and correct copy of an email dated April 15, 2016 from Jim Blew of Defendant StudentsFirst to Marc Magee and Vallay Varro of Defendant 50CAN with a portion of the attachment which were produced by Defendants in this action in response to Requests for Production of Documents propounded by Plaintiff.  Portions of these documents have been redacted.

9.    Attached hereto as Exhibit No. 5 is a true and correct copy of an email dated January 13, 2016 from Jum Blew of Defendant StudentsFirst to Kellen Arno of Defendant StudentsFirst, Luis Buhler, Tim Melton, Ed Kirby, and March Porter Magee, Vallay Varro and Lisa Gibes of Defendant 50CAN, which were produced by Defendants in this action in response to Requests for Production of Documents propounded by Plaintiff.

10.    Attached hereto as Exhibit No. 6 is a true and correct copy of an email dated December 13, 2016 from Jim Blew of Defendant StudentsFirst to Marc Porter Magee and Vallay Varro of Defendant 50CAN which were produced by Defendants in this action in response to Requests for Production of Documents propounded by Plaintiff.

2

**DECLARATION OF BRANDON T. WRIGHT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

11.     Attached hereto as Exhibit No. 7 is a true and correct copy of a SalesForce Assignment Agreement which were produced by Defendants in this action in response to Requests for Production of Documents propounded by Plaintiff.

12.     Attached hereto as Exhibit No. 8 is a true and correct copy of Plaintiff, Hale Bros. Investment Company, LLC's Notice of Deposition to Person Most Knowledgeable or 50CAN, Inc. and Request for Production of Documents which Plaintiff caused to be served on or about November 7, 2017.

13.     In response to Plaintiff, Hale Bros. Investment Company, LLC's, Request for Production of Documents, Defendants have produced multiple versions of an asset transfer agreement, and several more versions of the asset list purportedly attached thereto.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

DATED: January 16, 2018

Brandon T. Wright

3

**DECLARATION OF BRANDON T. WRIGHT IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# Exhibit No. 1

1                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF CALIFORNIA
2                    SACRAMENTO DIVISION
3      - - - - - - - - - - - - - -x
       HALE BROS. INVESTMENT        :
4      COMPANY, LLC, a              :
       California Limited           :
5      Liability Company,           :
                                    :
6          Plaintiff,               :
                                    :    Case No.
7          v.                       :    2:16-cv-02284-JAM-EFB
                                    :
8      STUDENTSFIRST                :
       INSTITUTE, a District        :
9      of Columbia Non-Profit       :
       Corporation, et al.,         :
10                                  :
           Defendants.              :
11     - - - - - - - - - - - - - -x
12
13          Deposition of: CHRISTOPHER TESSONE,
14     called for oral examination by counsel for the
15     Plaintiff, pursuant to notice, at the law offices
16     of Veritext Legal Solutions, 1250 I Street,
17     Northwest, Washington, D.C. 20005, before
18     Christina S. Hotsko, RPR, CRR, of Veritext Legal
19     Solutions, a Notary Public in and for the District
20     of Columbia, beginning at 12:14 p.m., on November
21     29, 2017 when were present on behalf of the
22     respective parties:
23
24     Job No. 2748111
25     Pages 1 - 175

                                              Page 1

```
 1                  A P P E A R A N C E S

 2

 3    On behalf of Plaintiff:

 4        BRANDON T. WRIGHT, ESQUIRE

 5        Smith McDowell & Powell, A Law Corporation

 6        100 Howe Avenue, Suite 208 South

 7        Sacramento, California 95825

 8        (916) 569-8100

 9

10    On behalf of Defendant:

11        DWAYNE SAM, ESQUIRE

12        Perkins Coie, LLP

13        700 13th Street, Northwest

14        Washington, D.C. 20005

15        (202) 654-6282

16

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1                    C O N T E N T S
 2   EXAMINATION BY:                              PAGE
 3        Counsel for the Plaintiff              04
 4
 5
 6   TESSONE DEPOSITION EXHIBITS:    *            PAGE
     Exhibit 1    Deposition Notice                10
 7   Exhibit 2    Expert Report                    17
     Exhibit 3    Lease between Hale Brothers       24
 8                and StudentsFirst/StudentsFirst
                  Institute
 9   Exhibit 4    Parking Agreement Hale Brothers   50
10                and StudentsFirst and StudentsFirst
                  Institute
11   Exhibit 5    Initial Disclosures From          50
12                Hale Brothers
13   Exhibit 6    E-mails                           51
14   Exhibit 7    E-mails                           58
15   Exhibit 8    E-mails                           60
16   Exhibit 9    E-mails                           66
17   Exhibit 10   E-mails                           69
18   Exhibit 11   E-mails                           71
19   Exhibit 12   E-mails                           73
20   Exhibit 13   E-mails                           80
21   Exhibit 14   E-mails                           84
22   Exhibit 15   E-mails                           86
23   Exhibit 16   E-mails                           88
24   Exhibit 17   E-mails                           91
25   Exhibit 18   E-mails, Exhibit A Assets         93
```

Page 3

```
 1   TESSONE DEPOSITION EXHIBITS:   *              PAGE

 2   Exhibit 19   E-mails, Exhibit A Assets         93

 3   Exhibit 20   E-mails, Exhibit A Assets         93

 4   Exhibit 21   E-mails, Exhibit A Assets         93

 5   Exhibit 22   E-mails                          102

 6   Exhibit 23   E-mails                          105

 7   Exhibit 24   E-mails                          108

 8   Exhibit 25   E-mails                          111

 9   Exhibit 26   E-mails                          115

10   Exhibit 27   E-mails                          117

11   Exhibit 28   E-mails                          117

12   Exhibit 29   E-mails                          133

13   Exhibit 30   E-mails                          134

14   Exhibit 31   E-mails                          137

15   Exhibit 32   E-mails                          143

16   Exhibit 33   E-mails                          144

17   Exhibit 34   E-mails                          149

18   Exhibit 35   E-mails                          150

19   Exhibit 36   E-mails                          153

20   Exhibit 37   E-mails                          155

21   Exhibit 38   E-mails                          156

22   Exhibit 39   E-mails                          159

23   Exhibit 40   E-mails                          163

24   Exhibit 41   E-mails                          164

25   Exhibit 42   E-mails                          172
```

Veritext Legal Solutions
866 299-5127

1                  P R O C E E D I N G S

2    Whereupon,

3                  CHRISTOPHER TESSONE,

4    being first duly sworn or affirmed to testify to

5    the truth, the whole truth, and nothing but the

6    truth, was examined and testified as follows:

7         EXAMINATION BY COUNSEL FOR THE PLAINTIFF

8    BY MR. WRIGHT:

9         Q.   Chris, why don't you go ahead and start

10   by stating and spelling your name for the record.

11        A.   Sure.   I'm Christopher Tessone,

12   T-E-S-S-O-N-E.

13        Q.   Thank you.

14             Have you ever been deposed before?

15        A.   I have.

16        Q.   When was the last time?

17        A.   It would have been late 2015.

18        Q.   And what was the matter of that case?

19        A.   It was a wrongful termination suit for

20   another -- a third party.

21        Q.   Any other times or was that it?

22        A.   No, that was the only time.

23        Q.   Were you on the plaintiff's side of that?

24   Testifying on the plaintiff's behalf or on

25   defendant's?

                                        Page 5

1      A.   It's an e-mail from Vallay Varro, 50CAN's
2   president, to me, introducing me to Jim Blew and
3   Angela Dickens.
4      Q.   This e-mail is dated April 5th, and it
5   references a start date of the following Monday.
6           So do you know the exact date you started
7   at 50CAN?
8      A.   I believe it's April 11th.  The math
9   works out.
10     Q.   That seems about right.
11     A.   Yeah.  April 11th.
12     Q.   So this is the first time you were kind
13  of brought into the conversation regarding
14  StudentsFirst?
15     A.   It was.
16     Q.   Was there anything told to you by
17  Vallay Varro or anyone else at 50CAN prior to your
18  start regarding StudentsFirst?
19     A.   Yes.  Vallay mentioned briefly, during my
20  job interview, that there may be a transaction
21  involved, bringing some programs of StudentsFirst
22  into 50CAN as a result of their strategic
23  direction and their board discussions.
24     Q.   Okay.  And was there any more detail
25  regarding that transaction discussed at that time?

Page 52

1    Exhibit 8.  Do you recognize this document?

2         A.  I guess I was added later.  I do.  And

3    I'm familiar with the issue that it refers to.

4         Q.  Okay.  So what is this?

5         A.  There was discussion about paid time off

6    for the employees that were leaving StudentsFirst

7    and joining 50CAN, how to handle their -- the

8    balances of paid time off that they had accrued as

9    StudentsFirst employees.

10        Q.  Okay.  How many employees of

11   StudentsFirst ended up being transferred to 50CAN?

12        A.  I believe 11 employees were transferred.

13        Q.  11 employees total over all the state

14   campaigns?

15        A.  Yes.  Excuse me -- yes.  Eleven.

16        Q.  Do you recall any of these employees'

17   names?

18        A.  I do.  Bradford Swan and another person

19   in South Carolina whose name I can't recall.

20   Michael O'Sullivan and Steven Quinn in Georgia.

21   Brent Easley, Victor Evans, Daniel Zavala,

22   Shelonda Richardson, Ted Boyett, and one other

23   person in Tennessee whose name I'm forgetting.

24   And Jim Blew in California.

25        Q.  The state campaigns that were transferred

Page 61

1   something different with 50CAN.  Or was he still

2   working with the --

3       A.   No.  This lawsuit -- the Students Success

4   California affiliate was a program of

5   StudentsFirst previously and was one of the

6   programs that was transferred.  However, that was

7   not -- my understanding is that was not his sole

8   duty at StudentsFirst, whereas at 50CAN that

9   affiliate was his sole duty.

10      Q.   Okay.  I get it.

11           The employees who transferred over to

12  50CAN from StudentsFirst, were they -- you said

13  they were primarily performing the same job

14  functions.  Were they working with the same

15  accounts that they were working with at

16  StudentsFirst?

17      A.   Can you explain "accounts"?

18      Q.   Or funders maybe is a better use of the

19  term?

20      A.   Yes.  So we did attempt to secure

21  renewals from previous StudentsFirst funders for

22  those states and in many cases succeeded.

23  However, they began working with our growth team,

24  which is our state development team, immediately

25  to identify new funders that may have been more

Page 65

1        A.    Where's the list of documents?   I'm

2    sorry.

3        Q.    Starting on page 8, subsection 3,

4    "documents required to be produced."

5            I guess I should start with the question,

6    did you bring any documents with you today?

7        A.    I did not.   I believe we provided these

8    previously through discovery.

9        Q.    Okay.   Going back to the second page,

10   there's a section called "matters on which

11   examination is requested."

12           Have you reviewed this section?

13       A.    I have.

14       Q.    Are you the person most knowledgeable and

15   qualified to discuss the categories of facts and

16   circumstances identified in this notice?

17       A.    I am the person most knowledgeable for

18   items 5 through 14.   And as our counsel has

19   noticed earlier, we believe there are multiple

20   persons most knowledgeable for items 1 through 4.

21   Marc Porter Magee and Vallay Varro can also answer

22   questions on those items, primarily due to me

23   having joined 50CAN partway through the course of

24   these events.

25       Q.    I'm sorry, you said you were the person

Page 165

# Exhibit No. 2

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF CALIFORNIA
3                 SACRAMENTO DIVISION
4
5   HALE BROS. INVESTMENT       )
    COMPANY, LLC, a California )
6   limited liability company, )
                               )
7              Plaintiff,      )
                               )
8       vs.                    )   No. 2:16-cv-02284-JAM-EFB
                               )
9   STUDENTSFIRST INSTITUTE, a )
    District of Columbia        )
10  non-profit corporation;    )
    50CAN, INC., a Connecticut )
11  corporation; and DOES 1    )
    through 50, inclusive,     )
12                             )
               Defendants.     )
13  _____)
    AND RELATED CROSS CLAIMS   )
14  _____)
15
16           DEPOSITION OF KELLEN ARNO
17                  VOLUME I
18            Sacramento, California
19            Monday, December 4, 2017
20
21  Reported by:
22  KATHLEEN BACA
23  CSR No. 10267
24  JOB No. 2766090A
25  Pages 1 - 128
```

Page 1

```
1                  UNITED STATES DISTRICT COURT
2                  EASTERN DISTRICT OF CALIFORNIA
3                      SACRAMENTO DIVISION
4
5    HALE BROS. INVESTMENT      )
     COMPANY, LLC, a California )
6    limited liability company, )
                                )
7                   Plaintiff,  )
                                )
8            vs.                )   No. 2:16-cv-02284-JAM-EFB
                                )
9    STUDENTSFIRST INSTITUTE, a )
     District of Columbia       )
10   non-profit corporation;    )
     50CAN, INC., a Connecticut )
11   corporation; and DOES 1    )
     through 50, inclusive,     )
12                              )
                    Defendants. )
13   _____)
     AND RELATED CROSS CLAIMS   )
14   _____)
15
16            Deposition of KELLEN ARNO, Volume I,
17            taken on behalf of Plaintiff, at
18            100 Howe Avenue, Suite 208 South,
19            Sacramento, California, beginning at
20            9:05 a.m. and ending at 12:10 p.m. on
21            Monday, December 4, 2017, before
22            KATHLEEN BACA, Certified Shorthand
23            Reporter No. 10267.
24
25
```

Page 2

```
 1   APPEARANCES:
 2   For Plaintiff:
 3         SMITH, McDOWELL & POWELL
 4         BY:   BRANDON T. WRIGHT
 5         Attorney at Law
 6         100 How Avenue, Suite 208 South
 7         Sacramento, California 95825
 8         916.569.8100
 9         bwright@smplawcorp.com
10
     For Defendants:
11         PERKINS COIE
12         BY:   PATRICK S. THOMPSON
13         Attorney at Law
14         505 Howard Street, Suite 1000
15         San Francisco, California 94105-3204
16         415.344.7068
17         PatrickThompson@perkinscoie.com
18
19   For The Witness:
20         BENBROOK LAW GROUP
21         BY:   STEPHEN M. DUVERNAY
22         Attorney at Law
23         400 Capitol Mall, Suite 2530
24         Sacramento, California 95814
25         916.447.4900
```

Page 3

```
1                       I N D E X

2                                           PAGE

3   EXAMINATION BY MR. WRIGHT                 5

4   EXAMINATION BY MR. THOMPSON              119

5

6


                        E X H I B I T S

7   NUMBER             DESCRIPTION          PAGE

    Exhibit 43   Subpoena to Testify at a Deposition   9

8   Exhibit 44   E-mails Bates Stamped PC00000185      39

9   Exhibit 45   E-mails Bates Stamped PC00000399      42

10               - PC00000400

11  Exhibit 46   E-mails with attachments Bates        45

12               stamped PC00000425 - PC00000427

                 and PC00000501 - PC00000503

13  Exhibit 47   E-mails Bates Stamped PC00000191 -     53

14               PC00000192

15  Exhibit 48   E-mails Bates Stamped PC00000407       58

16  Exhibit 49   E-mails Bates Stamped SMP000258        80

17               - SMP000259

18  Exhibit 50   E-mail Bates Stamped PC00000403       114

19  Exhibit 51   E-mails Bates Stamped PC00001246      124

20               - PC00001248

21

    Previously marked confidential exhibits attached under

22  separate cover: Exhibit 10, Exhibit 15, Exhibit 28,

    Exhibit 46

23

    Previously marked exhibits attached: Exhibit 3, Exhibit 4,

24  Exhibit 7, Exhibit 18, Exhibit 20, Exhibit 25, Exhibit 31,

25  Exhibit 33, Exhibit 35


                                          Page 4
```

```
 1              Sacramento, California, Monday, December 4, 2017
 2                           9:05 a.m.
 3
 4                      KELLEN ARNO,
 5        having been first duly sworn, was examined and
 6                    testified as follows:
 7
 8              EXAMINATION BY MR. WRIGHT
 9          MR. WRIGHT:  Q  All right.  Thank you for
10     coming in this morning.
11              To start, can you please state and spell your
12     name for the record.
13     A     Kellen Arno.  K-e-l-l-e-n, A-r-n-o.
14     Q     Thank you.
15              Kellen, have you ever been deposed before?
16     A     No.
17     Q     Do you understand that you're under oath
18     today?
19     A     I do.
20     Q     Do you further understand that your testimony,
21     even though given in this informal setting, has the
22     same force and effect as if given in a court of law?
23     A     I do.
24     Q     And do you understand that that means that
25     your testimony today is under penalty of perjury?
```

Page 5

```
 1              If you were a teacher, we provided materials
 2     around professional development and advocacy for
 3     different -- you know, things that a teacher might be
 4     interested in from the principal, from their teacher's
 5     union rep.  Things like that.
 6        Q    So your role as VP of membership was to help
 7     provide that information?
 8        A    Yeah.  I oversaw the team that did the
 9     outreach work and did the content generation.  Yes.
10        Q    How many people were on that team?
11        A    About 40.
12        Q    Were they all based in California?
13        A    No.  They were not.
14        Q    Were any based in California?
15        A    Yes.
16        Q    How many?
17        A    Approximately 15.
18        Q    Did you hold any other positions at
19     StudentsFirst?
20        A    Yes.
21        Q    Which ones?
22        A    Vice president of strategy and communications.
23        Q    What were the dates that you held that
24     position?
25        A    September of 2014, I believe.  That is an
```

Page 17

1     Q     Any role in negotiating its terms?

2     A     No.

3     Q     Do you know who had a role in drafting it?

4     A     No.

5     Q     Okay.  Other than prospective sublessees, at

6  any time during your employment with StudentsFirst, did

7  you discuss this lease with anyone else at

8  StudentsFirst?

9     A     At StudentsFirst?

10    Q     Yes.

11    A     Define "discuss the lease."

12    Q     Did you discuss with any other employee at

13 StudentsFirst any manner concerning the lease?

14    A     Yes.

15    Q     Do you recall what those discussions were with

16 regard to?

17    A     Probably the end date of the lease.  The

18 general lease amount, in terms of how much rent we were

19 paying per month.  And that's probably the extent.

20    Q     Okay.  Why --

21    A     I can't think of anything else.

22    Q     Sure.

23          Why do you think you would have discussed the

24 end date of the lease?

25    A     When we were doing the planning around the

Page 24

1    office on the third floor where Hale Bros. -- I don't

2    know if it's headquartered or just where they work out

3    of -- and I let them know, on behalf of StudentsFirst,

4    that we were pursuing a merger.  And that at some point

5    in the near future we were having funding shortages and

6    it was unlikely we would be able to meet our lease

7    obligation.

8        Q    Okay.  So I'm going to ask more questions

9    about that a little bit later.

10        But besides the April 29th, was there any

11    other time in which you discussed the lease with the

12    Hale Bros.?

13    A    I don't remember the date.  I had a meeting at

14    Hale Bros.  My hunch is it would have been sometime in

15    2015 -- probably later in the year in 2015 -- where

16    myself and two tenant representative agents and I met

17    with Hale Bros. and their team to discuss a potential

18    plan to -- for StudentsFirst to move up to the third

19    floor and cohabitate space with them.

20        And at that point they showed us some draft

21    architectural designs about how they would facilitate

22    that.  I do not recall the lease being specifically

23    discussed about.  But it's possible it was, given the

24    nature of the meeting.

25        Q    Okay.  And were there any other times?

Page 26

1        Q      Okay.  So were you familiar with 50CAN prior

2    to your employment with StudentsFirst?

3        A      I don't think so, no.

4        Q      Do you know when StudentsFirst and 50CAN

5    started discussing a merger?

6        A      I don't know for certain.

7        Q      Okay.  Do you have an estimate as to a time

8    frame?

9        A      The only information I could probably offer up

10   would be that I was informed in December of 2015.   I

11   couldn't speak to whether or not those conversations

12   had started the day before or three years before.   I

13   really have no idea.

14       Q      Sure.

15              Do you know who initiated the discussion

16   between StudentsFirst and 50CAN regarding a merger?

17       A      I really don't know who started.  I recall

18   hearing a story that it was sort of a matchmaking

19   exercise, where Jim Blew had been speaking to a -- sort

20   of related third party about struggles of running the

21   national education reform advocacy organization.  50CAN

22   CEO had also been having similar conversations and so

23   they were encouraged to talk and see what kind of

24   partnership might materialize.  That's possibly a

25   pocketful.  I don't know.

Page 30

```
 1        Q    Okay.  So you weren't a part of that initial
 2    discussion?
 3        A    No.
 4        Q    Why was StudentsFirst interested in merging
 5    with 50CAN?
 6        A    I guess I'm having a tough time understanding
 7    that question only because I can't speak to, like, a
 8    concentrated idea that StudentsFirst would have.  Like
 9    I can tell you why various people at StudentsFirst
10    might be interested in it.  Or various people related
11    to both sides.
12             But, like, there wasn't ever -- at least
13    during the scoping out phase, I was not privy to any
14    sort of like thesis about why this should or should not
15    happen.
16        Q    Okay.  And you mentioned individuals and why
17    they might be interested in such a merger.
18             Can you identify some of the individuals?
19        A    Jim Blew, president of StudentsFirst.  Marc
20    Porter Magee, president of 50CAN.  Myself had a vested
21    interest.  Various senior staff at both organizations.
22        Q    Okay.  And why were you interested in the
23    merger?
24        A    I thought that one of the challenges of
25    education reform is finding consistent funding that
```

Page 31

1    could support national advocacy organizations.  I think

2    that there was a lot of inefficiencies in terms of

3    support services that happened and a lot of duplication

4    and replication of work that needed to happen.

5            And if you could find two like-minded groups

6    who are doing very similar work, and you can

7    consolidate some of those support services into one,

8    you know, I think it's a much more efficient use of

9    sources.

10           And then, secondly, you know, like any

11   organization that works in the political space, the

12   larger you are, the stronger you are.  So any merger

13   that conceptually made the two organizations larger,

14   and, therefore, more powerful based on the number of

15   people they presented, was a good thing for, I think,

16   students in the -- K through 12 students in our

17   country.

18       Q    Okay.  And why was Jim Blew interested in the

19   merger?

20           MR. THOMPSON:  Objection.  Lacks foundation.

21           MR. WRIGHT:  Q  You can go ahead and answer.

22           MR. THOMPSON:  You can answer if you know.

23           THE WITNESS:  I don't know specifically why he

24   was.  I can only surmise, based on numerous

25   conversations I had with Jim, as we continued to try --

Page 32

```
 1    "we" being the senior staff of StudentsFirst --
 2    continued to try to find ways to make more impact with
 3    less money.
 4          And I believe he felt like a merger would
 5    conceptually allow the combined organization to make
 6    more impact with the money that was being granted to
 7    it.
 8          MR. WRIGHT:  Q  And do you know why Marc Magee
 9    was interested in the merger?
10    A     I really don't.
11    Q     Where did StudentsFirst get its grants?
12    A     A variety of large grant agreements were
13    provided by charitable foundations.  There was a
14    another group of what we referred to internally as
15    median-sized donors, individual donors.  And then from
16    a network of small donors.
17    Q     Okay.  So you said that you were first made
18    aware of potential merger around December of 2015?
19    A     Correct.
20    Q     What was your role prior to the merger?
21    A     Initially it was to, I think, help provide
22    advice and counsel to Jim as he explored from a
23    StudentsFirst perspective, whether or not a merger made
24    sense.  And if it did, how to merge the two
25    organizations together.
```

Page 33

```
 1    I'm sorry -- just to clarify.
 2            When it was announced or when it was discussed
 3    to me?  Or in the period in between it was first
 4    discussed to me and the merger was announced?
 5        Q    When it was first discussed to you to the end
 6    of your employment.
 7        A    Yeah.  Okay.  Then, yes, my answer stands.
 8    Substantial discussion.
 9        Q    Let's -- I guess, let's start back at when it
10    was first discussed with you.
11            How was the merger supposed to be affected?
12        A    When it was first discussed with me, there was
13    no plan.  It was "This is a potential thing.  Do you
14    think it's worth exploring?"  And it was clear -- I
15    believe it was explicitly stated that one of my
16    responsibilities, along with another member of senior
17    staff, were going to be responsible for helping Jim
18    Blew determine what a potential merger might look like.
19        Q    Who was the other senior staff?
20        A    Tim Melton, M-e-l-t-o-n.
21        Q    You said help Jim Blew kind of assess what a
22    merger would look like?
23        A    That was my understanding, yes.
24        Q    And what did you conclude?
25        A    I think we concluded -- at least I was part of
```

Page 37

1    a conversation that concluded that some form of merger

2    would look like the transition of all operational

3    support capacities be transitioned to 50CAN.  With, I

4    guess, limited amounts of state advocacy work that

5    StudentsFirst performed being subsumed by the 50CAN

6    network.

7          Q    We keep talking about this word "merger."  Do

8    you know what a merger is?

9                MR. DUVERNAY:  Object to the form of the

10   question.

11               THE WITNESS:  Yeah.  I mean, I guess help me

12   understand your question.

13               MR. WRIGHT:  Q  Well, you've mentioned the

14   word "merger" several times now.

15               What is your understanding of what the word

16   is?

17               MR. THOMPSON:  Objection to the form of the

18   question.  Foundation.  Calls for a legal conclusion.

19               The witness can answer.

20               MR. DUVERNAY:  Join in the objection.

21               THE WITNESS:  Yeah.  I don't have -- I do not

22   understand -- I'm not an attorney, so I do not know the

23   legal definition of a merger.

24               I will say that I understood a merger to be

25   two organizations in some capacity forming together.

Page 38

1           MR. WRIGHT:  Q  And this is your understanding

2     back in December of 2015?

3       A    I think that's right.  Yes.

4       Q    Okay.

5           THE WITNESS:  Let me take a bathroom break.

6     Is that okay?

7           MR. WRIGHT:  Sure.

8               (Recess taken 9:52 a.m. - 9:57 a.m.)

9           MR. WRIGHT:  We're back on the record.

10          We're going to need a stamp for this one.

11            (Exhibit 44 marked for identification by

12              the court reporter and is attached hereto.)

13          MR. WRIGHT:  I'm handing you what's marked

14    Exhibit 44.

15      Q    Do you recognize this document?

16      A    Vaguely, yes.

17      Q    What is it?

18      A    It appears to be an e-mail from Jim Blew to a

19    few members of StudentsFirst and 50CAN senior staff

20    communicating approval -- board approval to explore a

21    formal merger.

22          MR. THOMPSON:  I would like to make a comment.

23          Exhibit 44, which was produced by my law firm,

24    has a confidential stamp on this document.

25          In advance of the deposition, defense counsel

                                            Page 39

1      Q    Okay.  Can you take a look back at the e-mail,

2   the first page.  It references a meeting that gets to

3   take place on Monday.

4      A    Yes.

5      Q    This is a Friday e-mail.  I'm going to surmise

6   it's probably the following Monday.

7           Do you recall whether or not you attended that

8   Monday meeting?

9      A    I do recall.

10     Q    What was discussed at that meeting?

11     A    For the portion that I was involved in, it was

12  predominantly communications.  And I believe we also

13  talked about a handful of projects I was working on

14  that required vendors.  And I wanted clarity around

15  whether or not we were keeping these vendors on because

16  I wanted to be able to communicate with them in the

17  event we weren't.

18     Q    Okay.  And do you recall who else was in

19  attendance at that meeting?

20     A    Certainly Michelle and Jim.  Michelle Rhee and

21  Jim Blew, Marc Porter Magee, Vallay, and Lisa Gibes.

22  That was the group that was consistently meeting.

23     Q    Okay.

24     A    It's possible Deanna Lord was on that as well,

25  but it's -- I don't recall her being on it,

                                              Page 47

1   concerned about?

2        A    Not at least in that conversation.

3        Q    How about any subsequent conversations?

4        A    There weren't vendors that I was concerned

5   about.  There was just a series -- you know, a large

6   group of transition items and platforms that we were

7   utilizing that I wouldn't say -- I wouldn't

8   characterize them as being concerned about it.  But it

9   was part of the work that I needed to do as part of my

10  role.

11       Q    Okay.  So the e-mail says that the questions

12  presented in the attachment are to help wind down -- to

13  help drive the wind down costs.

14            Do you know what's meant by that?

15       A    I don't know what he meant by that.  No.

16       Q    Okay.  The e-mail also references a model of

17  the estimates of staff wind down costs of 1.5 million.

18            Do you know what model Jim was referring to?

19       A    Again, I don't know what wind down costs mean.

20  But I knew that generally the work we were doing there

21  was to try to provide a particular funder with costs

22  related to the merger.  And one of the big cost drivers

23  was the transition and subsequent severance agreements

24  for a large chunk of staff.  And so I assume that

25  that's what it refers to.

Page 49

1    A    Yes.   That's what it looks like.   Yes.

2    Q    It then states "Maybe you can add that to the

3    plan."

4         What plan is that referring to?

5    A    The communications plan that I was responsible

6    for preparation of and maintenance of.

7    Q    And according to -- sorry.   Communications

8    plan.   Is this something that was written down?

9    A    Yes.

10   Q    And something that you prepared?

11   A    Yes.

12   Q    Along with the team of people or just

13   yourself?

14   A    I prepared it and then comments were given.

15   Q    By whom?

16   A    Michelle Rhee, Marc Porter Magee and Jim Blew.

17   Q    So at this point what was the plan?

18   A    I guess -- how would you like me to describe

19   that?

20   Q    First of all, what was the purpose of

21   preparing this plan?

22   A    To ensure coordinated communications to

23   internalized audiences.

24   Q    So how was StudentsFirst -- what were -- I'm

25   trying to phrase this in a way that makes sense.

Page 54

1    announced?

2        A    That's correct.

3        Q    And the press release that you mentioned, is

4    that something you prepared?

5        A    Yes.

6        Q    By yourself or with anyone else?

7        A    Same.  I wrote the first draft and then it was

8    shared with the group I listed to you earlier.  I took

9    in their feedback and adjusted accordingly.

10       Q    Okay.

11       A    There was an additional piece missing from the

12   communications plan, which was a strategy about two

13   groups to contact.  One, the members of the media that

14   I was supposed to coordinate with to give an interview

15   about the merger.  And then also I drafted an e-mail to

16   the funders and sort very important person supporters.

17       Q    Okay.  So you talked about communications.

18   This e-mail, however, references StudentsFirst assets,

19   how 50CAN is to use StudentsFirst assets post merger

20   announcement.

21            Do you know what the plan was as far as use of

22   StudentsFirst assets?

23       A    Yeah.  That specifically referencing what we

24   would call Web-based assets.  So that's any kind of Web

25   presence related to a Web site or social media

Page 56

1    platforms.

2            So we had independent Web sites.  We had

3    Twitter handles.  Facebook accounts.  That kind of

4    thing that belonged -- that had pretty significant

5    followings.  Good audiences on it.  And one of the big

6    questions that Marc wanted to work through with me was

7    how we maintained those assets as part of this merger.

8        Q    And what did you guys decide to do as far as

9    maintaining those assets?

10       A    We -- when I left in May, the plan was to

11   retain the StudentsFirst branding, I believe for, I

12   believe it was four to six months.  And that there

13   would be a branding effort taken -- undertaken by 50CAN

14   to bring them into the 50CAN network, and subsequently

15   put them sort of through, I guess, transition assets

16   solely under the 50CAN brand.

17           Based on my knowledge of them now, I can say

18   that they did that.  I can't speak to when they did it.

19       Q    Okay.  So based on what you've told me, was it

20   the plan that StudentsFirst would maintain its

21   Web-based assets post merger announcement until some

22   later date when --

23       A    Correct.

24       Q    Okay.  Do you recall whether or not there were

25   any assets that were immediately transferred after the

                                                    Page 57

```
 1        Q      What is it?

 2        A      It's a press release announcing a merger

 3    between 50CAN and StudentsFirst.

 4        Q      Is this the release that you mentioned you

 5    prepared the initial draft of and then provided --

 6        A      Yes, it is.

 7        Q      And who provided feedback on this?

 8        A      Marc Porter Magee, Jim Blew, Michelle Rhee.

 9        Q      The date of the document is March 29th, 2016.

10        A      Correct.

11        Q      Is that the date that a merger occurred?

12               MR. DUVERNAY:  Object to the form of the

13    question.

14               MR. THOMPSON:  I join in the objection.

15               MR. DUVERNAY:  Calls for a legal conclusion.

16               MR. THOMPSON:  Same objection.  And lacks

17    foundation.

18               MR. WRIGHT:  Q  This is an announcement of a

19    merger.  Correct?

20        A      It appears so.

21        Q      Does the -- is the announcement that the

22    merger is going to happen or it happened?

23               MR. DUVERNAY:  Object to the form of the

24    question.

25               MR. THOMPSON:  Join in the objection.
```

Veritext Legal Solutions
866 299-5127

```
 1              THE WITNESS:  Yeah.  I don't -- I don't know.
 2    I don't know how to answer that question exactly
 3    correctly.  I apologize.
 4              MR. WRIGHT:  Q   Okay.  Do you know who this
 5    announcement was sent to?
 6        A    We had a -- we maintained a list of news
 7    outlets who we sent it out to.  It probably was 300 or
 8    so long of various news outlets across the country.
 9        Q    Okay.  The announcement states that 50CAN's
10    Marc Magee served as the combined company CEO, while
11    50CAN's Vallay Varro will serve as its president.
12              Was this your understanding at the time?
13        A    Yes.
14        Q    Do you know what the Minneapolis Foundation
15    is?
16        A    Vaguely.
17        Q    And what is it?
18        A    I believe it's a charitable foundation in
19    Minneapolis that does community impact --
20        Q    Do you know whether or not it had any
21    affiliation with StudentsFirst or 50CAN?
22        A    StudentsFirst, none whatsoever.  50CAN, I
23    believe the -- only through Sandy Vargas, who I believe
24    heads up at Minneapolis Foundation.  And she was on the
25    board of 50CAN.
```

Page 62

```
 1        Q     Okay.

 2        A     I also believe the Minneapolis Foundation was

 3   a funder of 50CAN as well.

 4        Q     Okay.  On the last page you're listed as one

 5   of the contacts.

 6        A     Correct.

 7        Q     Why were you listed as a contact?

 8        A     I was a designated spokesperson for the

 9   organization.

10        Q     Were you ever contacted about this merger?

11        A     I was.

12        Q     Do you recall by whom?

13        A     A long list of reporters.

14        Q     What did they want to know?

15        A     Numerous questions related to details about

16   the merger.  Numerous questions related to what it

17   meant for --

18                   (Door interruption.  Documents dropped

19                    off.)

20             MR. WRIGHT:  Sorry.

21             THE WITNESS:  Questions related to what it

22   meant for staff at StudentsFirst and 50CAN.  Questions

23   related to education policy.  Questions related to --

24   and about Michelle Rhee and her role moving forward in

25   the organization, and the merged organization.  That
```

Page 63

1   nature of questions.

2           MR. WRIGHT:   Q   What was Michelle Rhee's role

3   moving forward in the merger organization, if any?

4       A    I believe just a board position.  And even

5   then, I'm not actually certain.

6           When I left the organization, that was

7   something they were still working out.  And it was my

8   understanding that's what they were working towards.  I

9   actually can't speak to whether or not that was

10  consummated.

11      Q    Okay.  Were there any other members of

12  StudentsFirst that you were aware of that were supposed

13  to move over to 50CAN to their -- I'm sorry -- to

14  50CAN's board -- to join 50CAN's board?

15      A    No.  I'm not familiar.  I'm not aware.  It's

16  possible that there were.  I just -- that was a

17  decision that was not determined prior to me leaving.

18      Q    Okay.  Do you recall why the merger was

19  announced in March -- other than April 1st date not

20  working out, why March 16?

21      A    Oh.  So there is a two-part question for that.

22  The -- why we were targeting for a March or April

23  announcement had -- I believe related to -- was related

24  to a disbursement of funds from a funder who

25  essentially didn't -- wanted to withhold the funds from

Page 64

1      Q    Okay.  So at the time of the announcement of

2   the merger in March of 2016, was it already determined

3   that StudentsFirst operation within California would

4   close?

5      A    Define "operation."

6      Q    So StudentsFirst employed several California

7   based employees who worked on the more operational side

8   of the headquarters, you called it, of StudentsFirst.

9           Was their operation, you know, the

10  StudentsFirst headquarters, going to continue along

11  post merger?

12          MR. THOMPSON:  Objection to form.  Lacks

13  foundation.

14          MR. DUVERNAY:  Join.

15          THE WITNESS:  Yeah.  I can't speak to whether

16  or not it had been finalized because, again, it wasn't

17  an area that I oversaw.  I know that a lot of

18  conversations were happening between Luis Buhler and

19  Deanna Lord and Jim related to what that looked like.

20          I -- I am comfortable saying that it was my

21  understanding that that was -- that the operational

22  support from a StudentsFirst perspective was going to

23  go away and it was going to be done by 50CAN out of

24  their Washington, DC offices.

25          MR. WRIGHT:  Q  So then at the time of this

Page 69

1          MR. THOMPSON:  And lacks foundation.

2          THE WITNESS:  I don't know.

3          MR. WRIGHT:  Q  Okay.  So the e-mail he

4   references or requests a meeting with Paul Petrovich.

5          Did that meeting occur?

6     A    Yes, it did.

7     Q    When was that?

8     A    I believe it was the following Friday there,

9   April 29th.

10    Q    Who was at that meeting?

11    A    Myself and Deanna Lord were there from

12  StudentsFirst.  I'm going solely based on this here.  I

13  know Paul was there.  I knew Lisa was there.  And if

14  Ken, his attorney -- I believe he had -- I think he was

15  their attorney, that sounds right.  There was one other

16  person there for sure, I just can't remember the name

17  specifically.

18    Q    Your e-mail references legal counsel for

19  StudentsFirst.  Were they in attendance?

20    A    They were not.  Yeah.  They were not there.

21    Q    Okay.  So at the meeting on or about

22  April 29th, did you inform landlord, plaintiff in this

23  case, Paul, that StudentsFirst had merged its business

24  with 50CAN?

25    A    I don't know if I used those words.

Page 83

1          MR. DUVERNAY:   Join in the objection.

2          THE WITNESS:   I don't recall personally making

3     anybody at 50CAN aware of the meeting.  And I never had

4     a conversation with anyone at 50CAN about it.  That's

5     the most I know.

6          MR. WRIGHT:   Q   Were there any written

7     correspondence between yourself and anyone at

8     StudentsFirst prior to this meeting regarding what was

9     going to be discussed at the meeting?

10     A    It's possible.  I don't recall one offhand.

11     The only person that would likely be between me and

12     myself and Jim Blew.  But at that point I was speaking

13     to him predominantly over the phone just because it was

14     easier, frankly.  We had a lot of moving parts.  And I

15     don't recall ever writing anything to him or anybody

16     else about it.  So, no, I can't be certain one way or

17     the other.

18     Q    Sure.

19          During those phone calls prior to the meeting,

20     did Jim Blew ask you to convey any particular message

21     to the landlord at the meeting?

22     A    No.  Not necessarily.  You know, again, I

23     think I was more of a secondary role in this.  I think

24     it was more predominantly -- I'm sure there -- I would

25     guess there was conversations between him and Deanna

Page 88

Exhibit No. 3

```
 1                UNITED STATES DISTRICT COURT
 2               EASTERN DISTRICT OF CALIFORNIA
 3                     SACRAMENTO DIVISION
 4
 5   HALE BROS. INVESTMENT         )
     COMPANY, LLC, a California )
 6   limited liability company, )
                                  )
 7               Plaintiff,       )
                                  )
 8        vs.                     )   No. 2:16-cv-02284-JAM-EFB
                                  )
 9   STUDENTSFIRST INSTITUTE, a )
     District of Columbia         )
10   non-profit corporation;      )
     50CAN, INC., a Connecticut )
11   corporation; and DOES 1      )
     through 50, inclusive,       )
12                                )
                 Defendants.      )
13   _____)
14
15             DEPOSITION OF DEANNA LORD
16                    VOLUME I
17             Sacramento, California
18            Monday, December 4, 2017
19
20
21
22
     Reported by:
23   KATHLEEN BACA
     CSR No. 10267
24   JOB No. 2766090B
25   Pages 1 -
```

Page 1

1          UNITED STATES DISTRICT COURT
2          EASTERN DISTRICT OF CALIFORNIA
3               SACRAMENTO DIVISION
4
5   HALE BROS. INVESTMENT        )
    COMPANY, LLC, a California )
6   limited liability company, )
                                )
7               Plaintiff,      )
                                )
8        vs.                    )   No. 2:16-cv-02284-JAM-EFB
                                )
9   STUDENTSFIRST INSTITUTE, a )
    District of Columbia        )
10  non-profit corporation;     )
    50CAN, INC., a Connecticut )
11  corporation; and DOES 1     )
    through 50, inclusive,      )
12                              )
                Defendants.     )
13  _____ )
14
15
16
17          Deposition of DEANNA LORD, Volume I,
18          taken on behalf of Defendant, at
19          100 Howe Avenue, Suite 208 South,
20          Sacramento, California, beginning at
21          1:16 p.m. and ending at 5:54 p.m. on
22          Monday, December 4, 2017, before
23          KATHLEEN BACA, Certified Shorthand
24          Reporter No. 10267.
25

                                          Page 2

```
 1    APPEARANCES:

 2

 3    For Plaintiff:

 4          SMITH, McDOWELL & POWELL

 5          BY:  BRANDON T. WRIGHT

 6          Attorney at Law

 7          100 How Avenue, Suite 208 South

 8          Sacramento, California 95825

 9          916.569.8100

10          bwright@smplawcorp.com

11

      For Defendants:

12          PERKINS COIE

13          BY:  PATRICK S. THOMPSON

14          Attorney at Law

15          505 Howard Street, Suite 1000

16          San Francisco, California 94105-3204

17          415.344.7068

18          PatrickThompson@perkinscoie.com

19

20

21

22

23

24

25

                                        Page 3
```

```
1                    I N D E X

2                                              PAGE

3    EXAMINATION BY MR. WRIGHT                   5

4    EXAMINATION BY MR. THOMPSON                139

5

6

7                  E X H I B I T S

8    NUMBER           DESCRIPTION             PAGE

9    Exhibit 52   Subpoena with attachment      12

10   Exhibit 53   E-mail and attachment Bates   79

11                stamped SMP000262 - SMP00275

12   Exhibit 54   E-mails Bates stamped SMP000276  82

13                - SMP000278

14   Exhibit 55   Document produced by Ms. Lord at  84

15                deposition

16   Exhibit 56   Schedule prepared by Ms. Lord    127

17   Exhibit 57   List of files produced by Ms. Lord  132

18                at deposition

19   Exhibit 58   Schedules prepared by Ms. Lord   133

     Exhibit 59   Ms. Lord's notes                139

20

21   Previously marked confidential exhibits attached under

     separate cover: Exhibit 10, Exhibit 28, Exhibit 46

22

     Previously marked exhibits attached: Exhibit 3, Exhibit 4,

23   Exhibit 9, Exhibit 11, Exhibit 12, Exhibit 13, Exhibit 14,

     Exhibit 16, Exhibit 18, Exhibit20, Exhibit 24, Exhibit 25,

24   Exhibit 26, Exhibit 29, Exhibit 31, Exhibit 35, Exhibit 44,

25   Exhibit 49

                                          Page 4
```

```
 1            Sacramento, California, Monday, December 4, 2017

 2                          1:16 p.m.

 3

 4                        DEANNA LORD,

 5          having been first duly sworn, was examined and

 6                      testified as follows:

 7

 8                  EXAMINATION BY MR. WRIGHT

 9            MR. WRIGHT:  All right.  Thank you for coming

10      in today.  Sorry to drag you in here.

11            So my name is Brandon Wright and I'm the

12      attorney for the plaintiff in the action, Hale Bros.

13      Investment Company.

14        Q    As a preliminary matter, can you state and

15      spell your name for the record?

16        A    Deanna Lord.  D-e-a-n-n-a, L-o-r-d.

17        Q    Thank you.

18             Have you been deposed before?

19        A    Yes.

20        Q    How many times?

21        A    One deposition that was over the course of two

22      days.

23        Q    When was that?

24        A    2001-ish.

25        Q    What was the nature of that case?
```

Page 5

1      Q    Did it dissolve prior to July 1st, 2016?

2      A    No.

3      Q    When were you first aware that the company was

4  going to be dissolving?

5      A    I knew you were going to ask that and I don't

6  know.

7      Q    Do you have a sense of maybe a month that it

8  occurred that you were first aware?

9           MR. THOMPSON:  Objection.  Lacks foundation.

10          You may answer.

11          THE WITNESS:  I know the timing only with

12  reference to a press release that came out.  And I

13  remember it was just two to three weeks before that

14  press release, I think, that I became aware of it.  Or

15  maybe I should say -- yes.  That's true.

16          MR. WRIGHT:  Q  Okay.

17     A    And I don't know when the press release was.

18     Q    Okay.  So there was a press release that came

19  out at some point while you were an employee of

20  StudentsFirst?

21     A    Right.

22     Q    And it's your testimony that roughly two to

23  three weeks before that press release came out, you

24  were first aware that the -- that StudentsFirst would

25  be dissolved.  Correct?

Page 21

```
 1        A    I believe so.  To the best of my recollection.
 2    True.
 3        Q    Okay.  Sure.
 4             During your employment with StudentsFirst,
 5    were you always based out of California?
 6        A    Yes.
 7        Q    And did you always work out of the 825 K
 8    Street location?
 9        A    Yes.
10        Q    As a consultant, do you have a place that you
11    rent and work out of?
12        A    Usually it's my home.  So I guess you could
13    say yes, because I rent my home.
14        Q    Fair enough.
15             Are you employed anywhere else -- I'm sorry.
16    Are you currently employed by anyone?
17        A    Yes.
18        Q    Who is that?
19        A    Crowe, C-r-o-w-e, Horwath H-o-r-w-a-t-h.
20        Q    Okay.  Is that a consultant --
21        A    It's an accounting firm.  CPA firm.
22        Q    And what is your position there?
23        A    I am a consultant on the high-speed rail
24    California project.
25        Q    That must be interesting.
```

Page 22

```
 1              THE WITNESS:  I'm fine.

 2              MR. WRIGHT:  All right.  I'm handing you what

 3      has been previously marked Exhibit No. 31.

 4         Q    Do you recognize this document?

 5         A    Yes.

 6         Q    What is it?

 7         A    It's the press release with a date of

 8      March 29th.

 9         Q    Do you know who created this press release?

10         A    I believe it was Kellen.

11         Q    And do you know who -- at whose direction he

12      created it?

13         A    I'm not sure.

14         Q    Do you know why this press release was

15      created?

16         A    Because StudentsFirst winding down.

17         Q    When you say "winding down," what do you mean?

18         A    Dissolving.

19         Q    As of the date of this press release,

20      March 29th, 2016, it was -- it's your understanding is

21      that StudentsFirst was already starting a process to

22      dissolve?

23              MR. THOMPSON:  Objection form of the question.

24      Lacks foundation.  Assumes a legal conclusion.

25              You may answer.
```

Page 46

```
 1              THE WITNESS:  Yes.
 2              MR. WRIGHT:  Q  And what was your
 3    understanding about StudentsFirst dissolving based on?
 4        A    I don't remember specifically, but
 5    discussions.
 6        Q    Discussions with whom?
 7        A    The management team.
 8        Q    And do you recall when you had those
 9    discussions?
10        A    No.
11        Q    But you believe it might have been before --
12        A    Yes.  Yeah.
13              I could only piece together timing, if I
14    looked at a few key documents.
15        Q    Understood.
16              So this press release states that 50CAN's Marc
17    Magee will serve as the combined company CEO, while
18    50CAN's Vallay Varro will serve as its president.
19              Was that your understanding at the time?
20              MR. THOMPSON:  Objection to the form of the
21    question.  It misstates the statements in the document.
22              The witness can answer the question.
23              THE WITNESS:  My understanding comes directly
24    from the press release.
25              MR. WRIGHT:  Q  Okay.
```

Page 47

1    would probably continue in some capacity in California.

2        Q    Continue --

3        A    Continue with 50CAN.

4        Q    And do you know whether or not he did continue

5    in some capacity with 50CAN?

6        A    Yes.

7        Q    What did Jim continue to do for 50CAN?

8        A    I don't specifically know, other than just

9    generally being related to the State of California.

10       Q    Okay.  At the time that this release was made

11   in March of 2016, do you know if there had been any

12   determination as to what 50CAN was going to do with

13   regard to the K Street lease?

14       A    I don't know.

15       Q    You weren't part of any discussions prior to

16   March of 2016 regarding the K Street lease?

17       A    No.  Not that I recall.

18            MR. WRIGHT:  Okay.  I'm handing you what has

19   been previously marked as Exhibit No. 10.

20       Q    Do you recognize this document?

21       A    Yes.

22       Q    What is it?

23       A    It is the package that was created for the

24   board meeting that was to occur on around April 19th.

25       Q    Do you know who prepared this package?

Page 51

```
1       A    No.
2       Q    Okay.  Looking at Page 8 of the package.
3       A    Is it the time line?
4       Q    Correct.
5            If you look at Phase 1 --
6       A    Mm-hmm.
7       Q    -- the second bullet point says "April 4th to
8   29th, remaining national program staff will transfer
9   files, databases, software, equipment, et cetera.  Most
10  program staff severed on May 1st."
11           When it references "national program staff"
12  what is that in reference to?
13      A    Those employees at the headquarters at 825 K.
14      Q    So national program staff refers to
15  StudentsFirst employees who work out of 825?
16      A    That's my recollection.
17      Q    Okay.  And this references a transfer of
18  files, databases, software, equipment, et cetera.
19           Do you know whether or not files were
20  transferred from StudentsFirst between April 4th and
21  April 29th?
22      A    I can only assume that they were.  I don't
23  have direct knowledge.
24      Q    Okay.  Do you have direct knowledge of any
25  assets transferred between StudentsFirst and 50CAN
```

Page 53

```
1       Q     Second bullet point says "July to
2   September 1st, remaining assets moved to 50CAN."
3             Do you know what remaining assets this refers
4   to?
5       A     I think I do.
6       Q     Okay.  Which assets?
7       A     I believe it was primarily cash and then maybe
8   something related to the system that wasn't -- wasn't
9   of value but was an information transfer.
10      Q     Okay.
11      A     Like the server that all the documents were on
12  or something like that.
13      Q     Okay.  So was all of StudentsFirst's available
14  cash transferred to 50CAN?
15      A     Was available cash?  I ultimately don't know.
16      Q     Was any of StudentsFirst's cash transferred to
17  50CAN?
18      A     Yes.
19      Q     Do you recall the dates of those transfers?
20      A     The documents will say.
21      Q     Okay.  Do you know whether there were any
22  assets of StudentsFirst that were not transferred to
23  50CAN?
24      A     There were some assets that were left at the
25  825 K location.  And I believe there were computers
```

Page 58

1   that didn't have a material fair market value, so those

2   went with the employees -- or former employees.

3           So the furniture, fixtures, of course, they

4   sold them.  That's what I recall.

5       Q    Okay.  So it's your understanding that the

6   remaining assets, other than those few we just talked

7   about, were transferred to 50CAN?

8       A    Yes.

9       Q    Okay.  And then the third bullet point under

10  "Closure" says "September 1st entities set to

11  officially dissolve."

12          Do you know whether that occurred?

13      A    I don't know if it happened on that date.

14      Q    Do you know whether the entities did, in fact,

15  dissolve?

16      A    I assume that they did.  But I didn't go to

17  the Secretary of State Web site to see.

18      Q    Okay.

19      A    And no one showed me any documents to say

20  that.

21      Q    It says "entities" plural.

22      A    Mm-hmm.

23      Q    Is it referring to StudentsFirst and

24  StudentsFirst Institute?

25      A    I believe so, yes.

Page 59

```
 1              Do you know what changes to the organization
 2   Kellen is referring to?
 3        A     The intent to merge or transfer assets to
 4   50CAN.
 5        Q     And had those changes already occurred as of
 6   the date of this e-mail?
 7        A     Had what changes occurred?
 8        Q     You said that the changes referenced in this
 9   e-mail refer to the intent to merge or transfer assets.
10              Had StudentsFirst and 50CAN merged or
11   transferred assets as of April 25th, 2016?
12        A     I believe the e-mail references -- it's
13   forward looking.
14        Q     Okay.  And in the e-mail it also says "It is
15   our intent to vacate the building prior to the
16   termination of our lease."
17              Is the building referring to 825 K Street?
18        A     Yes.
19        Q     And is the lease referring to the lease
20   between StudentsFirst and 50CAN -- I'm sorry --
21   studentsFirst and Hale Bros.?
22        A     Yes.
23        Q     So was it your understanding at the time that
24   this e-mail was sent, April 25th, 2016, that it was
25   StudentsFirst intent to -- as Kellen puts in his
```

Page 63

1    words -- vacate the building prior to the termination
2    of the lease?
3        A    Yes.
4        Q    Okay.  Do you recall when that determination
5    to vacate the premises occurred?
6            MR. THOMPSON:  Objection to the form of the
7    question.  States facts not in evidence.  Foundation.
8            The witness can answer.
9            THE WITNESS:  No, I don't.
10           And I want to set the stage a little bit so
11   this makes more sense.
12           I wasn't informed of some of the discussions
13   that you would typically think the head of finance
14   would be informed about so...
15           MR. WRIGHT:  Q  Okay.  What would a head of
16   finance typically be informed about that you believe
17   you were not informed about?
18       A    Final decisions on what is being done with the
19   organization.
20       Q    So you weren't being informed about the final
21   decisions of StudentsFirst, about what was going to be
22   done with StudentsFirst going forward?
23       A    Generally, no.
24       Q    Okay.  You said "generally no."  Were you
25   somewhat involved in those decisions?

Page 64

1    landlord -- I'm not sure how I should refer to them.
2           Did you inform the representatives of Hale
3    Bros. that StudentsFirst had merged its business with
4    50CAN?
5           MR. THOMPSON:  Objection.  Form of the
6    question.
7           You may answer.
8           THE WITNESS:  We talked about leaving.  I
9    don't know specifically what form we talked about at
10   the meeting.  I don't know if we said we were merging
11   or changing the organization.  I don't specifically
12   recall what we said.
13          MR. WRIGHT:  Q  At that meeting, did you
14   inform the representative of Hale Bros. that
15   StudentsFirst would be dissolving its business?
16       A    I think --
17          MR. THOMPSON:  Objection to the form of the
18   question.  Assumes a legal conclusion.
19          You can answer.
20          THE WITNESS:  I think that we did.
21          MR. WRIGHT:  Q  Did you provide the
22   representatives of Hale Bros. a date by which you
23   thought StudentsFirst would be dissolving?
24          MR. THOMPSON:  Same objections.
25          THE WITNESS:  We may have.

                                        Page 66

1           MR. WRIGHT:   Q  Do you recall that date?

2      A    No.

3      Q    Do you recall whether or not that date was in

4  2016?

5      A    I would have assumed at the time it was.  Yes.

6      Q    Okay.  Did you inform the representatives of

7  Hale Bros. that StudentsFirst would be transferring all

8  of its assets to a third party?

9           MR. THOMPSON:  Objection.  Assumes facts not

10  in evidence.

11          You may answer.

12          THE WITNESS:  I don't know if we said that we

13  would be transferring all assets.  I actually don't

14  remember precisely what we said.  Kellen took the lead

15  in the meeting and I didn't say a lot.

16          So when you say "you" -- you've been asking

17  questions "you."  I've been answering "you" as if you

18  were asking it whether it was Kellen or I --

19          MR. WRIGHT:  Q  Okay.

20      A    -- or me.

21      Q    Okay.  So Kellen took the lead --

22      A    Right.

23      Q    -- in a that meeting of April 29th, 2016?

24      A    Right.

25      Q    Okay.  And at that meeting with the landlord,

Page 67

1        A     It might not be precise, but yes.

2        Q     So in the case of StudentsFirst, you filed the

3     form.

4              Did you file a form because a significant

5     portion of its assets were transferred or because

6     assets were transferred due to a dissolution?

7              MR. THOMPSON:  Objection to form.

8              THE WITNESS:  Both.

9              MR. THOMPSON:  Foundation.

10             You may answer.

11             THE WITNESS:  Both.  They were concurrent -- I

12    can't think of the word.  They were concurrent.

13             MR. WRIGHT:  Q  Okay.  And the significant

14    assets that were transferred, were those transferred to

15    50CAN?

16       A     Yes.

17       Q     And the assets transferred in anticipation of

18    dissolution, were those transferred to 50CAN?

19       A     I think that requires a technical answer and I

20    would have to look at the tax return.

21       Q     Okay.

22       A     It would be so much easier to look at

23    documents.

24       Q     So when StudentsFirst filed its first tax

25    returns, did it have any assets remaining?

                                              Page 95

```
 1        A     I don't think -- no.

 2        Q     Okay.  Looking back at Exhibit 35, there is a

 3   list of liabilities that start on first page and extend

 4   to the second page.

 5              Do you see that?

 6        A     Yes.

 7        Q     Do you know whether or not these liabilities

 8   were transferred to 50CAN?

 9        A     I don't believe they were.

10        Q     And do you know what's meant by "deferred rent

11   payable"?

12        A     Yes.

13        Q     What's that?

14        A     That's the difference between cash that gets

15   paid out and the straight lining of the expense for

16   accounting purposes that will determine the lease.  And

17   that calculation is included in Exhibit 53 --

18        Q     Okay.

19        A     -- I believe, somewhere.

20              MR. WRIGHT:   Okay.  I'm handing you what's

21   been marked Exhibit No. 11.

22        Q     Do you recognize this document?

23        A     I recognize the subject matter.

24        Q     Okay.  What is that?

25        A     The list of assets proposed to be transferred
```

Page 96

```
 1        Q      Okay.

 2        A      But that would be part of the grant too would

 3   be to cover payroll costs.

 4        Q      Okay.  So there is an e-mail on that first

 5   page from Chris Tessone to yourself.

 6        A      Right.

 7        Q      And he says "Received a check from Teacher

 8   Town that is made out to StudentsFirst TN."

 9               What is Teacher Town?

10        A      I believe it was a program in Tennessee that

11   was set up by a grant.

12        Q      Okay.  And Chris' e-mail also says that "We

13   haven't concluded the agreement and moved over to the

14   StudentsFirst name."

15               Do you know what agreement he's referring to?

16        A      I think he's generally speaking to the Asset

17   Purchase Agreement or whatever form it was at that

18   time.

19        Q      Okay.  So if the Asset Purchase Agreement

20   hadn't been concluded, why was 50CAN receiving checks

21   for StudentsFirst Tennessee?

22               MR. THOMPSON:  Would you read that back,

23   please.

24               (Pending question read.)

25               MR. THOMPSON:  Thank you.
```

Page 100

```
 1              THE WITNESS:  I don't specifically recall,
 2    other than at this point I knew that the transaction
 3    was going to take place.  And I just don't remember the
 4    dates behind the formal transfer.  But apparently by
 5    that time there had already been discussions between
 6    50CAN and Jim.
 7              MR. WRIGHT:  Q  Okay.
 8        A    So I guess I was confident it would happen.
 9        Q    Is that also why funds in the amount of
10    300,000 were already being transferred to 50CAN as
11    well?
12        A    Yes.
13        Q    So as of at least April 18th, 2016 it was a
14    forgone conclusion that an Asset Purchase Agreement
15    would be entered into?
16              MR. THOMPSON:  Objection.  Form of the
17    question.
18              MR. WRIGHT:  Q  Is that correct?
19              MR. THOMPSON:  And lacks foundation.
20              THE WITNESS:  That was my opinion at the time.
21              MR. WRIGHT:  Q  What was that opinion based
22    on?
23        A    Discussions with Jim, primarily.
24        Q    When did you have those discussions?
25        A    I think I answered that earlier.  But around
```

Page 101

1                    (Recess taken 4:35 p.m. - 4:41 p.m.)

2              MR. WRIGHT:  All right.  We're back on the

3      record.

4              I have a few more documents to get through.

5      And I might ask you a few questions about some of

6      yours, but definitely not all of them.

7              I'm handing you what has been marked as

8      Exhibit No. 14.

9         Q    Do you recognize this document?

10        A    I do.

11        Q    What is it?

12        A    E-mail between Chris and I about the

13     inter-entity payable/receivable, and the structure of

14     the transaction between StudentsFirst and 50CAN.

15        Q    Okay.  What does the inter-entity

16     payable/receivable refer to?

17        A    The payable/receivable between StudentsFirst

18     and StudentsFirst Institute.

19        Q    Okay.  So that's that liability we discussed

20     earlier.  Correct?

21        A    Yes.

22        Q    Okay.

23        A    Although I think we looked at the receivable.

24     But yes.

25        Q    Okay.  And then as you said, the second part

                                          Page 105

1   of the agreement refers to one in which the transaction

2   between StudentsFirst and 50CAN would take.  Correct?

3       A    Right.

4       Q    And in your e-mail it says that you received

5   some information, one e-mail chain, where there are

6   references to -- and you list several bullet points,

7   including a technical merger, a stock sale, sale of the

8   organization, the impossibility of moving over the

9   inter-entity payable/receivable -- and on and on.

10      A    Can you tell I was ticked?

11      Q    What e-mail chain are you referring to?

12      A    I don't remember.

13      Q    Do you remember any individuals who were on

14  that e-mail chain?

15      A    It was probably Jim, among other people.  I

16  don't specifically remember.

17      Q    Do you happen to remember the date of the

18  e-mail chain?

19      A    No.  It would have been close to the date of

20  this e-mail, probably.  But other than that, no.

21      Q    Okay.  And when you say there are references

22  to technical merger, what do you mean by that?

23      A    I guess in the e-mail chain there must have

24  been -- there was discussion about the transaction

25  being structured and the ways listed here.  And those

Page 106

1    of it, PC, a lot of zeros, 95.  At the very top item --

2        A    Yes.

3        Q    -- it says "StudentsFirst/StudentsFirst

4    Institute Cost Sharing Agreement."

5            Do you know what that references?

6        A    Yes.  I believe it references sharing staff

7    and overhead costs that we previously talked about.  So

8    it's a formal agreement between the two entities to

9    share costs.

10       Q    Okay.  And on that cautionary agreement is

11   listed as an asset on this Exhibit A.  Correct?

12       A    Can you refer to a page?

13       Q    Sure.  The one we just looking at.

14            And if you turn to the previous page --

15       A    Yeah.  I gave up by this point.  It's

16   inaccurate.

17       Q    What is --

18       A    I don't know what else to say.

19       Q    Okay.  What's inaccurate about this?

20       A    Some of the items listed on here are clearly

21   not assets, at least from an accounting perspective.

22       Q    And do you know whether or not this cautionary

23   agreement between StudentsFirst and StudentsFirst

24   Institute was transferred to 50CAN?

25       A    It says that it -- that it is.  But that

                                              Page 116

1   you outlined before, but he thinks it should be a

2   contract with SF, not 50CAN."

3          What is Jim referring to in this e-mail?

4   A    Sorry.  Let me take a second.

5               (Witness reads exhibit.)

6          THE WITNESS:  I'm sorry.  I do not recall.

7          MR. WRIGHT:  It's okay.

8   Q    You testified earlier that you provided

9   consulting services to StudentsFirst after the

10  termination of your employment in July of 2016.

11  Correct?

12  A    Correct.

13  Q    Who paid you for those services?

14  A    StudentsFirst or StudentsFirst Institute.

15  Probably StudentsFirst.

16         And my -- I'm sorry --

17  Q    No.  Go ahead, please.

18  A    It just came to me.  My last invoice, I

19  believe, it was paid by 50CAN.

20  Q    What was the date of that invoice?

21  A    It was within the last three months.  I don't

22  recall specifically.

23  Q    So we are currently in December of 2017.  So

24  sometime around September of 2017 you believe you had

25  an invoice to 50CAN -- I'm sorry -- invoice to

                                        Page 122

```
 1    StudentsFirst that 50CAN paid.
 2           Is that correct?
 3       A    I believe so.  I would have to look at my
 4    records.
 5       Q    Was that invoice provided directly to
 6    StudentsFirst?
 7       A    Yes.  It was provided to Jim.
 8       Q    Okay.
 9       A    Well, so I don't know the answer.  It was
10    provided to Jim.
11       Q    Okay.  Did you provide monthly invoices for
12    services rendered?
13       A    The charges were monthly.  But I was not
14    timely always in invoicing them.
15       Q    Okay.
16       A    So it was based on work mostly.  And not a
17    regularly scheduled invoice.
18       Q    Okay.  And each of the invoices for consulting
19    service were to Jim Blew?
20       A    Yes.
21       Q    You testified earlier that Jim Blew was an
22    employee of 50CAN?
23       A    Right.
24       Q    And, sorry, I don't recall what dates, if any,
25    you specified for that.
```

Page 123

1      Q     There is a line item for Consulting Fees.   Are

2   those your consulting fees?

3      A     Yes.  As well as for Suzan.

4      Q     And, I'm sorry, Suzan's last name?

5      A     Christensen.

6      Q     Okay.  And you previously testified that you

7   thought, but were not certain, whether or not certain

8   funds were withheld from transfer to 50CAN to pay for

9   the -- I'm sorry -- for the benefit of Hale Bros.

10            Based on this cash retained for expenses

11   schedule, was any such amount withheld?

12      A     In this particular schedule, no.  There were

13   different iterations of this schedule.  And without

14   time stamps, I don't remember when this document is

15   from.

16      Q     Okay.  That's fair enough.

17            Okay.  This is relevant to our discussions

18   right now.

19            I'm handing you what's been marked Exhibit 29.

20            Do you recognize this document?

21      A     I do.

22      Q     Okay.  What is it?

23      A     It's the e-mail dated June 30th from me to

24   Chris at 50CAN.  Copies Jim, Angelia, and Suzan.

25      Q     Okay.  The e-mail references a total cash

Page 130

Exhibit No. 4



**Exhibit 10**

Vallay Varro <vallay.varro@50can.org>

## Fwd: Board Package for Tuesday, April 19th Meeting

2 messages

**Jim Blew** <jblew@studentsfirst.org>                                   Fri, Apr 15, 2016 at 9:16 PM
To: Marc Porter Magee <marc.magee@50can.org>, Vallay Varro <vallay.varro@50can.org>

Here's the package that went out. Please let me know if you have any questions. Enjoy the weekend,
Thanks, Jim

--------- Forwarded message ---------
From: **Jim Blew** <jblew@studentsfirst.org>
Date: Fri, Apr 15, 2016 at 6:03 PM
Subject: Board Package for Tuesday, April 19th Meeting
To: Dmitri Mehlhorn <dmitri@alumni.stanford.edu>, Gregory McGinity <gmcginity@broadfoundation.org>, Jalen Rose
<jrose005@gmail.com>, Joe Saunders <joesaundersoffice@gmail.com>, Michelle Rhee
<michelle@studentsfirst.org>, Rev Floyd Flake <cummingsc@allencathedral.org>, Roland Martin
<roland@rolandsmartin.com>
Cc: Cori Carlson <ccarlson@broadfoundation.org>, Helen Burrows <saundershomeoffice@gmail.com>, Michelle
Ruscitti-Miller <assistant@jalenrose.com>, MJ Schedule <mjschedule@studentsfirst.org>, Ranasha Ro Chittick
<ranasha@vidinovo.com>, Ranasha Ro Chittick <ro@sheektechnology.com>, Toi Salter <toi@rolandsmartin.com>,
Angelia Dickens <ADickens@studentsfirst.org>, Deanna Lord <dlord@studentsfirst.org>, Luis Buhler
<lbuhler@rockledgeassociates.com>

Your materials are attached for the StudentsFirst Board meeting next Tuesday, April 19 at 10 a.m. Pacific Time. We
will walk through them on the call. The dial-in number is on the title page.
If for any reason you're unable to attend, please let me know right away. It is particularly important that we have a
quorum to act on the transfer of assets to 50CAN.
Please feel free to call if you have questions before the meeting. I look forward to our discussion. Thanks,
Jim

--
**Jim Blew**, President
StudentsFirst
Office: (661) 222-3010
Cell: (661) 713-8836
Email: jblew@studentsfirst.org
28212 Kelly Johnson Pkwy., Suite 105
Valencia, CA 91355


--
**Jim Blew**, President
StudentsFirst
Office: (661) 222-3010
Cell: (661) 713-8836
Email: jblew@studentsfirst.org
28212 Kelly Johnson Pkwy., Suite 105
Valencia, CA 91355


📎  **StudentsFirst BoD 4.19.2016 vF with Appendix.pdf**
     310K

CONFIDENTIAL

PC00000411

**Marc Porter Magee** <marc.magee@50can.org>
To: Jim Blew <jblew@studentsfirst.org>
Cc: Vallay Varro <vallay.varro@50can.org>

Sat, Apr 16, 2016 at 3:03 PM

Thanks Jim.

[Quoted text hidden]
[Quoted text hidden]
<StudentsFirst BoD 4.19.2016 vF with Appendix.pdf>

CONFIDENTIAL

PC00000412

CONFIDENTIAL

studentsfirst

# Board of Directors

Tuesday, April 19, 2016
10:00 – 11:00 a.m. Pacific (1:00 p.m. Eastern)

studentsfirst

# Agenda

**Pacific Standard Time**

**10:00 – Welcome and Agenda Review** (Michelle)

**10:05 –Update on the StudentFirst/50CAN Merger** (Michelle & Jim)

**10:25 – Financial Update** (Luis & Deanna)

**10:35 – Governance & Merger Items** (Angelia)

    Minutes of last meeting

    Transfer of Assets

    Formal Dissolution

    Signature Authority

**10:55 – Executive Session** (Jim)

**11:00 – Adjourn**

CONFIDENTIAL

studentsfirst

PC00000456   2

CONFIDENTIAL

studentsfirst

PC00000458    4

CONFIDENTIAL

PC00000459

CONFIDENTIAL

# MERGER UPDATE

studentsfirst

PC00000460



CONFIDENTIAL

studentsfirst

CONFIDENTIAL

# Timeline

**Announce-ment**
- March 29: Announced merger (prematurely)
- March 29-April 1: Informed staff of individual implications

**Phase 1**
- April 16: Staff from SC and TN transferred to 50CAN.
- April 4-29: Remaining national program staff will transfer files, databases, software, equipment, etc. Most program staff severed on May 1.
- April 4: Severed some national and all state staff and consultants in AL, MI, MO, NV, and PA.

**Phase 2**
- June 1: SFNY becomes fully autonomous.
- June 1: Staff in GA and CA either severed or, if they can prove sustainability, transferred to 50CAN.

**Closure**
- July 1: Close Sacramento office. Finance and Legal teams severed.
- July – September 1: Remaining assets moved to 50CAN.
- September 1: Entities set to officially dissolve.

# Exhibit No. 5

10/20/2017                                         StudentsFirst Mail - Board meeting



Kellen Arno <karno@studentsfirst.org>

## Board meeting
2 messages

**Jim Blew** <jblew@studentsfirst.org>                                    Wed, Jan 13, 2016 at 5:20 PM
To: Kellen Arno <KArno@studentsfirst.org>, Luis Buhler <lbuhler@rockledgeassociates.com>, Tim Melton
<TMelton@studentsfirst.org>, Marc Porter Magee <marc.magee@50can.org>, Vallay Varro <vallay.varro@50can.org>, Lisa
Gibes <lisa.gibes@50can.org>, Ed Kirby <ek@edkirby.com>

Our board today enthusiastically approved exploring a formal merger. The conversation was upbeat, and the only real
concern they expressed was about needing to manage communications around it. Gregory McGinity and Dmitri Mehlhorn
were particularly articulate about the advantages.
Michelle might have additional observations.
Full speed ahead. Thanks,
Jim



**Jim Blew**, President
StudentsFirst
Office: (661) 222-3010
Cell: (661) 713-8836
Email: jblew@studentsfirst.org
28212 Kelly Johnson Pkwy., Suite 105
Valencia, CA 91355

**Marc Porter Magee** <marc.magee@50can.org>                              Wed, Jan 13, 2016 at 5:59 PM
To: Jim Blew <jblew@studentsfirst.org>
Cc: Kellen Arno <KArno@studentsfirst.org>, Luis Buhler <lbuhler@rockledgeassociates.com>, Tim Melton
<TMelton@studentsfirst.org>, Vallay Varro <vallay.varro@50can.org>, Lisa Gibes <lisa.gibes@50can.org>, Ed Kirby
<ek@edkirby.com>

Great. So glad to hear that. - Marc

Sent from my iPhone
[Quoted text hidden]

Exhibit __44__
Witness __ABA__
Date __12-4-17__
K. Baca, CSR #10267

CONFIDENTIAL

PC00000185

# Exhibit No. 6

Vallay Varro <vallay.varro@50can.org>

**50CAN**
GREAT SCHOOLS CHANGE EVERYTHING

## Merged structure discussion doc

18 messages

**Jim Blew** <jblew@studentsfirst.org>                                                                                   Sun, Dec 13, 2015 at 7:13 PM
To: Marc Porter Magee <marc.magee@50can.org>, Vallay Varro <vallay.varro@50can.org>

Attached is a discussion document about the potential new structure for the merged organization. At this point, I've focused on the national support team. I stopped short of trying to identify people for the various responsibilities. I'll be sharing this with my team to get their reactions too.

Let me know if you have any availability to discuss on Monday or Tuesday, 1214-15. I'm tied up in Sacramento meetings on Wednesday and Thursday.

Thanks,

--
**Jim Blew,** President
StudentsFirst
Office: (661) 222-3010
Cell: (661) 713-8836
Email: jblew@studentsfirst.org
28212 Kelly Johnson Pkwy., Suite 105
Valencia, CA 91355

**Merged Structure Discussion Document_12.12.15.docx**
27K

**Marc Porter Magee** <marc.magee@50can.org>                                                              Sun, Dec 13, 2015 at 7:23 PM
To: Jim Blew <jblew@studentsfirst.org>
Cc: Vallay Varro <vallay.varro@50can.org>

Thanks Jim. Will send over times soon. Should be able to make Monday or Tuesday work.

Sent from my iPhone
[Quoted text hidden]

        <Merged Structure Discussion Document_12.12.15.docx>

**Marc Porter Magee** <marc.magee@50can.org>                                                              Sun, Dec 13, 2015 at 7:48 PM
To: Vallay Varro <vallay.varro@50can.org>

I'm pretty open. What times work for you?

Begin forwarded message:

**From:** Jim Blew <jblew@studentsfirst.org>
**Date:** December 13, 2015 at 7:13:36 PM EST
**To:** Marc Porter Magee <marc.magee@50can.org>, Vallay Varro <vallay.varro@50can.org>
**Subject: Merged structure discussion doc**
[Quoted text hidden]

CONFIDENTIAL

Exhibit No. 7

DocuSign Envelope ID: 5EA0889E-7194-4D2F-B167-A506ED86DD59



salesforce.org

## ASSIGNMENT AGREEMENT

| | | |
|---|---|---|
| **Assignor:** | Insert Name Here | *(Full legal name of salesforce.org customer that is assigning agreement(s) or is being acquired)* |
| **Assignee:** | Insert Name Here | *(Full legal name of entity receiving assignment of agreement(s) or acquiring salesforce.org customer)* |

| *Type "X" next to all that apply* | **Agreement(s) being Assigned** |
|---|---|
| | Online Master Subscription Agreement: [X] |
| | Signed Master Subscription Agreement dated: [X] |
| | Order Forms under Quote and/or Contract(s) No's: [X] |

| **Assignment Effective Date:** | |
|---|---|
| XX-XX-XXXX | *(If merger or acquisition, the closing date; otherwise, the date the assignment becomes effective)* |

This Assignment Agreement is entered to as of the Assignment Effective Date above, among the Assignor named above, the Assignee named above and salesforce.org ("salesforce.org"). Capitalized terms not defined herein shall have the meanings given to them in the assigned agreements.

### Background

Assignor and salesforce.org are parties to the agreements identified above, which include all order forms under the Quotes and/or Contracts identified above (collectively the "Assigned Agreements"). Assignor desires to assign the Assigned Agreements to Assignee, Assignee desires to accept such assignment, and salesforce.org wishes to consent to such assignment, subject to the terms and conditions below.

### Agreement

1. **Assignment.** As of the Assignment Effective Date, Assignor hereby assigns all of its rights and delegates all of its obligations under the Assigned Agreements to Assignee. This assignment includes Assignor's assignment to Assignee of all Customer Data of Assignor in the salesforce.org Service, including all right, title and interest in and to all intellectual property rights in such Customer Data. Following the Assignment Effective Date, Assignor shall no longer have access, and Assignee shall have full access, to the Customer Data. As of the Assignment Effective Date, all references to Assignor in the Assigned Agreements shall be deemed to refer to Assignee. If no Master Subscription Agreement is being assigned hereunder, then starting on the Assignment Effective Date the Assigned Agreements will be governed by the Master Subscription Agreement previously signed by Assignee and salesforce.org, or, if Assignee and salesforce.org have not signed a Master Subscription Agreement, by salesforce.org's online Master Subscription Agreement.

2. **Acceptance of Assignment.** Assignee hereby accepts the assignment of the Assigned Agreements by Assignor in accordance with the above terms, and agrees to be bound by the Assigned Agreements as of the Assignment Effective Date, as if Assignee were an original party thereto.

Revision date: May 15, 2011

Confidential

CONFIDENTIAL

DocuSign Envelope ID: 5EA0889E-7194-4D2F-B167-A506ED86DD59

3. **Consent by salesforce.org.** In consideration of the foregoing, salesforce.org hereby consents to the assignment of the Assigned Agreements by Assignor to Assignee. Salesforce.org reserves the right to require adjustment to the payment terms under the Assigned Agreements based on Assignee's creditworthiness.

4. **Effectiveness.** Upon signature by Assignor, Assignee and salesforce.org, this Assignment Agreement shall be effective as of the Assignment Effective Date above.

Assignor:   StudentsFirst

By:   *Angelia Dickens*

Name:   Angelia Dickens

Date:   4/26/2016

Assignee:   SO CAN, Inc.

By:   *[signature]*

Name:   Marc Magee

Date:   April 26, 2016

salesforce.org

By:   *Cathy Lai*

Name:   Cathy Lai

Date:   2/29/2016

CONFIDENTIAL

PC00000082

Exhibit No. 8

1  SMITH, McDOWELL & POWELL,
   A LAW CORPORATION
2  C. Jason Smith, SBN 237966
   Brandon T. Wright, SBN 294305
3  100 Howe Avenue, Suite 208 South
   Sacramento, CA 95825
4  Telephone: (916) 569-8100
   Facsimile: (916) 848-3777
5
   Attorneys for Plaintiff,
6  Hale Bros. Investment Company, LLC

7

8                     UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10                         SACRAMENTO DIVISION



11  HALE BROS. INVESTMENT COMPANY,        )  Case No.:  2:16-cv-02284-JAM-EFB
    LLC, a California limited liability company,  )
12                                        )  **PLAINTIFF HALE BROS.**
                                          )  **INVESTMENT COMPANY, LLC'S**
13           Plaintiff,                   )  **NOTICE OF DEPOSITION OF PERSON**
                                          )  **MOST KNOWLEDGEABLE OF 50CAN,**
14  vs.                                   )  **INC. AND REQUEST FOR**
                                          )  **PRODUCTION OF DOCUMENTS**
15                                        )
16  STUDENTSFIRST INSTITUTE, a District of  )
    Columbia        non-profit    corporation;  )  Date: November 29, 2017
17  STUDENTSFIRST, a District of Columbia non-  )  Time: 2:00 p.m.
    profit corporation; 50CAN, INC., a Connecticut  )  Location: 1250 I Street, NW, Suite 350,
18  corporation; and DOES 1 through 50 inclusive.  )  Washington, D.C. 20005
                                          )
19                                        )
             Defendants.                  )
20                                        )
                                          )
21  AND RELATED CROSS CLAIMS              )
                                          )
22                                        )

23  TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

24       NOTICE IS HEREBY GIVEN that, pursuant to the Federal Rules of Civil Procedure

25  ("Rule"), Rule 30(b), Plaintiff HALE BROS. INVESTMENT COMPANY, LLC ("Plaintiff") will

26  take the deposition of PERSON MOST KNOWLEDGEABLE ("PMK") for Defendant, 50CAN,

27  INC., a Connecticut corporation ("Deponent") on November 29, 2017 at 2:00 p.m. at 1250 I Street,

28

                                          1

1   NW, Suite 350, Washington, D.C. 20005. This deposition shall be taken before a certified

2   stenographic reporter authorized to administer oaths.

3       NOTICE IS FURTHER GIVEN that the deposition of Deponent will be taken pursuant to

4   Rule 30 of the Federal Rules of Civil Procedure, before a Notary Public or person authorized to

5   administer oaths.

6       NOTICE IS FURTHER GIVEN that Plaintiff intends to record the testimony at the above-

7   described deposition by stenographic method, by audiotape or videotape, and through the instant

8   visual display of testimony.

9       NOTICE IS FURTHER GIVEN that Plaintiff intends to reserve the right to use the

10  videotaped deposition at trial. This deposition will be taken for purposes of discovery, for use at

11  trial, and for all other permissible purposes under the Federal Rules of Civil Procedure.

12      NOTICE IS FURTHER GIVEN THAT, pursuant to Rule 34 of the Federal Rules of Civil

13  Procedure, Deponent is required to produce at this limited deposition, the original writings,

14  records, documents, things and other items listed in **Exhibit A** hereto. If originals are not available,

15  Deponent is requested to produce copies.

16  ## MATTERS ON WHICH EXAMINATION IS REQUESTED

17      Plaintiff, HALE BROS. INVESTMENT COMPANY, LLC requests that Defendant,

18  50CAN, INC., produce the person or persons most knowledgeable or most qualified to respond to

19  questions relating to the following categories:

20      1.   The facts and circumstances surrounding 50CAN, INC.'s (as used herein,

21  "50CAN" shall mean Defendant, 50CAN, Inc., a Connecticut corporation, and its agents,

22  subsidiaries, officers, employees, attorneys, accountants, consultants, subcontractors,

23  predecessors, assigns, investigators, insurers, successor and/or other PERSON(s) affiliated with or

24  acting on its behalf) MERGER (as used herein, "MERGER" shall mean the combination, joining,

25  or transferring of one or more business entities, or portions thereof, into a single business entity,

26  or portion thereof, including put not limited to the transfer of certain programs) with Defendant,

27  STUDENTSFIRST, a District of Columbia non-profit corporation.

28  ///

2

PLAINTIFF HALE BROS. INVESTMENT COMPANY, LLC'S NOTICE OF DEPOSITION OF PMK OF
50CAN, INC. AND REQUEST FOR PRODUCTION OF DOCUMENTS

2.    The facts and circumstances surrounding 50CAN, INC.'s MERGER with Defendant, STUDENTSFIRST INSTITUTE, a District of Columbia non-profit corporation.

3.    The facts and circumstances surrounding the timing of 50CAN, INC.'s MERGER with STUDENTSFIRST, a District of Columbia non-profit corporation.

4.    The facts and circumstances surrounding the timing of 50CAN, INC.'s MERGER with STUDENTSFIRST INSTITUTE, a District of Columbia non-profit corporation.

5.    The facts and circumstances, including, without limitation, the timing, surrounding 50CAN, INC.'s receipt of any of STUDENTSFIRST's assets.

6.    The facts and circumstances, including, without limitation, the timing, surrounding 50CAN, INC.'s receipt of any of STUDENTSFIRST INSTITUTE's assets.

7.    The facts and circumstances, including, without limitation, the timing, surrounding the obligations and liabilities of STUDENTSFIRST 50CAN, INC. has taken on or otherwise assumed.

8.    The facts and circumstances, including, without limitation, the timing, surrounding the obligations and liabilities of STUDENTSFIRST INSTITUTE 50CAN, INC. has taken on or otherwise assumed.

9.    The facts and circumstances, including without limitation, the timing, surrounding the transfer of STUDENTSFIRST's remaining liabilities, including, without limitation, its liabilities under the LEASE (as used herein, "LEASE" shall mean the Office Lease entered into between STUDENTSFIRST and STUDENTSFIRST INSTITUTE and PLAINTIFF (as used herein, "PLAINTIFF" shall mean and refer to Plaintiff, Hale Bros. Investment Company, LLC, a California limited liability company, and its agents, subsidiaries, officers, employees, attorneys, accountants, consultants, subcontractors, predecessors, assigns, investigators, insurers, successor and/or other PERSON(s) affiliated with or acting on its behalf).

10.    The facts and circumstances, including without limitation, the timing, surrounding the transfer of STUDENTSFIRST INSTITUTE's remaining liabilities, including, without limitation, its liabilities under the LEASE.

11.    The qualifications and the experience of the person most knowledgeable ("PMK")

3

12.     The process by which the PMK became most knowledgeable about the subjects identified herein.

13.     Any and all communications between 50CAN, INC. and STUDENTSFIRST regarding the LEASE.

14.     Any and all communications between 50CAN, INC. and STUDENTSFIRST INSTITUTE regarding the LEASE

Dated: November 7, 2017

SMITH, McDOWELL & POWELL,
A LAW CORPORATION


C. JASON SMITH
BRANDON T. WRIGHT
Attorneys for Plaintiff,
HALE BROS. INVESTMENT COMPANY, LLC

PLAINTIFF HALE BROS. INVESTMENT COMPANY, LLC'S NOTICE OF DEPOSITION OF PMK OF
50CAN, INC. AND REQUEST FOR PRODUCTION OF DOCUMENTS

## EXHIBIT A

**I.**   **DEFINITIONS**

For the purpose of this request, the following definitions shall apply:

1.   The terms "Deponent", "YOU", and "YOURS", as used herein, refer to Deponent, Christopher A. Tessone, and his agents, subsidiaries, officers, employees, attorneys, accountants, consultants, subcontractors, predecessors, assigns, investigators, insurers, successor and/or other PERSON(s) affiliated with or acting on his behalf.

2.   The term "PLAINTIFF" as used herein refers to Plaintiff, Hale Bros. Investment Company, LLC, a California limited liability company, and its agents, subsidiaries, officers, employees, attorneys, accountants, consultants, subcontractors, predecessors, assigns, investigators, insurers, successor and/or other PERSON(s) affiliated with or acting on its behalf.

3.   The terms "DOCUMENT" and/or "DOCUMENTS", as used herein, include any "writing", "recording", or "photograph" as defined by Rule 1001 of the Federal Rules of Evidence, transcriptions, notes, computer disks, electronic data files, information stored on computer or on any type of computer readable storage media and capable of being reproduced by printed representation or any other form of physical evidence. Specifically, the terms "DOCUMENT" and/or "DOCUMENTS", as used herein, include any matter or tangible thing containing or recording any electronic data, handwriting, typewriting, printing, photographing, or any other means of recording on ant tangible thing, any form of communication, including letters, words, pictures, sounds, or symbols, or combinations thereof, and it further includes any oral communication later reduced to writing or confirmed by writing. By way of example only, the terms "DOCUMENT" and/or "DOCUMENTS", as used herein, include, but are not limited to any letter, correspondence, note, book, pamphlet, article, bulletin, directive, review, report, publication, memorandum, diary, log, test, analysis, study, projection, check, invoice, receipt, bill, audit report, contract, agreement, work paper, calendar, envelope, paper, telephone message, post-it notes, tapes, drawings, charts, accounts, graphs, ledgers, statements, reports, financial data, oral communications reduced to writing or confirmed by writing, meeting agendas, meeting notes, and all other writings or communications, including all non-identical copies, drafts, preliminary

5

sketches, no matter how produced or maintained in YOUR actual or constructive possession, custody or control or of which YOU have knowledge or the existence of, and whether prepared, published, or released by you or by any other person or entity. The terms "DOCUMENT" and/or "DOCUMENTS", as used herein, shall also include all information generated, recorded, preserved or maintained by electronic means, including information generated, recorded, preserved or maintained on computer hard drives, floppy disks, e-mail, computer files, deleted computer files, mirror image files, file menus, file directories, file distribution lists, acknowledgment of receipt files, backup computer files, magnetic tapes, computer archives, computer memory, computer disk, computer card, film, microfilm, microfiche, microforms, photographs, or any other form of computer readable storage media. **All electronic information and electronic data should be produced in its useful form or translated into a usable form for production.** Without limitation on the foregoing, the terms "DOCUMENT" and/or "DOCUMENTS" shall include any copy that differs in any respect from the original or any other version of the DOCUMENT, such as, but not limited to, copies containing notations, insertions, corrections, redlining, marginal notes, recommendations, drafts, or any other variation.

4. The term "COMMUNICATIONS", as used herein, means, and includes, any contact or act by which any information or knowledge is transmitted or conveyed between two (2) or more persons including written contact (by such means as letters, memoranda, telegrams, electronic mail, telexes, facsimiles, tape recordings, computer transmissions, computer readable recordings, e-mail, text message, instant messenger, online chat or any other DOCUMENTS), oral contact (by such means as face-to-face communications or telephonic conversations), or any other transfer of information, written or otherwise.

5. The terms "RELATE TO" or "RELATING TO" means, with respect to a given subject, constituting, embodying, referencing, reflecting, identifying, stating, referring to, evidencing, regarding, and/or being in any way relevant to the subject.

///

///

///

6

## II.   GENERAL INSTRUCTIONS

### A. Documents Requested

1.     The requests set out herein call for all DOCUMENTS in Deponent's actual or constructive possession, custody, control or care, including but not limited to, those DOCUMENTS in the actual or constructive possession, custody, control or care of any lawyer, agent or other representative of Deponent.

2.     YOU are further requested to identify any DOCUMENT called for by these requests if you know it to be in the possession of Deponent or his attorneys.

3.     If YOU subsequently become aware of any DOCUMENT called for by the requests set out herein, YOU are requested to provide a copy of that DOCUMENT to PLAINTIFF or to identify it, if YOU know it to be in the possession of PLAINTIFF or its attorneys.

### B. Documents Withheld

1.     If any DOCUMENT is withheld under a claim of privilege or other protection, so as to aid the court and the parties hereto to determine the validity of the claim of privilege or other protection, provide the following information with respect to any such DOCUMENT:

    a.   The identity of the person(s) who prepared the DOCUMENT, who signed it, and over whose name it was sent out or issued;

    b.   The identity of the person(s) to whom the DOCUMENT was directed;

    c.   The nature and substance of the DOCUMENT with sufficient particularity to enable the court and parties hereto to identify the DOCUMENT;

    d.   The date of the DOCUMENT;

    e.   The identity of the person who has custody of, or control over, the DOCUMENT and each copy thereof;

    f.   The identity of each person to whom copies of the DOCUMENT were furnished;

    g.   The number of pages in the DOCUMENT;

    h.   The basis on which any privilege or other protection is claimed; and

    i.   Whether any non-privileged matter is included in the DOCUMENT.

**C. Partial Production**

If YOU object to a particular request, or portion thereof, YOU must produce all DOCUMENTS called for which are not subject to that objection. Similarly, whenever a DOCUMENT is not produced in full for some other reason, state with particularity the reason(s) it is not being produced in full, and describe, to the best of YOUR knowledge, information and belief, and with as much particularity as possible, those portions of the DOCUMENT which are not produced.

**D. Orderly Response**

Please produce the DOCUMENTS called for herein either as they are kept in the usual course of YOUR affairs, or organize them in such a manner as will facilitate their identification with a particular request(s) to which they are responsive.

**III.   DOCUMENTS REQUIRED TO BE PRODUCED**

1.      Any and all DOCUMENTS RELATING TO 50CAN's (as used herein, "50CAN" shall mean Defendant, 50CAN, Inc., a Connecticut corporation, and its agents, subsidiaries, officers, employees, attorneys, accountants, consultants, subcontractors, predecessors, assigns, investigators, insurers, successor and/or other PERSON(s) affiliated with or acting on its behalf) MERGER (as used herein, "MERGER" shall mean the combination, joining, or transferring of one or more business entities, or portions thereof, into a single business entity, or portion thereof, including put not limited to the transfer of certain programs) with STUDENTSFIRST (as used herein, "STUDENTSFIRST" shall mean Defendant, STUDENTSFIRST, a District of Columbia non-profit corporation, and its agents, subsidiaries, officers, employees, attorneys, accountants, consultants, subcontractors, predecessors, assigns, investigators, insurers, successor and/or other PERSON(s) affiliated with or acting on its behalf).

2.      Any and all DOCUMENTS RELATING TO 50CAN's MERGER with STUDENTSFIRST INSTITUTE (as used herein, "STUDENTSFIRST INSTITUTE" shall mean Defendant, STUDENTSFIRST INSTITUTE, a District of Columbia non-profit corporation, and its .agents, subsidiaries, officers, employees, attorneys, accountants, consultants, subcontractors,

8

1  predecessors, assigns, investigators, insurers, successor and/or other PERSON(s) affiliated with or

2  acting on its behalf").

3      3.      Any and all DOCUMENTS RELATING to 50CAN's assumption of

4  STUDENTSFIRST's obligations.

5      4.      Any and all DOCUMENTS RELATING to 50CAN's assumption of

6  STUDENTSFIRST's liabilities.

7      5.      Any and all DOCUMENTS RELATING to 50CAN's assumption of

8  STUDENTSFIRST INSTITUTE's obligations.

9      6.      Any and all DOCUMENTS RELATING to 50CAN's assumption of

10  STUDENTSFIRST INSTITUTES's liabilities.

11      7.      Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST

12  RELATING TO the PREMISES (as used herein, "PREMISES" shall mean the office space located

13  at 825 K Street, Sacramento, CA 95814).

14      8.      Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST

15  INSTITUTE RELATING TO the PREMISES.

16      9.      Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST

17  RELATING TO PLAINTIFF.

18      10.     Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST

19  INSTITUTE RELATING TO PLAINTIFF.

20      11.     Any and all DOCUMENTS RELATING TO any and all sums 50CAN has received

21  from STUDENTSFIRST from January, 2016 to the present.

22      12.     Any and all DOCUMENTS RELATING TO any and all sums 50CAN has received

23  from STUDENTSFIRST INSTITUTE from January, 2016 to the present.

24      13.     Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST

25  RELATING TO any and all sums YOU have received from STUDENTSFIRST from January,

26  2016 to the present.

27

28

14.    Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST INSTITUTE RELATING TO any and all sums YOU have received from STUDENTSFIRST INSTITUTE from January, 2016 to the present.

15.    Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST RELATING TO STUDENTSFIRST's intent to vacate the PREMISES.

16.    Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST INSTITUTE RELATING TO STUDENTSFIRST INSTITUTE's intent to vacate the PREMISES.

17.    Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST RELATING TO the LEASE (as used herein, "LEASE" shall mean the Office Lease entered into between STUDENTSFIRST and STUDENTSFIRST INSTITUTE and PLAINTIFF on or about October 26, 2011 for rent of the office space located at 825 K Street, Sacramento, CA 95814).

18.    Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST INSTITUTE RELATING TO the LEASE.

19.    Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST RELATING TO the LETTER OF CREDIT (as used herein, "LETTER OF CREDIT" shall mean that certain standby, unconditional, irrevocable, and transferrable Letter of Credit securing STUDENTSFIRST and STUDENTSFIRST INSTITUTE's performance of the LEASE).

20.    Any and all COMMUNICATIONS between 50CAN and STUDENTSFIRST INSTITUTE RELATING TO the LETTER OF CREDIT.

21.    Any and all DOCUMENTS RELATED TO any affirmative defense 50CAN may have to the allegations contained in the COMPLAINT (as used herein, "COMPLAINT" shall mean the First Amended Complaint filed by PLAINTIFF on October 13, 2016 in the United States District Court for the Eastern District of California, Case No. 2:16-cv-02284-JAM-EFB).

22.    Any and all DOCUMENTS RELATING TO YOUR qualification to give an expert opinion on those matters identified in the REPORT (as used herein, "REPORT" shall mean "Defendants' Expert Report and Disclosure Pursuant to Rule 26(a)(2)(B) of Christopher A. Tessone").

1    23.    Any and all DOCUMENTS YOU have reviewed in rendering YOUR expert

2  opinion on those matters identified in the REPORT.

3    24.    Any and all DOCUMENTS YOU intend to rely on in rendering YOUR expert

4  opinion on those matters identified in the REPORT.

11