1  SMITH, MCDOWELL & POWELL,
   A LAW CORPORATION
2  C. Jason Smith, SBN 237966
   Brandon T. Wright, SBN 294305
3  100 Howe Avenue, Suite 208 South
   Sacramento, CA 95825
4  Telephone: (916) 569-8100
   Facsimile: (916) 848-3777

5
   Attorneys for Plaintiff,
6  HALE BROS. INVESTMENT COMPANY, LLC

7

8              UNITED STATES DISTRICT COURT

9            EASTERN DISTRICT OF CALIFORNIA

10               SACRAMENTO DIVISION

11  HALE BROS. INVESTMENT COMPANY,        )  Case No.: 2:16-cv-02284-JAM-EFB
    LLC, a California limited liability company,  )
12                                         )
13          Plaintiff,                     )  **DECLARATION OF PAUL PETROVICH**
                                           )  **IN   SUPPORT   OF   PLAINTIFF'S**
14  vs.                                    )  **OPPOSITION   TO   DEFENDANTS'**
                                           )  **MOTION FOR SUMMARY JUDGMENT**
15                                         )
16  STUDENTSFIRST INSTITUTE, a District of )
    Columbia       non-profit    corporation;  )  Hearing Date:  January 30, 2018
17  STUDENTSFIRST, a District of Columbia non-)  Hearing Time: 1:30 p.m.
    profit corporation; 50CAN, INC., a Connecticut)  Department:   Courtroom 6
18  corporation; and DOES 1 through 50 inclusive.  )  Judge:        The Honorable John A. Mendez
                                           )
19                                         )  Trial Date:    April 30, 2018
           Defendants.                     )
20                                         )
   _____ )
21  STUDENTSFIRST INSTITUTE, et al.,       )
                                           )
22          Counterclaimants,              )
                                           )
23  vs.                                    )
                                           )
24                                         )
    HALE   BROS.   INVESTMENT   COMPANY,   )
25  LLC,                                   )
                                           )
26          Counterdefendant.              )
                                           )
27  _____ )

28  ///

                              1

**DECLARATION OF PAUL PETROVICH IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, Paul Petrovich, declare:

1.     I am the managing member of Hale Bros. Investment Company, LLC, a California limited liability company, Plaintiff in the above-entitled action ("Plaintiff"), an individual, am over the age of 18 and am a resident of the County of Sacramento, State of California.

2.     The contents of this declaration are made from my personal knowledge, except where stated on information and belief, and as to those matters I believe them to be true.

3.     If called and sworn as a witness I could and would competently and truthfully testify to the facts set forth in this declaration.

4.     On or about October 26, 2011, Defendants, StudentsFirst and StudentsFirst Institute (collectively, "StudentsFirst") entered into a written commercial lease (the "Lease") with Plaintiff to lease the second floor of the Hale Building, located at 825 K Street, Sacramento, CA 95814 (the "Premises") for a term of sixty-seven (67) months at the agreed base rental of $37,484.46 per month for the first 19 months, $38,455.56 per month for months 20-31, $39,426.66 per month for months 32-43, $40,397.76 per month for months 44-55, and $41,368.86 per month for months 56-67. A true and correct copy of the Lease is attached hereto as **Exhibit A**.

5.     The parties also entered into a related agreement (the "Parking Agreement") to lease 12 parking spaces to StudentsFirst for the same period, for the sum of $175.00 per space per month for the first 18 months, $180.00 per space per month for months 19-30, $185.00 per space per month for months 31-42, $190.00 per space per month for months 43-54, $195.00 per space per month for months 55-66, and $200.00 per space per month for the 67th month. A true and correct copy of the Parking Agreement is attached hereto as **Exhibit B**.

6.     Pursuant to the Lease, Plaintiff agreed to pay, subject to reimbursement, an allowance toward the total cost of construction and installation of certain tenant improvements ("Tenant Improvements"), requested by StudentsFirst and uniquely designed for their purposes. Plaintiff's portion of the tenant improvement cost was $832,365.00 ("Tenant Improvement Allowance"), which Plaintiff paid prior to StudentsFirsts' taking possession of the Premises.

7.     Per the terms of the Lease, Plaintiff also paid, subject to reimbursement, leasing commissions ("Leasing Commissions") in the amount of $118,280.00.

2

**DECLARATION OF PAUL PETROVICH IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

8.      Pursuant to Section 11.6(c) of the Lease, StudentsFirst's repayment of Leasing Commissions was amortized over a five-year period, and the Tenant Improvement Allowance was amortized over 10 years at 6% interest per annum. These amortization periods were to commence upon the date StudentsFirst commenced paying rent.

9.      StudentsFirst's obligations under the Lease, including, without limitation, payment of rent, Tenant Improvements, and Leasing Commissions, was secured with a security deposit in the amount of $41,368.86 (the "Security Deposit").  A standby, unconditional, irrevocable, and transferable Letter of Credit (the "Letter of Credit") in the initial face amount of $1,000,000.00, was provided to Plaintiff for security of various furniture, fixtures, and equipment, and certain other promises made by StudentsFirst per the terms of the Lease.

10.     In accordance with the Lease, StudentsFirst entered into possession of the Premises on or about March 6, 2012. Pursuant to Section 3.2 of the Lease, Plaintiff agreed, as incentive for StudentsFirst's continued and full performance under the Lease, to forego rental payment for the first seven months of the Lease, contingent upon StudentsFirst's full performance thereunder. Accordingly, StudentsFirst commenced paying rent on October 6, 2012.

11.     I occupy an office on the floor immediately above the Premises. In the weeks leading up to April 29, 2016, I became aware of a significant number of layoffs occurring at StudentsFirst, and noticed that the Premises was being run by a skeleton crew of what appeared to be roughly five or so people, when there had, a few months prior, been more than 50 employees of StudentsFirst working out of the Premises. We also have a high technology security system that requires a programmed access card unique to each user and we can track who and when was entering the building. Concerned about StudentsFirst's financial condition, in April 2016, I requested StudentsFirst provide me a copy of their financials.

12.     In response, Kellen Arno from StudentsFirst's requested, via email dated April 25, 2016, a meeting with me to discuss the matter. A true and correct copy of this email is attached hereto as **Exhibit C**. Mr. Arno's email states, "We've had some changes to our organization recently and as a result it is our intent to vacate the building prior to the termination of our lease."

3

**DECLARATION OF PAUL PETROVICH IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

13.     The requested meeting (the "Meeting") occurred on April 29, 2016 in my office on the floor immediately above the Premises in my conference room. The Meeting lasted 40-45 minutes. The meeting was attended by myself, Kenneth King, senior in-house counsel for Plaintiff, Lisa Montagnino, Vice President of Property Management for Plaintiff (collectively, "we" or "us"), Kellen Arno ("Arno") of StudentsFirst, and Deana Lord ("Lord"), Chief Financial Officer of StudentsFirst.

14.     At the Meeting, we were informed by Arno and Lord that StudentsFirst had a severe shortage of funds and could not continue to make its rent obligations under the Lease beyond June 2016. We were also informed by Arno and Lord that StudentsFirst was in the process of winding up its affairs and merging its operations with a third party. Arno and Lord further informed us that StudentsFirst would be abandoning the Premises soon, and that it expected to dissolve by September 2016 (well before the end of the Lease term).

15.     We were further informed by Arno and Lord during the Meeting that StudentsFirst was actively disposing of its physical and liquid assets in a conscious effort to leave Plaintiff "holding the bag" with no recourse to collect what it was owed under the Lease from StudentsFirst. Arno and Lord also informed us during the Meeting that StudentsFirst was paying its employees and directors exorbitant severances and transferring to a third party its remaining assets.

16.     At the Meeting, Arno and Lord provided a financial spreadsheet (which included StudentsFirst's quarterly cash projections – ending June 30th, consolidated activities, and consolidated financial positions) which disclosed StudentsFirst transfer of $1.2 million in contributions being transferred to 50CAN, Inc. ("50CAN"). A true and correct copy of this financial statement is attached hereto as **Exhibit D**. StudentsFirst's financial cash projections failed to show any ongoing Lease payments past June 2016, consistent with statements made by Arno and Lord that StudentsFirst would cease paying rent in or around June 2016.   The StudentsFirst financial disclosure also projected disbursements of more than $800,000 in transition payroll and nearly the same about in severance payments.

17.     At the Meeting, Arno and Lord also informed us that StudentsFirst knowingly waited until after the Letter of Credit reduced from $1 million to $500,000.00 to inform us of its

1  plans to vacate the Premises and cease paying rent prior to the expiration of the Lease term, to

2  thwart Plaintiff's ability to draw on the full $1,000,000.00 as allowed under the Lease.

3      18.    As of the time of the Meeting, I had had a good working relationship with Arno,

4  and Lord, who informed me that he thought we deserved to know what was going on with

5  StudentsFirst's restructuring and intentions with regard to the Lease. Arno and Lord specifically

6  stated in the Meeting they were disgusted with StudentsFirst's deceitful actions and wanted to

7  distance themselves from those actions and preserve their professional reputations within

8  Sacramento area. Arno and I even discussed open positions at my company, as he, like nearly

9  every other StudentsFirst's employee, was being laid off imminently thereafter.

10     19.    On or before June 30, 2016, StudentsFirst vacated the Premises, just as they

11 indicated they intended to do in the April 29, 2016 Meeting. Also, as they indicated they would,

12 StudentsFirst ceased making all payment under the Lease after June 2016. This default left Plaintiff

13 with insufficient funds in the Letter of Credit and Security Deposit to cover the losses that occurred

14 which include, but are not limited to, future rent obligations, unamortized leasing commissions

15 and tenant improvements, the abated rent, and other costs of Plaintiff.

16     20.    Following StudentsFirst's abandonment of the Premises, Plaintiff managed to

17 secure a new tenant (the "Tenant") for the Premises. Tenant's lease commenced October 1, 2016,

18 however, to incentivize Tenant to continue to perform its obligations under their lease for the full

19 term, no rent was due for the first five (5) months of their lease. Commencing March 2017, and

20 continuing through December 31, 2017, Tenant has paid monthly base rent of $27,000.00. Notably,

21 this is considerably less than the $41,368.86 per month StudentsFirst was required to pay for the

22 same period pursuant to the Lease. Accounting for the offset of the Tenant's base rent payments,

23 there still remains a difference in what StudentsFirst would have paid had they not breached the

24 Lease and what the Tenant is paying for the same period of time in the amount of no less than

25 $442,831.83.

26     21.    There is also due and owing from StudentsFirst to Plaintiff the sum of $22,850.32

27 for unpaid parking rent, which amount takes into account the amount mitigated by Plaintiff's lease

28 with the new Tenant.

5

---

**DECLARATION OF PAUL PETROVICH IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

22.     Pursuant to Section 25.1 of the Lease, StudentsFirst is also liable for late charges in the amount of 5% of the delinquent installment of rent if such rent is not received, in full, by Plaintiff within 5 days of the date the rent is due. StudentsFirst failed to pay any portion of the base rent or parking rent due, commencing July 2016 and continuing through October 2017. Accordingly, Plaintiff is entitled to late charges of at least $22,141.59 (which sum takes into account Plaintiff's mitigated damages) for failure to pay the base rent, and $1,142.52 (which sum takes into account Plaintiff's anticipated mitigated damages) for failure to pay the parking rent.

23.     Section 3.2 of the Lease provides that the free rent or fully abated rent (the "Abated Rent") StudentsFirst received during the initial seven (7) months of the lease shall immediately become due and payable if StudentsFirst is in material default under the lease (as is the case here). The Abated Rent was offered in consideration for, and indeed, was contingent upon, StudentsFirst's fulfillment of its obligations under the terms of the Lease. The parties expressly agreed that in the event of StudentsFirst's default, it would not be entitled to the benefit of seven-months free rent, and that Plaintiff would be under no obligation to continue to confer said benefit on StudentsFirst. The monthly office rent during that seven-month (7) period was $37,484.46 per month for a total of $262,391.22 abated office rent, and the monthly parking rent for the 16 parking stalls leased by StudentsFirst during that same abatement period was $175.00 per parking stall per month for a total of $19,600.00 abated parking rent. Accordingly, the total abated rent that is now due and payable from StudentsFirst to Plaintiff is $281,991.22.

24.     Pursuant to Sections 1.1(17) and 11.6(c) of the Lease, StudentsFirst agreed to pay tenant improvement allowance in the sum of $832,365.00, amortized over 10 years at 6% interest, for a total of $9,240.96 per month. Pursuant to the agreed upon 10-year amortization period, there was 76 months remaining unpaid as of the date of StudentsFirst's vacated the Premises and ceased making its required rent payments. Accordingly, there is currently due and owing to Plaintiff the sum of at least $702,312.96 in unpaid tenant improvement allowance costs.

25.     Pursuant to Section 11.6(c) of the Lease, StudentsFirst agreed to pay leasing commissions in the total sum of $118,280.00, amortized over a period of 5 years, for a total of $1,971.33 per month. StudentsFirst vacated the Premises and ceased making its required rent

payment under the Lease with 16 months remaining therein. Accordingly, there is currently due and owing to Plaintiff the sum of at least $31,541.28 in unpaid leasing commissions.

26.     Plaintiff is entitled to the unamortized attorneys' fees it incurred in connection with entering into the Lease pursuant to Section 11.2(b)(4) of the Lease, as well as all reasonable attorneys' fees and costs it has and will continue to incur in connection with the enforcement of the Lease pursuant to Section 11.3. The exact amount of these sums is yet undetermined, and will continue to increase the longer this matter goes unresolved.

27.     In or around the time of my April 2016 meeting with StudentsFirst, I discovered a press release (the "Press Release") online dated March 29, 2016. A true and correct copy of the Press Release is attached hereto as **Exhibit E**. The Press Release announces the merger of StudentsFirst and 50CAN.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

DATED: January 16, 2018



_____
Paul Petrovich

**DECLARATION OF PAUL PETROVICH IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# Exhibit No. A

OFFICE LEASE

BETWEEN

HALE BROS INVESTMENT COMPANY, LLC (LANDLORD)

AND

STUDENTS FIRST AND STUDENTSFIRST INSTITUTE (TENANT)

825 K Street, Second Floor
Sacramento, California

StudentsFirst Lease (10/4/11)

SMP000001

# TABLE OF CONTENTS

Page

ARTICLE 1    BASIC LEASE PROVISIONS ................................................................ 1

   1.1    BASIC LEASE PROVISIONS ................................................................ 1

   1.2    ENUMERATION OF EXHIBITS AND RIDER(S) ............................ 3

   1.3    DEFINITIONS ............................................................................................. 3

ARTICLE 2    PREMISES, TERM, FAILURE TO GIVE POSSESSION, AND PARKING ........................................................................................ 8

   2.1    LEASE OF PREMISES ............................................................................ 8

   2.2    TERM .............................................................................................................. 8

   2.3    FAILURE TO DELIVER POSSESSION ............................................. 9

   2.4    CONDITION OF PREMISES ................................................................. 9

   2.5    PARKING ..................................................................................................... 9

   2.6    RENEWAL OPTION ............................................................................... 10

ARTICLE 3    RENT ............................................................................................................ 11

   3.1    GENERALLY ............................................................................................. 11

   3.2    RENT ABATEMENT ............................................................................... 12

ARTICLE 4    RENT ADJUSTMENTS AND PAYMENTS .................................. 12

   4.1    RENT ADJUSTMENTS ......................................................................... 12

   4.2    STATEMENT OF LANDLORD .......................................................... 13

   4.3    BOOKS AND RECORDS ...................................................................... 14

   4.4    TENANT OR LEASE SPECIFIC TAXES ........................................ 15

ARTICLE 5    SECURITY DEPOSIT ........................................................................... 15

ARTICLE 6    SERVICES ................................................................................................. 16

   6.1    LANDLORD'S GENERAL SERVICES ............................................ 16

   6.2    ELECTRICAL SERVICES .................................................................... 16

   6.3    ADDITIONAL AND AFTER HOUR SERVICES ......................... 17

   6.4    TELEPHONE SERVICES ...................................................................... 17

   6.5    DELAYS IN FURNISHING SERVICES .......................................... 18

   6.6    CHOICE OF SERVICE PROVIDER ................................................. 19

   6.7    SIGNAGE .................................................................................................... 19

ARTICLE 7    POSSESSION, USE AND CONDITION OF PREMISES ........... 19

StudentsFirst Lease (10/4/11)

SMP000002

TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| 7.1 | POSSESSION AND USE OF PREMISES | | 19 |
| 7.2 | LANDLORD ACCESS TO PREMISES; APPROVALS | | 21 |
| 7.3 | QUIET ENJOYMENT | | 22 |
| ARTICLE 8 | MAINTENANCE | | 22 |
| 8.1 | LANDLORD'S MAINTENANCE | | 22 |
| 8.2 | TENANT'S MAINTENANCE | | 23 |
| ARTICLE 9 | ALTERATIONS AND IMPROVEMENTS | | 23 |
| 9.1 | TENANT ALTERATIONS | | 23 |
| 9.2 | LIENS | | 24 |
| ARTICLE 10 | ASSIGNMENT AND SUBLETTING | | 25 |
| 10.1 | ASSIGNMENT AND SUBLETTING | | 25 |
| 10.2 | RECAPTURE | | 27 |
| 10.3 | EXCESS RENT | | 27 |
| 10.4 | TENANT LIABILITY | | 27 |
| 10.5 | ASSUMPTION AND ATTORNMENT | | 28 |
| 10.6 | PROCESSING EXPENSES | | 28 |
| ARTICLE 11 | DEFAULT AND REMEDIES | | 28 |
| 11.1 | EVENTS OF DEFAULT | | 28 |
| 11.2 | LANDLORD'S REMEDIES | | 29 |
| 11.3 | ATTORNEY'S FEES | | 32 |
| 11.4 | BANKRUPTCY | | 32 |
| 11.5 | LANDLORD'S DEFAULT | | 33 |
| 11.6 | LETTER OF CREDIT | | 33 |
| 11.7 | BREACH OF NON-MONETARY OBLIGATIONS | | 36 |
| ARTICLE 12 | SURRENDER OF PREMISES | | 37 |
| 12.1 | IN GENERAL | | 37 |
| 12.2 | LANDLORD'S RIGHTS | | 37 |
| ARTICLE 13 | HOLDING OVER | | 38 |
| ARTICLE 14 | DAMAGE BY FIRE OR OTHER CASUALTY | | 38 |
| 14.1 | SUBSTANTIAL UNTENANTABILITY | | 38 |

-ii-

SMP000003

# TABLE OF CONTENTS
(continued)

Page

14.2    INSUBSTANTIAL UNTENANTABILITY .................................... 39
14.3    RENT ABATEMENT ................................................................. 39
14.4    WAIVER OF STATUTORY REMEDIES ................................... 39
ARTICLE 15    EMINENT DOMAIN ............................................................ 40
15.1    TAKING OF WHOLE OR SUBSTANTIAL PART ................... 40
15.2    TAKING OF PART ................................................................... 40
15.3    COMPENSATION ................................................................... 40
ARTICLE 16    INSURANCE ........................................................................ 40
16.1    TENANT'S INSURANCE ......................................................... 40
16.2    FORM OF POLICIES .............................................................. 41
16.3    LANDLORD'S INSURANCE ................................................... 41
16.4    WAIVER OF SUBROGATION ................................................ 42
16.5    NOTICE OF CASUALTY ........................................................ 43
ARTICLE 17    WAIVER OF CLAIMS AND INDEMNITY ............................ 43
17.1    WAIVER OF CLAIMS ............................................................. 43
17.2    INDEMNITY BY TENANT ....................................................... 44
ARTICLE 18    RULES AND REGULATIONS .............................................. 44
18.1    RULES .................................................................................... 44
18.2    ENFORCEMENT .................................................................... 44
ARTICLE 19    LANDLORD'S RESERVED RIGHTS .................................... 45
ARTICLE 20    ESTOPPEL CERTIFICATE .................................................. 45
20.1    IN GENERAL .......................................................................... 45
20.2    ENFORCEMENT .................................................................... 46
ARTICLE 21    RELOCATION OF TENANT ................................................ 46
ARTICLE 22    REAL ESTATE BROKERS .................................................. 46
ARTICLE 23    MORTGAGEE PROTECTION ............................................. 46
23.1    SUBORDINATION AND ATTORNMENT ................................ 46
23.2    MORTGAGEE PROTECTION ................................................ 47
ARTICLE 24    NOTICES ............................................................................. 47
ARTICLE 25    MISCELLANEOUS .............................................................. 48

StudentsFirst Lease (10/4/11)

-iii-

SMP000004

## TABLE OF CONTENTS
(continued)

Page

25.1   LATE CHARGES ................................................................... 48

25.2   NO JURY TRIAL; VENUE; JURISDICTION ................................... 49

25.3   NO-DISCRIMINATION ............................................................ 49

25.4   FINANCIAL STATEMENTS ...................................................... 49

25.5   OPTION .............................................................................. 50

25.6   TENANT AUTHORITY ............................................................ 50

25.7   ENTIRE AGREEMENT ............................................................ 50

25.8   MODIFICATION OF LEASE FOR BENEFIT OF MORTGAGEE ................ 50

25.9   EXCULPATION ..................................................................... 50

25.10   ACCORD AND SATISFACTION ................................................ 51

25.11   LANDLORD'S OBLIGATIONS ON SALE OF BUILDING ..................... 51

25.12   BINDING EFFECT ............................................................... 51

25.13   CAPTIONS ........................................................................ 51

25.14   TIME; APPLICABLE LAW; CONSTRUCTION ............................... 51

25.15   ABANDONMENT ................................................................. 52

25.16   LANDLORD'S RIGHT TO PERFORM TENANT'S DUTIES ................. 52

25.17   SECURITY SYSTEM ............................................................ 52

25.18   NO LIGHT, AIR OR VIEW EASEMENTS ..................................... 52

25.19   RECORDATION .................................................................. 53

25.20   SURVIVAL ........................................................................ 53

25.21   OFAC REPRESENTATION, WARRANTY AND COVENANT .............. 53

25.22   COUNTERPARTS ................................................................ 54

25.23   RIDERS ........................................................................... 54

25.24   SECURITY AGREEMENT ...................................................... 54

SMP000005

OFFICE LEASE


ARTICLE 1
BASIC LEASE PROVISIONS

1.1   BASIC LEASE PROVISIONS

In the event of any conflict between these Basic Lease Provisions and any other Lease provision, such other Lease provision shall control.

(1)   BUILDING AND ADDRESS:

Hale Building
825 K Street
Sacramento, California 95814

(2)   LANDLORD AND ADDRESS:

Hale Bros Investment Company, LLC,
a California limited liability company
825 K Street, 3rd Floor
Sacramento, California 95814

Notices to Landlord shall be addressed:

Hale Bros Investment Company, LLC
c/o Petrovich Development Company
825 K Street, 3rd Floor
Sacramento, California 95814

(3)   TENANT AND CURRENT ADDRESS:

(a)   Name:   StudentsFirst Institute, a nonprofit corporation and StudentsFirst, a nonprofit corporation, jointly and severally

(b)   State of incorporation:   District of Columbia

Notices to Tenant shall be addressed:

Prior to the Commencement Date:

StudentsFirst Institute
406 7th St NW, Second Floor

StudentsFirst Lease (10/4/11)

SMP000006

Washington, DC 20004
Attention:  Chief Operating Officer

On and after the Commencement Date:

At the Premises
Attention: President

(4)   DATE OF LEASE: as of October 26, 2011

(5)   LEASE TERM:      Commencing on the Commencement Date, and ending on the last day of the sixty seventh (67th) full calendar month following the Commencement Date, subject to any option(s) set forth in Section 2.6.

(6)   PROJECTED COMMENCEMENT DATE: One  Hundred  Twenty  (120)  days from the Date of Lease.

(7)   EXPIRATION DATE:  The last day of the 67th full calendar month following the Commencement Date.

(8)   MONTHLY BASE RENT:

| PERIOD FROM/TO | MONTHLY BASE RENT | MONTHLY RATE PER RENTABLE SQUARE FOOT OF PREMISES |
|---|---|---|
| Months 1-19* | $37,484.46 | $1.93 |
| Months 20-31 | $38,455.56 | $1.98 |
| Months 32-43 | $39,426.66 | $2.03 |
| Months 44-55 | $40,397.76 | $2.08 |
| Months 56-67 | $41,368.86 | $2.13 |

* "Month 1" will include any partial calendar month following the Commencement Date if the Commencement Date is other than the first (1st) day of a calendar month, and in the event Month 1 includes any partial calendar month, Tenant shall pay the prorated amount of Monthly Base Rent for such partial calendar month pursuant to Article 3 in addition to the Monthly Base Rent for the first full calendar month of the Term.

2

StudentsFirst Lease (10/4/11)

(9)     RENTABLE AREA OF THE PREMISES:  19,422 square feet

(10)    USABLE AREA OF THE PREMISES:   18,497 square feet

(11)    SECURITY DEPOSIT:     $41,368.86 (equal to last month's rent)

(12)    SUITE NUMBER OF PREMISES:     Suite 200, consisting of the entire second floor

(13)    TENANT'S USE OF PREMISES:     General professional office use

(14)    PARKING:   Up to 16 unreserved parking spaces in garage lot and up to 2 reserved parking spaces in garage lot.
(The total number of parking spaces allocated for Tenant's use shall not exceed 1 per 1,000 usable square feet of the Premises)

(15)    BROKERS:

Landlord's Broker:    Tom Bacon, Tom Heacox, & David Brandenburger
Cornish & Carey Commercial Newark Knight Frank

Tenant's Broker:    F. Frederick Brown
Brown Stevens Elmore & Sparre

(16)    BASE YEAR:    2012

(17)    TENANT IMPROVEMENT ALLOWANCE:     $832,365 (based on $45 psf of usable floor area)

## 1.2    ENUMERATION OF EXHIBITS AND RIDER(S)

The Exhibits and Rider set forth below and attached to this Lease are incorporated in this Lease by this reference:

EXHIBIT A    Workletter Agreement
EXHIBIT B    Rules and Regulations
EXHIBIT C    Form of Letter of Credit
EXHIBIT D    Final Construction Documents (including D-1 and D-2)
EXHIBIT E    Landlord's Estimate
EXHIBIT F    Potential Sublessee Mission Statements
RIDER 1      Commencement Date Agreement

## 1.3    DEFINITIONS

For purposes hereof, the following terms shall have the following meanings:

ADJUSTMENT YEAR:  The applicable calendar year or any portion thereof, during the Term, after the Base Year for which a Rent Adjustment computation is being made.

AFFILIATE:  Any corporation or other business entity that is currently owned or controlled by, owns or controls, or is under common ownership or control with Tenant or Landlord, as the case may be.

BASE YEAR: The calendar year specified in Section 1.1(16).

BUILDING:  The building located at the address specified in Section 1.1(1).  The Building includes office, retail and other uses.

COMMENCEMENT DATE: The date specified in Section 2.2.

COMMON AREAS:  All areas of the Project made available by Landlord from time to time for the general common use or benefit of the tenants of the Building, and their employees and invitees, or the public, as such areas currently exist and as they may be changed from time to time.

DECORATION:  Tenant Alterations which do not require a building permit and which do not involve any of the structural elements of the Building, or any of the Building's systems, including its electrical, mechanical, plumbing, security, heating, ventilating, air-conditioning, communication, and fire and life safety systems.

DEFAULT RATE:  Two (2) percentage points above the rate then most recently announced by Bank of America N.A. at its San Francisco main office as its base lending reference rate, from time to time announced, but in no event higher than the maximum rate permitted by Law.

ENVIRONMENTAL LAWS:  All Laws governing the use, storage, disposal or generation of any Hazardous Material, including, without limitation, the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and the Resource Conservation and Recovery Act of 1976, as amended.

EXPIRATION DATE:  The last day of the 67th full calendar month following the Commencement Date.

FORCE MAJEURE:  Any accident, casualty, act of God, war or civil commotion, strike or labor troubles, or any cause whatsoever beyond the reasonable control of Landlord, including water shortages, energy shortages or governmental preemption in connection with an act of God, a national emergency, or by reason of Law, or by reason of the conditions of supply and demand which have been or are affected by act of God, war or other emergency.

HAZARDOUS MATERIAL:  Such substances, material and wastes which are or become regulated under any Environmental Law; or which are classified as hazardous or toxic under any Environmental Law; and explosives and firearms, radioactive material, asbestos, polychlorinated biphenyls, and petroleum products.

INDEMNITEES:  Collectively, Landlord, any Mortgagee or ground lessor of the Property, the property manager and the leasing manager for the Property and their respective partners, members, directors, officers, agents and employees.

4

SMP000009

LAND:  The parcel(s) of real estate on which the Building and Project are located.

LANDLORD WORK:  The construction or installation of improvements to the Premises, to be furnished by Landlord, as specifically described in the Workletter or exhibits attached hereto.

LAWS OR LAW:  All laws, ordinances, rules, regulations, other requirements, orders, rulings or decisions adopted or made by any governmental body, agency, department or judicial authority having jurisdiction over the Property, the Premises or Tenant's activities at the Premises and any covenants, conditions or restrictions of record which affect the Property.

LEASE:  This instrument and all exhibits and riders attached hereto, as may be amended from time to time.

MONTHLY BASE RENT:  The monthly base rent specified in Section 1.1(8).

MORTGAGEE:  Any holder of a mortgage, deed of trust or other security instrument encumbering the Property.

NATIONAL HOLIDAYS:  New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day and other holidays recognized by the Landlord and the janitorial and other unions servicing the Building in accordance with their contracts.

OPERATING EXPENSES:  All costs, expenses and disbursements of every kind and nature which Landlord shall pay or become obligated to pay in connection with the ownership, management, operation, maintenance, replacement and repair of the Premises, the Building and the Property, including, without limitation, property management fees; costs and expenses of any capital expenditure or improvement, amortized over the useful life of the applicable capital expenditure or improvement, as reasonably determined by Landlord, together with interest thereon on the unamortized costs at the lower of the rate incurred by Landlord to finance such capital expenditure or improvement or the Default Rate, which capital expenditure or improvement (a) is made to the Property after the Commencement Date in order to comply with Laws enacted after the Commencement Date, or (b) is installed for the purpose of reducing or controlling Operating Expenses; and the costs of changing utility service providers.  Operating Expenses shall not include, (i) costs of alterations of the premises of tenants of the Project, (ii) costs of capital improvements to the Project (except as permitted above in the definition of "Operating Expenses"), (iii) depreciation charges, (iv) interest and principal payments on loans (except for loans for capital improvements which Landlord is allowed to include in Operating Expenses as provided above), (v) ground rental payments, (vi) real estate brokerage and leasing commissions, (vii) advertising and marketing expenses, (viii) costs of Landlord reimbursed by insurance proceeds, (ix) expenses incurred in negotiating leases of tenants in the Project or enforcing lease obligations of tenants in the Project and (x) Landlord's general corporate overhead.  If any Operating Expense, though paid in one year, relates to more than one calendar year, at the option of Landlord such expense may be proportionately allocated among such related calendar years.  Operating Expenses for the Building that are not, in Landlord's reasonable discretion, allocable solely to either the office or retail portion of the Building shall be equitably allocated by Landlord between such uses.

5

SMP000010

PREMISES:   The space located in the Building at the Suite Number listed in Section 1.1(12).

PROJECT or PROPERTY:  The Project consists of the office building with ground retail spaces located at the street address specified in Section 1.1(1) in Sacramento, California, associated garage parking as designated by Landlord from time to time, and improvements, together with the Land, any associated interests in real property, and the personal property, fixtures, machinery, equipment, systems and apparatus located in or used in conjunction with any of the foregoing. The Project may also be referred to as the Property.

REAL PROPERTY:  The Property excluding any personal property.

RENT:   Collectively, Monthly Base Rent, Rent Adjustments and Rent Adjustment Deposits, and all other charges, payments, late fees or other amounts required to be paid by Tenant under this Lease.

RENT ADJUSTMENT:  Any amounts owed by Tenant for payment of Operating Expenses or Taxes. The Rent Adjustments shall be determined and paid as provided in Article 4.

RENT ADJUSTMENT DEPOSIT:  An amount equal to Landlord's estimate of the Rent Adjustment attributable to each month of the applicable Adjustment Year.  On or before the beginning of each Adjustment Year or with Landlord's Statement (defined in Article 4), Landlord may estimate and notify Tenant in writing of its estimate of the amount of Operating Expenses and Taxes payable by Tenant for such Adjustment Year.   Prior to the first determination by Landlord of the amount of Operating Expenses and Taxes for the first Adjustment Year, Landlord may estimate such amounts in the foregoing calculation.  The last estimate by Landlord shall remain in effect as the applicable Rent Adjustment Deposit unless and until Landlord notifies Tenant in writing of a change, which notice may be given by Landlord from time to time during any Adjustment Year.

RENTABLE AREA OF THE PREMISES:  The amount of square footage set forth in Section 1.1(9).

SECURITY DEPOSIT:  The funds specified in Section 1.1(11), if any, deposited by Tenant with Landlord as security for Tenant's performance of its obligations under this Lease.

STANDARD OPERATING HOURS:  Monday through Friday from 7:00 A.M. to 6:00 P.M., excluding National Holidays.

SUBSTANTIALLY COMPLETE or SUBSTANTIAL COMPLETION:  The completion of the Landlord Work or Tenant Work, as the case may be, except for minor insubstantial details of construction, decoration or mechanical adjustments which remain to be done.

TAXES:  All federal, state and local governmental taxes, assessments and charges of every kind or nature, whether general, special, ordinary or extraordinary, which Landlord shall pay or become obligated to pay because of or in connection with the ownership, leasing, management, control, or operation of the Property or any of its components (including any personal property used in connection therewith), which may also include any rental or similar

taxes levied in lieu of or in addition to general real and/or personal property taxes. For purposes hereof, Taxes for any year shall be Taxes which are assessed for any period of such year, whether or not such Taxes are billed and payable in a subsequent calendar year. There shall be included in Taxes for any year the amount of all fees, costs and expenses (including reasonable attorneys' fees) paid by Landlord during such year in seeking or obtaining any refund or reduction of Taxes. Taxes for any year shall be reduced by the net amount of any tax refund received by Landlord attributable to such year. If a special assessment payable in installments is levied against any part of the Property, Taxes for any year shall include only the installment of such assessment and any interest payable or paid during such year. Taxes shall not include any federal or state inheritance, general income, gift or estate taxes, except that if a change occurs in the method of taxation resulting in whole or in part in the substitution of any such taxes, or any other assessment, for any Taxes as above defined, such substituted taxes or assessments shall be included in the Taxes.

TENANT ADDITIONS:   Collectively, Landlord Work, Tenant Work and Tenant Alterations.

TENANT ALTERATIONS:  Any alterations, improvements, additions, installations or construction in or to the Premises or any Building systems serving the Premises (excluding Landlord Work or Tenant Work); and any supplementary air-conditioning systems installed by Landlord or by Tenant at Landlord's request pursuant to Section 6.1(b).

TENANT DELAY:  Any event or occurrence that delays the completion of the Landlord Work which is caused by or is described as follows:

(i)     special work, changes, alterations, additions, or any Change Orders (defined in the Workletter) requested or made by Tenant in the design or finish in any part of the Premises other than the Tenant Improvements set forth in the Final Construction Documents (defined in the Workletter);

(ii)     Tenant's delay in submitting plans, supplying information, approving plans, specifications or estimates, giving authorizations or otherwise;

(iii)     failure to pay for those portions of Tenant Improvements that Tenant is obligated to pay for pursuant to the Workletter;

(iv)     the performance or completion by Tenant or any person engaged by Tenant of any work in or about the Premises; or

(v)     failure to perform or comply with any obligation or condition binding upon Tenant pursuant to the Workletter, including the failure to approve and pay for such Landlord Work or other items if and to the extent the Workletter provides they are to be approved or paid by Tenant.

TENANT WORK:  All work installed or furnished to the Premises by Tenant, if any, pursuant to the Workletter.

SMP000012

TENANT'S SHARE:  The percentage that represents the ratio of the Rentable Area of the Premises to the Usable Area of the Building, as determined by Landlord from time to time. Landlord and Tenant agree that as of the Effective Date, the "Usable Area of the Building" for purposes of determining those Operating Expenses which are allocable among both office and retail tenants shall be 54,925 square feet, and the "Usable Area of the Building" for purposes of determining those Operating Expenses which are only allocable among the office tenants shall be 36,994 square feet.  Tenant acknowledges that the Rentable Area of the Premises or Usable Area of the Building may change from remeasurement or otherwise during the Term.  If there are any Operating Expenses which are solely attributable to Tenant (or any sublessee) or which are required because of Tenant's (or any sublessee's) use, Tenant's Share shall be 100% of such costs.

TERM:  The term of this Lease commencing on the Commencement Date and expiring on the Expiration Date.

TERMINATION DATE:  The Expiration Date or such earlier date as this Lease terminates or Tenant's right to possession of the Premises terminates.

WORKLETTER:  The Agreement regarding the manner of completion of Landlord Work and Tenant Work set forth on Exhibit A attached hereto.

ARTICLE 2
PREMISES, TERM, FAILURE TO GIVE POSSESSION, AND PARKING

2.1   LEASE OF PREMISES

Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises for the Term and upon the terms, covenants and conditions provided in this Lease.

2.2   TERM

(a) The Commencement Date shall be the date determined as follows:  the date which is the latter of (i) the date which Landlord delivers the Premises to Tenant Substantially Complete, and (ii) the earlier of receipt of (a) the temporary certificate of occupancy for the Premises or (b) the certificate of occupancy for the Premises.

(b)   Within thirty (30) days following the occurrence of the Commencement Date, Landlord and Tenant shall enter into an agreement (the form of which is attached hereto as Rider 1) confirming the Commencement Date and the Expiration Date.  If Tenant fails to enter into such agreement, then the Commencement Date and the Expiration Date shall be the dates designated by Landlord in such agreement.

(c)   Tenant and Tenant agents shall be permitted to enter into the Premises from and after the Date of Lease, at Tenant's sole risk, solely for the purpose of installing furniture and equipment in the Premises, provided that Tenant has delivered to Landlord evidence of the insurance coverages required under Article 16, the Letter of Credit required under Section 11.6, the Security Deposit, and further provided that such access shall not interfere with the quiet enjoyment of other Tenants in the Building.  Such early entry shall be subject to all the terms and

SMP000013

provisions of this Lease, except that Tenant shall have no obligation to pay Monthly Base Rent or other charges during such early access period unless Tenant commences business operations in the Premises during such early access period.

2.3   <u>FAILURE TO DELIVER POSSESSION</u>

Intentionally omitted.

2.4   <u>CONDITION OF PREMISES</u>

Tenant shall notify Landlord in writing within thirty (30) days after the Commencement Date of any defects in the Premises claimed by Tenant or in the materials or workmanship furnished by Landlord in completing the Landlord Work. Except for defects stated in such notice, Tenant shall be conclusively deemed to have accepted the Premises "AS IS" in the condition existing on the date Tenant first takes possession, and to have waived all claims relating to the condition of the Premises. Landlord shall proceed diligently to correct the defects stated in such notice unless Landlord disputes the existence of any such defects. In the event of any dispute as to the existence of any such defects, the decision of a mutually agreed upon third-party architect shall be final and binding on the parties. Such architect shall be neutral and shall not have completed any work related to the Premises. No agreement of Landlord to alter, remodel, decorate, clean, or improve the Premises or the Real Property and no representation regarding the condition of the Premises or the Real Property has been made by or on behalf of Landlord to Tenant, except as may be specifically stated in this Lease or in the Workletter.

2.5   <u>PARKING</u>

During the Term, Tenant may use the number of spaces specified in Section 1.1(14) for parking at the rate of $175 per month per stall for the period from the Commencement Date until the end of the 18th month following the Commencement Date, which rate shall increase by $5 per month per stall commencing on the first day of the 19th month following the Commencement Date and each twelve month anniversary thereafter (for clarification purposes, the foregoing shall mean that during the 19th month following the Commencement Date through the 30th month following the Commencement Date, the parking rate would be $180 per month per stall, which rate would increase on the 31st month to $185 per month per stall); provided, however, that if Tenant does not, on or before the Date of the Lease, enter into a contract for such spaces for the entire Term of the Lease, then Landlord shall only be obligated to provide the number of spaces for which Tenant has contracted and any additional spaces, up to the number of spaces specified in Section 1.1(14) shall be at Landlord's sole discretion. Notwithstanding the foregoing, provided that Tenant is not in Default under this Lease, Tenant shall have the use of up to 18 spaces at no charge to Tenant during the Abatement Period; provided, however, that Tenant shall only have use of those spaces during the Abatement Period for which Tenant has entered into a contract which is (i) executed no later than the Date of Lease and (ii) for the entire Term of the Lease. In the event Tenant fails at any time to pay the full amount of such parking charges, Tenant's parking rights shall be reduced to the extent of Tenant's failure to pay for any such parking. The locations and type of parking shall be designated by Landlord or Landlord's parking operator from time to time. Tenant acknowledges and agrees that the parking spaces serving the Project may include tandem parking and a mixture of spaces for compact vehicles as

9

SMP000014

well as full-size passenger automobiles, and that Tenant shall not use parking spaces for vehicles larger than the striped size of the parking spaces. All vehicles utilizing Tenant's parking privileges shall prominently display identification stickers or other markers, and/or have passes or keycards for ingress and egress, as may be required and provided by Landlord or its parking operator from time to time. Tenant shall comply with any and all parking rules and regulations from time to time established by Landlord or Landlord's parking operator, including a requirement that Tenant pay to Landlord or Landlord's parking operator a charge for loss and replacement of passes, keycards, identification stickers or markers, and for any and all loss or other damage caused by persons or vehicles related to use of Tenant's parking privileges, including without limitation, damages to walls, pillars, or other portions of the garage caused by such persons or vehicles. Without limiting the foregoing, any individual utilizing a parking space hereunder shall enter into a direct contractual agreement with Landlord in a form acceptable to Landlord in its sole discretion, provided that the monthly cost for such use shall be as set forth herein. Visitors, guests, and any other non-employee, non-director, or non-officer of Tenant shall not be permitted to use Tenant's parking privileges. Tenant shall not allow any vehicles using Tenant's parking privileges to be parked, loaded or unloaded except in accordance with this Section, including in the areas and in the manner designated by Landlord or its parking operator for such activities. If any vehicle is using the parking or loading areas contrary to any provision of this Section, Landlord or its parking operator shall have the right, in addition to all other rights and remedies of Landlord under this Lease, to remove or tow away the vehicle without prior notice to Tenant, and the cost thereof shall be paid to Landlord within ten (10) days after notice from Landlord. Landlord shall, at its option, offer more parking spaces for Tenant's use, provided that any such additional spaces shall be subject to the terms and conditions of this Lease.

2.6   RENEWAL OPTION

(a)   Tenant shall have the option to renew this Lease ("Renewal Option") with respect to the entirety of the Premises, for one (1) additional term of sixty (60) months ("Renewal Term"), commencing upon expiration of the initial Term. The Renewal Option must be exercised, if at all, by written notice given by Tenant to Landlord no later than six (6) months prior to expiration of the initial Term. If Tenant properly exercises the Renewal Option, references in the Lease to the Term shall be deemed to include the Renewal Term. The Renewal Option shall be null and void and Tenant shall have no right to renew this Lease if on the date Tenant exercises the Renewal Option or on the date immediately preceding the commencement date of the Renewal Term (i) a Default beyond the applicable cure period shall have occurred and be continuing hereunder, or (ii) Landlord has given Tenant two or more valid notices respecting a Default during the initial Term of this Lease, whether or not such Default was subsequently cured.

(b)   If Tenant properly exercises the Renewal Option, then during the Renewal Term all of the terms and conditions set forth in this Lease as applicable to the Premises during the initial Term shall apply during the Renewal Term, including without limitation the obligation to pay Rent Adjustments, except that (i) Tenant shall accept the Premises in their then "as-is" state and condition and Landlord shall have no obligation to repaint, remodel, repair or make or pay for any improvements to the Premises, (ii) during the Renewal Term the Monthly Base Rent payable by Tenant shall be the Fair Market Rent during the Renewal Term, determined as

10

SMP000015

hereinafter set forth, except that in no event shall Monthly Base Rent during the Renewal Term be less than the Monthly Base Rent in effect during the last month of the initial Term, (iii) at Landlord's option, the Base Year may be changed to the actual expenses of the calendar year immediately preceding the commencement of the Renewal Term; and (iv) there shall be no further option to renew or extend the Term of this Lease.

(c)     For purposes of this Section, the term "Fair Market Rent" shall mean the base rental rate, periodic rental rate adjustment and other charges and increases, if any, for space comparable in size, location and quality of the Premises under primary lease (and not sublease) to new or renewing tenants, for a comparable term with a tenant improvement allowance, if applicable and taking into consideration such amenities as existing improvements, view, floor on which the Premises are situated and the like, situated in comparable buildings in downtown Sacramento, California

(d)     If Tenant properly exercises the Renewal Option, Tenant, by notice to Landlord not more than thirty (30) days after Tenant's exercise of the Renewal Option, shall indicate Tenant's determination of the Fair Market Rent. Landlord, within thirty (30) days after the date on which Tenant provides such notice of the Fair Market Rent shall give Tenant final binding written notice ("Binding Notice") of Landlord's acceptance of Tenant's determination of the Fair Market Rent. If Landlord fails to provide Tenant with a Binding Notice, then the Renewal Option shall be void and the Lease shall expire at the end of the initial Lease Term. If Landlord provides Tenant with a Binding Notice, Landlord and Tenant shall enter into the Renewal Amendment (as defined below) upon the terms and conditions set forth herein.

(e)     If Tenant is entitled to and properly exercises its Renewal Option, upon determination of Fair Market Rent pursuant to this Section 2.6, Landlord shall prepare an amendment (the "Renewal Amendment") to reflect changes in the Base Rent, Term, Expiration Date and other appropriate terms. The Renewal Amendment shall be sent to Tenant within a reasonable time after Landlord's receipt of Tenant's Binding Notice and, provided the same is accurate, Tenant shall execute and return the Renewal Amendment to Landlord within ten (10) days after Tenant's receipt of same, but an otherwise valid exercise of the Renewal Option shall be fully effective whether or not the Renewal Amendment is executed.

ARTICLE 3
RENT

3.1     GENERALLY

Tenant shall pay to Landlord at the address specified in Section 1.1(2), or to such other persons, or at such other places designated by Landlord, without any prior demand therefor in immediately available funds and without any deduction or offset whatsoever, Rent, including Monthly Base Rent and Rent Adjustments in accordance with Article 4, during the Term. Monthly Base Rent shall be paid monthly in advance on the first day of each month of the Term, except that the first installment of non-abated Monthly Base Rent shall be paid by Tenant to Landlord concurrently with Tenant's execution of this Lease. Monthly Base Rent shall be prorated for partial months within the Term. Unpaid Rent shall bear interest at the Default Rate

11

SMP000016

from the date due until paid. Tenant's covenant to pay Rent shall be independent of every other covenant in this Lease.

## 3.2   RENT ABATEMENT

Notwithstanding Section 3.1, so long as Tenant is not in Default hereunder, Tenant shall be entitled to an abatement of Monthly Base Rent during the first seven (7) month period of the Term (collectively, the "Abatement Period"), which abatement shall relieve Tenant of all monetary obligations owing to Landlord during such Abatement Period (except as set forth in this Section 3.2). The total amount of Monthly Base Rent abated during the Abatement Period is referred to herein as the "Abated Base Rent". If Tenant is in material Default under this Lease at any time during the Term, (i) all Abated Base Rent shall immediately become due and payable and (ii) if such material Default occurs prior to the expiration of the Abatement Period, there shall be no further abatement of Monthly Base Rent pursuant to this Section 3.2. The payment by Tenant of the Abated Base Rent in the event of a Default pursuant to clause (i) above shall not limit or affect any of Landlord's other rights or remedies, pursuant to this Lease or at law or in equity. During the Abatement Period, only Monthly Base Rent shall be abated, and all other applicable costs and charges specified in this Lease shall remain as due and payable.

ARTICLE 4
RENT ADJUSTMENTS AND PAYMENTS

## 4.1   RENT ADJUSTMENTS

Tenant shall pay to Landlord Rent Adjustments with respect to each Adjustment Year as follows:

(a)     The Rent Adjustment Deposit representing Tenant's Share of increases in Operating Expenses for the applicable Adjustment Year over the Operating Expenses for the Base Year, monthly during the Term with the payment of Monthly Base Rent;

(b)     The Rent Adjustment Deposit representing Tenant's Share of increases in Taxes for the applicable Adjustment Year over the Taxes for the Base Year, monthly during the Term with the payment of Monthly Base Rent; and

(c)     Any Rent Adjustments due in excess of the Rent Adjustment Deposits in accordance with Section 4.2. Rent Adjustments due from Tenant to Landlord for any Adjustment Year shall be Tenant's Share of Operating Expenses for such year in excess of the Base Year Operating Expenses and Tenant's Share of Taxes for such year in excess of the Base Year Taxes. If Operating Expenses and/or Taxes in any Adjustment Year decrease below the amount of Operating Expenses and/or Taxes for the Base Year for any reason, the Rent Adjustment Deposit for Operating Expenses and/or Taxes, as the case may be, for that Adjustment Year shall be $0.

(d)     For purposes of determining Rent Adjustments, if the Building is not fully occupied during all or any portion of the Base Year or any Adjustment Year during the Term, Landlord shall make appropriate adjustments to the variable components of Operating Expenses for the Base Year or such Adjustment Year, employing sound accounting and management

12

SMP000017

principles consistently applied, to determine the amount of Operating Expenses that would have been paid or incurred by Landlord had the Building been one hundred percent (100%) occupied, and the amount so determined shall be deemed to have been the amount of Operating Expenses for the Base Year or such Adjustment Year. In the event that the Property is not fully assessed for all or a portion of the Base Year or any Adjustment Year, then Taxes shall be adjusted to an amount which would have been payable in the Base Year or such Adjustment Year if the Property had been fully assessed.

(e)     Tenant's obligation to pay for Tenant's Share of increases in "controllable" Operating Expenses for any Adjustment Year over the controllable Operating Expenses for the Base Year shall not increase by more than five percent (5%) per calendar year, calculated on a compounding and cumulative basis. In other words, controllable Operating Expenses for the first (1st) Adjustment Year ("Adjustment Year 1") shall not exceed 105% of the controllable Operating Expenses for the Base Year, controllable Operating Expenses for the second (2nd) Adjustment Year ("Adjustment Year 2") shall not exceed 105% of the limit on controllable Operating Expenses for Adjustment Year 1, etc. By way of illustration, if controllable Operating Expenses were $10.00 per rentable square foot for the Base Year, then controllable Operating Expenses for Adjustment Year 1 shall not exceed $10.50 per rentable square foot, and controllable Operating Expenses for Adjustment Year 2 shall not exceed $11.03 per rentable square foot. As used in this Lease, "controllable" Operating Expenses shall mean all Operating Expenses exclusive of the cost of any utilities, capital improvements, insurance, security, costs driven by increases in union rates, and all costs not within the reasonable control of Landlord. Landlord and Tenant agree that as long as Thrifty Payless, Inc., dba Rite Aid (together with a permitted assignee thereof, "Rite Aid") is the tenant open and operating in the retail space on the first floor of the Building, then for those Operating Expenses calculated using the full Usable Area of the Building, Rite Aid's share of Operating Expenses for those items shall be sixty percent (60%).

4.2     STATEMENT OF LANDLORD

As soon as practicable after the expiration of the Base Year, and each Adjustment Year thereafter, Landlord will furnish to Tenant a statement ("Landlord's Statement") showing the following:

(a)     The amount of actual Operating Expenses and Taxes for the Base Year and thereafter for the most recent Adjustment Year;

(b)     The amount of Rent Adjustments due Landlord for the most recent Adjustment Year, less credit for Rent Adjustment Deposits or other amounts paid, if any, toward Operating Expenses and Taxes for such Adjustment Year; and

(c)     Any change in the Rent Adjustment Deposit due monthly in the current Adjustment Year, including the amount or revised amount due for months preceding any such change pursuant to Landlord's Statement.

Tenant shall pay to Landlord within ten (10) days after receipt of each Landlord's Statement any amounts for Rent Adjustments then due in accordance with such Landlord's

13

SMP000018

Statement. Any amounts due from Landlord to Tenant pursuant to this Section shall be credited to the Rent Adjustment Deposit next coming due, or refunded to Tenant if the Term has already expired provided Tenant is not in default hereunder and no further Rent is due. No interest or penalties shall accrue on any amounts that Landlord is obligated to credit or refund to Tenant by reason of this Section 4.2. Landlord's failure to deliver Landlord's Statement or to compute the amount of the Rent Adjustments shall not constitute a waiver by Landlord of its right to deliver such items nor constitute a waiver or release of Tenant's obligations to pay such amounts. The Rent Adjustment Deposit shall be credited against Rent Adjustments due for the applicable Adjustment Year. During the last complete Adjustment Year or during any partial Adjustment Year in which the Lease terminates, Landlord may include in the Rent Adjustment Deposit its estimate of Rent Adjustments which might not be finally determined until after the termination or expiration of this Lease. Tenant's obligation to pay Rent Adjustments survives the expiration or termination of the Lease.

4.3     BOOKS AND RECORDS

Landlord shall maintain books and records showing Operating Expenses and Taxes in accordance with sound accounting and management practices, consistently applied. Tenant or its representative (which representative shall be a certified public accountant licensed to do business in the state in which the Property is located and whose primary business is certified public accounting and who shall not be paid on a contingency basis) shall have the right, for a period of sixty (60) days following the date upon which Landlord's Statement is delivered to Tenant, to examine the Landlord's books and records with respect to the items in the foregoing statement of Operating Expenses and Taxes during normal business hours, upon written notice, delivered at least three (3) business days in advance. If Tenant does not object in writing to Landlord's Statement within ninety (90) days of Tenant's receipt thereof, specifying the nature of the item in dispute and the reasons therefor, then Landlord's Statement shall be considered final and accepted by Tenant and Tenant shall be deemed to have waived its right to dispute Landlord's Statement. If Tenant does dispute any Landlord's Statement, Tenant shall deliver a copy of any such audit to Landlord at the time of notification of the dispute. If Tenant does not provide such notice of dispute and a copy of such audit to Landlord within such ninety day (90) day period, it shall be deemed to have waived such right to dispute Landlord's Statement. Any amount due to the Landlord as shown on Landlord's Statement, whether or not disputed by Tenant as provided herein shall be paid by Tenant when due as provided above, without prejudice to any such written exception. In no event shall Tenant be permitted to examine Landlord's records or to dispute any statement of Operating Expenses and Taxes unless Tenant has paid and continues to pay all Rent when due. Upon resolution of any dispute with respect to Operating Expenses and Taxes, Tenant shall either pay Landlord any shortfall or Landlord shall credit Tenant with respect to any overages paid by Tenant. The records obtained by Tenant shall be treated as confidential and neither Tenant nor any of its representatives or agents shall disclose or discuss the information set forth in the audit to or with any other person or entity ("Confidentiality Requirement") except to the extent that such information is subject to standard discovery in the event of a dispute.

14

SMP000019

4.4   TENANT OR LEASE SPECIFIC TAXES

In addition to Monthly Base Rent, Rent Adjustments, Rent Adjustment Deposits and other charges to be paid by Tenant, Tenant shall pay to Landlord, upon demand, any and all taxes payable by Landlord (other than federal or state inheritance, general income, gift or estate taxes) whether or not now customary or within the contemplation of the parties hereto: (a) upon, allocable to, or measured by the Rent payable hereunder, including any gross receipts tax or excise tax levied by any governmental or taxing body with respect to the receipt of such rent; or (b) upon or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises or any portion thereof; or (c) upon the measured value of Tenant's personal property located in the Premises or in any storeroom or any other place in the Premises or the Property, or the areas used in connection with the operation of the Property, it being the intention of Landlord and Tenant that, to the extent possible, such personal property taxes shall be billed to and paid directly by Tenant; (d) resulting from any Landlord Work, Tenant Work, Tenant Alterations, or any other improvements to the Premises, whether title thereto is in Landlord or Tenant; or (e) upon this transaction. Taxes paid by Tenant pursuant to this Section 4.4 shall not be included in any computation of Taxes payable pursuant to Sections 4.1 and 4.2.

ARTICLE 5
SECURITY DEPOSIT

Concurrently with the execution of this Lease, Tenant shall pay to Landlord the Security Deposit, in immediately available funds. The Security Deposit may be applied by Landlord to cure, in whole or part, any default of Tenant under this Lease, and upon notice by Landlord of such application, Tenant shall replenish the Security Deposit in full by paying to Landlord within ten (10) days of demand the amount so applied. Landlord's application of the Security Deposit shall not constitute a waiver of Tenant's default to the extent that the Security Deposit does not fully compensate Landlord for all losses, damages, costs and expenses incurred by Landlord in connection with such default and shall not prejudice any other rights or remedies available to Landlord under this Lease or by Law. Landlord shall not pay any interest on the Security Deposit. Landlord shall not be required to keep the Security Deposit separate from its general accounts. The Security Deposit shall not be deemed an advance payment of Rent or a measure of damages for any default by Tenant under this Lease, nor shall it be a bar or defense of any action that Landlord may at any time commence against Tenant. In the absence of evidence satisfactory to Landlord, in Landlord's reasonable discretion, of an assignment of the right to receive the Security Deposit or the remaining balance thereof, Landlord may return the Security Deposit to the original Tenant, regardless of one or more assignments of this Lease. Upon the transfer of Landlord's interest under this Lease, Landlord's obligation to Tenant with respect to the Security Deposit shall terminate upon transfer to the transferee of the Security Deposit, or any balance thereof. If Tenant shall fully and faithfully comply with all the terms, provisions, covenants, and conditions of this Lease, the Security Deposit, or any balance thereof, shall be returned to Tenant within thirty (30) days after Landlord recovers possession of the Premises or such longer time as may be permissible under Law. Tenant hereby waives any and all rights of Tenant under the provisions of Section 1950.7(c) of the California Civil Code.

SMP000020

ARTICLE 6
SERVICES

6.1   LANDLORD'S GENERAL SERVICES

(a)     So long as the Lease is in full force and effect and Tenant is not in material Default, Landlord shall furnish the following services the cost of which services shall be included in Operating Expenses or paid directly by Tenant to the utility or service provider:

(1)     heat, ventilation and air-conditioning ("HVAC") in the Premises during Standard Operating Hours as necessary in Landlord's reasonable judgment for the comfortable occupancy of the Premises under normal business office operations, subject to compliance with all applicable voluntary and mandatory regulations and Laws;

(2)     tempered and cold water for use in the lavatories from the regular supply of the Building;

(3)     customary cleaning and janitorial services in the Premises five (5) days per week, excluding National Holidays;

(4)     washing of the outside windows in the Premises weather permitting at intervals determined by Landlord; and

(5)     automatic passenger elevator service in common with other tenants of the Building.

(b)     If Tenant uses heat generating machines or equipment in the Premises to an extent which adversely affects the temperature otherwise maintained by the air-cooling system or whenever the occupancy or electrical load adversely affects the temperature otherwise maintained by the air-cooling system, Landlord reserves the right to install or to require Tenant to install supplementary air-conditioning units in the Premises. Tenant shall bear all costs and expenses related to the installation, maintenance and operation of such units.

6.2   ELECTRICAL SERVICES

(a)     So long as the Lease is in full force and effect and Tenant is not in material Default, Landlord shall furnish to the Premises as an Operating Expense or a service which is paid directly by Tenant to the utility provider, electric current for general office use, including normal lighting, normal business office machines and customary janitorial service. Notwithstanding any provision of the Lease to the contrary, without, in each instance, the prior written approval of Landlord, in Landlord's prudent business judgment, Tenant shall not: (i) make any alterations or additions to the electric equipment or systems; or (ii) install or use or permit the installation or use of any computer or electronic data processing equipment in the Premises other than personal computers, laptop computers and ancillary equipment. Tenant's use of electric current shall at no time exceed the capacity of the wiring, feeders and risers providing electric current to the Premises or the Building. The consent of Landlord to the installation of electric equipment shall not relieve Tenant from the obligation to limit usage of electricity to no more than such capacity.

16

SMP000021

(b)      At any time and from time to time, Landlord may in its sole discretion either (i) install one or more meters to measure electric current furnished to the Premises or (ii) reasonably estimate electric current furnished to the Premises. Landlord shall incur the cost of installing and maintaining all such meters and of any electrical engineering or consulting firm, if Landlord retains such firm to estimate the electric current furnished to the Premises in lieu of installation of a meter.

(c)      So long as the Lease is in full force and effect and Tenant is not in material Default, Landlord shall furnish to the Premises replacement lamps, bulbs, ballasts and starters used in any normal Building lighting installed in the Premises, except that if the replacement or repair of such items is a result of negligence of Tenant, its employees, agents, servants, licensees, subtenants, contractors or invitees, such cost shall be paid by Tenant within ten (10) days after notice from Landlord and shall not be included as part of Operating Expenses.

6.3    ADDITIONAL AND AFTER HOUR SERVICES

At Tenant's request, Landlord shall furnish additional quantities of any of the services or utilities specified in Section 6.1, if Landlord can reasonably do so, on the terms set forth herein. For services or utilities requested by Tenant and furnished by Landlord, Tenant shall pay to Landlord as a charge therefor Landlord's prevailing rates charged from time to time for such services and utilities.  Without limiting the generality of the foregoing, for HVAC service beyond Standard Operating Hours, Landlord's prevailing rate as of the date of this Lease is thirty-five dollars ($35) per hour and includes a two (2) hour minimum per activation. If Tenant shall fail to make any such payment, Landlord may, upon notice to Tenant and in addition to Landlord's other remedies under this Lease, discontinue any or all of such additional services.

6.4    TELEPHONE SERVICES

All telephone, and communication connections which Tenant may desire shall be subject to Landlord's prior written approval, in Landlord's reasonable discretion, and the location of all wires and the work in connection therewith shall be performed by contractors approved by Landlord and shall be subject to the direction of Landlord, except that such approval is not required as to Tenant's telephone equipment (including cabling) within the Premises and from the Premises in a route designated by Landlord to any telephone cabinet or panel provided (as existing or as installed as part of Landlord's Work, if any) on Tenant's floor for Tenant's connection to the telephone cable serving the Building so long as Tenant's equipment does not require connections different than or additional to those to the telephone cabinet or panel provided. Except to the extent of such cabling within the Premises or from the Premises to such telephone cabinet or panel, Landlord reserves the right to designate and control the entity or entities providing telephone or other communication cable installation, removal, repair and maintenance in the Building and to restrict and control access to telephone cabinets or panels. In the event Landlord designates a particular vendor or vendors to provide such cable installation, removal, repair and maintenance for the Building, Tenant agrees to abide by and participate in such program. Tenant shall be responsible for and shall pay all costs incurred in connection with the installation of telephone cables and communication wiring in the Premises, including any hook-up, access and maintenance fees related to the installation of such wires and cables in the Premises and the commencement of service therein, and the maintenance thereafter of such wire

17

SMP000022

and cables; and there shall be included in Operating Expenses for the Building all installation, removal, hook-up or maintenance costs incurred by Landlord in connection with telephone cables and communication wiring serving the Building which are not allocable to any individual users of such service but are allocable to the Building generally. If Tenant fails to maintain all telephone cables and communication wiring in the Premises and such failure affects or interferes with the operation or maintenance of any other telephone cables or communication wiring serving the Building, Landlord or any vendor hired by Landlord may enter into and upon the Premises forthwith and perform such repairs, restorations or alterations as Landlord deems necessary in order to eliminate any such interference (and Landlord may recover from Tenant all of Landlord's costs in connection therewith). If required by Landlord, no later than the Termination Date Tenant shall remove all telephone cables and communication wiring installed by Tenant for and during Tenant's occupancy. Tenant agrees that neither Landlord nor any of its agents or employees shall be liable to Tenant, or any of Tenant's employees, agents, customers or invitees or anyone claiming through, by or under Tenant, for any damages, injuries, losses, expenses, claims or causes of action because of any interruption, diminution, delay or discontinuance at any time for any reason in the furnishing of any telephone or other communication service to the Premises and the Building.

6.5   DELAYS IN FURNISHING SERVICES

Tenant agrees that Landlord shall not be in breach of this Lease nor be liable to Tenant for damages or otherwise, for any failure to furnish, or a delay in furnishing, or a change in the quantity or character of any service when such failure, delay or change is occasioned, in whole or in part, by repairs, improvements or mechanical breakdowns, by the act or default of Tenant or other parties or by an event of Force Majeure. No such failure, delay or change shall be deemed to be an eviction or disturbance of Tenant's use and possession of the Premises, or relieve Tenant from paying Rent or from performing any other obligations of Tenant under this Lease, without any deduction or offset. Landlord agrees to use all reasonable haste and diligence to restore any failed services to Tenant. Failure to any extent to make available, or any slowdown, stoppage, or interruption of, the specified utility services resulting from any cause, including changes in service provider or Landlord's compliance with any voluntary or similar governmental or business guidelines now or hereafter published or any requirements now or hereafter established by any governmental agency, board, or bureau having jurisdiction over the operation of the Property shall not render Landlord liable in any respect for damages to either persons, property, or business, nor be construed as an eviction of Tenant or work an abatement of Rent, nor relieve Tenant of Tenant's obligations for fulfillment of any covenant or agreement hereof. Should any equipment or machinery furnished by Landlord break down or for any cause cease to function properly, Landlord shall use reasonable diligence to repair same promptly, but Tenant shall have no claim for abatement of Rent or damages on account of any interruption of service occasioned thereby or resulting therefrom. In the event that (i) Landlord fails to provide services in accordance with the terms of Section 6 of this Lease, and (ii) providing such services is within Landlord's reasonable control, and (iii) Landlord has had a reasonable time in which to cure such failure, then Tenant shall receive a credit from Landlord in the amount of one (1) day's per diem rent for each day that Landlord could have reasonably provided such services to Tenant but did not.

18

StudentsFirst Lease (10/4/11)

SMP000023

6.6   CHOICE OF SERVICE PROVIDER

Tenant acknowledges that Landlord may, at Landlord's sole option, to the extent permitted by applicable law, elect to change, from time to time, the company or companies which provide services (including electrical service, gas service, water, telephone and technical services) to the Building, the Premises and/or its occupants. Notwithstanding anything to the contrary set forth in this Lease, Tenant acknowledges that Landlord has not and does not make any representations or warranties concerning the identity or identities of the company or companies which provide services to the Building and the Premises or its occupants and Tenant acknowledges that the choice of service providers and matters concerning the engagement and termination thereof shall be solely that of Landlord. The foregoing provision is not intended to modify, amend, change or otherwise derogate any provision of this Lease concerning the nature or type of service to be provided or any specific information concerning the amount thereof to be provided. Tenant agrees to cooperate with Landlord and each of its service providers in connection with any change in service or provider; provided, however, that Tenant shall not be responsible for any costs associated with such changeover unless such change is at Tenant's request.

6.7   SIGNAGE

Initial Building standard signage will be installed by Landlord in the directory in the main lobby of the Building at Landlord's sole cost and expense. Any change in such initial signage shall be only with Landlord's prior written consent, shall conform to Building standard signage and shall be at Tenant's sole cost and expense.

ARTICLE 7
POSSESSION, USE AND CONDITION OF PREMISES

7.1   POSSESSION AND USE OF PREMISES

(a)   Tenant shall be entitled to possession of the Premises as of the Date of the Lease in accordance with the terms and conditions of Section 2.2(c) and such possession of the Premises shall be deemed delivered to Tenant on such date. Tenant shall occupy and use the Premises only for the uses specified in Section 1.1(13) to conduct Tenant's business. Tenant shall not occupy or use the Premises (or permit the use or occupancy of the Premises) for any purpose or in any manner which: (1) is unlawful or in violation of any Law or Environmental Law; (2) may be dangerous to persons or property or which may increase the cost of, or invalidate, any policy of insurance carried on the Building or covering its operations; (3) is contrary to or prohibited by the terms and conditions of this Lease or the rules of the Building set forth in Article 18; or (4) would tend to create or continue a nuisance.

(b)   Landlord shall provide Tenant with Access Card Keys for up to 30 employees and/or directors of Tenant. After the initial Access Card Key provided to Tenant, the cost of any additional Access Card Keys or any replacement cards for either the initial or additional Access Car Keys shall be paid by Tenant at a rate of no more than Fifty Dollars ($50.00) per replacement or additional card. Tenant shall place a deposit for such cards with Landlord to cover lost cards or cards which are not returned at the end of the Term. Tenant agrees that

19

SMP000024

Access Card Keys shall only be issued to Tenant's employees and/or directors. Each Access Card Key shall be uniquely identified by Landlord. Tenant agrees to comply with the rule and regulations related to the Access Card Keys or other security devices which Landlord may make from time to time. Without limiting the generality of the foregoing, Tenant agrees to (i) maintain current and accurate records of all persons to whom Tenant issues Access Card Keys so that Landlord may, at any time upon reasonable request, be able to identify which individual has which unique Access Card Key and (ii) provide Landlord with a quarterly update of its current employees, directors, and officers.

(c)     Tenant shall comply with all Environmental Laws pertaining to Tenant's occupancy and use of the Premises and concerning the proper storage, handling and disposal of any Hazardous Material introduced to the Premises, the Building or the Property by Tenant or other occupants of the Premises, or their employees, servants, agents, contractors, customers or invitees. Landlord shall comply with all Environmental Laws applicable to the Property other than those to be complied with by Tenant pursuant to the preceding sentence. Tenant shall not generate, store, handle or dispose of any Hazardous Material in, on, or about the Property without the prior written consent of Landlord, which may be withheld in Landlord's sole discretion, except that such consent shall not be required to the extent of Hazardous Material packaged and contained in office products for consumer use in general business offices in quantities for ordinary day-to-day use provided such use does not give rise to, or pose a risk of, exposure to or release of Hazardous Material. In the event that Tenant is notified of any investigation or violation of any Environmental Law arising from Tenant's activities at the Premises, Tenant shall immediately deliver to Landlord a copy of such notice. In such event or in the event Landlord reasonably believes that a violation of Environmental Law exists, Landlord may conduct such tests and studies relating to compliance by Tenant with Environmental Laws or the alleged presence of Hazardous Materials upon the Premises as Landlord deems desirable, all of which shall be completed at Tenant's expense. Landlord's inspection and testing rights are for Landlord's own protection only, and Landlord has not, and shall not be deemed to have assumed any responsibility to Tenant or any other party for compliance with Environmental Laws, as a result of the exercise, or non-exercise of such rights. Tenant hereby indemnifies, and agrees to defend, protect and hold harmless, the Indemnitees from any and all loss, claim, demand, action, expense, liability and cost (including attorneys' fees and expenses) arising out of or in any way related to the presence of any Hazardous Material introduced to the Premises during the Term by Tenant or any parties who are Tenant's employees, directors, invitees, licensees, or any other party accessing the Premises with Tenant's consent. In case of any action or proceeding brought against the Indemnitees by reason of any such claim, upon notice from Landlord, Tenant covenants to defend such action or proceeding by counsel chosen by Landlord, in Landlord's sole discretion. Landlord reserves the right to settle, compromise or dispose of any and all actions, claims and demands related to the foregoing indemnity. Landlord hereby indemnifies and agrees to defend, protect and hold Tenant harmless from any and all loss, claim, demand, action, expense, liability and cost (including attorneys' fees and expenses) arising out of or in any way related to the presence of any Hazardous Material prior to the Commencement Date which was both (i) known as a Hazardous Material under the laws in existence at the Commencement Date and (ii) which is in the Premises as a result of Landlord's failure to remediate the Premises prior to the Commencement Date in accordance with the applicable standards in effect at the Commencement Date for professional office space use. If any Hazardous Material is released, discharged or disposed of on or about the Property and such

20

SMP000025

release, discharge or disposal is not caused by Tenant or other occupants of the Premises, or their employees, servants, agents, contractors customers or invitees, such release, discharge or disposal shall be deemed casualty damage under Article 14 to the extent that the Premises are affected thereby; in such case, Landlord and Tenant shall have the obligations and rights respecting such casualty damage provided under such Article.

(d)     Landlord and Tenant acknowledge that the Americans With Disabilities Act of 1990 (42 U.S.C. §12101 et seq.) and regulations and guidelines promulgated thereunder, as all of the same may be amended and supplemented from time to time (collectively referred to herein as the "ADA") establish requirements for business operations, accessibility and barrier removal, and that such requirements may or may not apply to the Premises, the Building and the Project depending on, among other things: (1) whether Tenant's business is deemed a "public accommodation" or "commercial facility", (2) whether such requirements are "readily achievable", and (3) whether a given alteration affects a "primary function area" or triggers "path of travel" requirements.  The parties hereby agree that: (a) Landlord shall be responsible for ADA Title III compliance in the Common Areas, except as provided below, (b) Tenant shall be responsible for ADA Title III compliance in the Premises, including any leasehold improvements or other work to be performed in the Premises under or in connection with this Lease, (c) Landlord may perform, or require that Tenant perform, and Tenant shall be responsible for the cost of, ADA Title III "path of travel" requirements triggered by Tenant Additions in the Premises, and (d) Landlord may perform, or require Tenant to perform, and Tenant shall be responsible for the cost of, ADA Title III compliance in the Common Areas necessitated by the Building being deemed to be a "public accommodation" instead of a "commercial facility" as a result of Tenant's use of the Premises.  Tenant shall be solely responsible for requirements under Title I of the ADA relating to Tenant's employees.

7.2     LANDLORD ACCESS TO PREMISES: APPROVALS

(a)     Tenant shall permit Landlord to erect, use and maintain pipes, ducts, wiring and conduits in and through the Premises, so long as Tenant's use, layout or design of the Premises is not materially affected or altered.  Landlord or Landlord's agents shall have the right to enter upon the Premises in the event of an emergency, or within reasonable prior written notice and at reasonable times to inspect the Premises, to perform janitorial and other services, to conduct safety and other testing in the Premises and to make such repairs, alterations, improvements or additions to the Premises or the Building or other parts of the Property as Landlord may deem necessary or desirable (including all alterations, improvements and additions in connection with a change in service provider or providers).  Janitorial and cleaning services shall be performed after Standard Operating Hours.  Any entry or work by Landlord may be during Standard Operating Hours but Landlord shall use reasonable efforts to ensure that any entry or work shall not materially interfere with Tenant's occupancy of the Premises.

(b)     If Tenant shall not be personally present to permit an entry into the Premises when for any reason an entry therein shall be necessary or permissible, Landlord (or Landlord's agents), after attempting to notify Tenant (unless Landlord believes an emergency situation exists), may enter the Premises without rendering Landlord or its agents liable therefor, and without relieving Tenant of any obligations under this Lease.

21

StudentsFirst Lease (10/4/11)

(c)     Subject to the restrictions set forth in 7.2(a), Landlord may enter the Premises for the purpose of conducting such inspections, tests and studies as Landlord may deem desirable or necessary to confirm Tenant's compliance with all Laws and Environmental Laws or for other purposes necessary in Landlord's reasonable judgment to ensure the sound condition of the Property and the systems serving the Property.  Landlord's rights under this Section 7.2(c) are for Landlord's own protection only, and Landlord has not, and shall not be deemed to have assumed, any responsibility to Tenant or any other party as a result of the exercise or non-exercise of such rights, for compliance with Laws or Environmental Laws or for the accuracy or sufficiency of any item or the quality or suitability of any item for its intended use.

(d)     Landlord may do any of the foregoing, or undertake any of the inspection or work described in the preceding paragraphs without such action constituting an actual or constructive eviction of Tenant, in whole or in part, or giving rise to an abatement of Rent by reason of loss or interruption of business of the Tenant, or otherwise.  Landlord shall be responsible for repairing any damage to the Premises caused by its access.

(e)     The review, approval or consent of Landlord with respect to any item required or permitted under this Lease is for Landlord's own protection only, and Landlord has not, and shall not be deemed to have assumed, any responsibility to Tenant or any other party, as a result of the exercise or non-exercise of such rights, for compliance with Laws or Environmental Laws or for the accuracy or sufficiency of any item or the quality or suitability of any item for its intended use.

7.3     QUIET ENJOYMENT

Landlord covenants, in lieu of any implied covenant of quiet possession or quiet enjoyment, that so long as Tenant is in compliance with the covenants and conditions set forth in this Lease, Tenant shall have the right to quiet enjoyment of the Premises without hindrance or interference from Landlord or those claiming through Landlord, and subject to the covenants and conditions set forth in the Lease and to the rights of any Mortgagee or ground lessor.

ARTICLE 8
MAINTENANCE

8.1     LANDLORD'S MAINTENANCE

Subject to the provisions of Articles 4 and 14, Landlord shall, as an Operating Expense, maintain and make necessary repairs to the foundations, roofs, exterior walls, and the structural elements of the Building, those corridors and lobbies which are Common Areas of the Building, and the electrical, plumbing, heating, ventilating, air-conditioning, mechanical, communication, security and the fire and life safety systems of the Building (including those serving the Premises) and the washrooms, lavatories, showers, or breakrooms of the second and third floors of the Building, and all other portions of the Premises except that: (a) Landlord shall not be responsible for those maintenance or repairs for which Tenant is obligated under Section 8.2 below; and (b) that the cost of performing any of said maintenance or repairs whether to the Premises or to the Building caused by the negligence of Tenant, its employees, agents, servants, licensees, subtenants, contractors or invitees, shall be paid by Tenant, subject to the waivers set

22

SMP000027

forth in Section 16.4.  Landlord shall not be liable to Tenant for any expense, injury, loss or damage resulting from work done in or upon, or in connection with the use of, any adjacent or nearby building, land, street or alley.

8.2     TENANT'S MAINTENANCE

Tenant shall periodically inspect the Premises to identify any conditions that are dangerous or in need of maintenance or repair.  Tenant shall promptly provide Landlord with notice of any such conditions. Tenant shall, at its sole cost and expense, perform all maintenance and repairs to the Premises that are not Landlord's express responsibility under this Lease, and keep the Premises in good condition and repair, reasonable wear and tear excepted. Tenant's repair and maintenance obligations include repairs to: (a) interior partitions; (b) all cabling, DSL (or equivalent), or telephone lines in the Premises and serving the Premises exclusively; (c) decorative light fixtures (excluding bulb replacement); (d) removable improvements in the Premises, including without limitation removable appliances; (e) furnishings in the Premises; (f), Tenant Alterations; (g) business equipment in the Premises; and (h) any other personal property such as plants, art or other decorations. To the extent Landlord is not reimbursed by insurance proceeds, Tenant shall reimburse Landlord for the cost of repairing damage to the Building caused by the acts of Tenant, Tenant Related Parties and their respective contractors and vendors. If Tenant fails to make any repairs to the Premises for more than fifteen (15) days after notice from Landlord (although notice shall not be required in an emergency), Landlord may make the repairs, and Tenant shall pay the reasonable cost of the repairs, together with an administrative charge in an amount equal to 10% of the cost of the repairs. With respect to Tenant's maintenance and repair obligations, Tenant hereby waives all right to make repairs at the expense of Landlord or in lieu thereof to vacate the Premises and its other similar rights as provided in California Civil Code Sections 1932(1), 1941 and 1942 or any other Laws (whether now or hereafter in effect).

ARTICLE 9
ALTERATIONS AND IMPROVEMENTS

9.1     TENANT ALTERATIONS

(a)     The following provisions shall apply to the completion of any Tenant Alterations:

(1)     Tenant shall not, except as provided herein, without the prior written consent of Landlord, which consent shall not be unreasonably withheld, make or cause to be made any Tenant Alterations in or to the Premises or any Property systems serving the Premises. Prior to making any Tenant Alterations, Tenant shall give Landlord ten (10) days prior written notice (or such earlier notice as would be necessary pursuant to applicable Law) to permit Landlord sufficient time to post appropriate notices of non-responsibility. Subject to all other requirements of this Article 9, Tenant may undertake Decoration work without Landlord's prior written consent.  Tenant shall furnish Landlord with the names and addresses of all contractors and subcontractors and copies of all contracts. All Tenant Alterations shall be completed at such time and in such manner as Landlord may from time to time designate, and only by contractors or mechanics approved by Landlord, which approval shall not be unreasonably withheld; provided, however, that Landlord may, in its sole discretion, specify the engineers and

23

SMP000028

contractors to perform all work relating to the Building's systems (including the mechanical, heating, plumbing, security, ventilating, air-conditioning, electrical, communication and the fire and life safety systems in the Building). The contractors, mechanics and engineers who may be used are further limited to those whose work will not cause or threaten to cause disharmony or interference with Landlord or other tenants in the Building and their respective agents and contractors performing work in or about the Building. Landlord may further condition its consent upon Tenant furnishing to Landlord and Landlord approving prior to the commencement of any work or delivery of materials to the Premises related to the Tenant Alterations such of the following as specified by Landlord: architectural plans and specifications, opinions from Landlord's engineers stating that the Tenant Alterations will not in any way adversely affect the Building's systems, necessary permits and licenses, certificates of insurance, and such other documents in such form reasonably requested by Landlord. Landlord may, in the exercise of reasonable judgment, request that Tenant provide Landlord with appropriate evidence of Tenant's ability to complete and pay for the completion of the Tenant Alterations such as a performance bond or letter of credit. Upon completion of the Tenant Alterations, Tenant shall deliver to Landlord an as-built mylar and digitized (if available) set of plans and specifications for the Tenant Alterations.

(2)     Other than those Tenant Alterations which are part of Landlord's Work, Tenant shall pay the cost of all Tenant Alterations and the cost of decorating the Premises and any work to the Property occasioned thereby. Upon completion of Tenant Alterations, Tenant shall furnish Landlord with contractors' affidavits and full and final waivers of lien and receipted bills covering all labor and materials expended and used in connection therewith and such other documentation reasonably requested by Landlord or Mortgagee.

(3)     Tenant agrees to complete all Tenant Alterations (i) in accordance with all Laws, Environmental Laws, all requirements of applicable insurance companies and in accordance with Landlord's standard construction rules and regulations, (ii) in a good and workmanlike manner with the use of good grades of materials, and (iii) with materials that qualify for "gold" level LEED certification. Tenant shall notify Landlord immediately if Tenant receives any notice of violation of any Law in connection with completion of any Tenant Alterations and shall immediately take such steps as are necessary to remedy such violation. In no event shall such supervision or right to supervise by Landlord nor shall any approvals given by Landlord under this Lease constitute any warranty by Landlord to Tenant of the adequacy of the design, workmanship or quality of such work or materials for Tenant's intended use or of compliance with the requirements of Section 9.1(a)(3)(i) and (ii) above or impose any liability upon Landlord in connection with the performance of such work.

(b)     All Tenant Additions, whether installed by Landlord or Tenant, shall without compensation or credit to Tenant, become part of the Premises and the property of Landlord at the time of their installation and shall remain in the Premises, unless pursuant to Article 12, Tenant may remove them or is required to remove them at Landlord's request.

9.2     LIENS

Tenant shall not permit any lien or claim for lien of any mechanic, laborer or supplier or any other lien to be filed against the Building, the Land, the Premises, or any other part of the

Property arising out of work performed, or alleged to have been performed by, or at the direction of, or on behalf of Tenant. If any such lien or claim for lien is filed, Tenant shall within ten (10) days of receiving notice of such lien or claim (a) have such lien or claim for lien released of record or (b) deliver to Landlord a bond in form, content, amount, and issued by surety, satisfactory to Landlord, indemnifying, protecting, defending and holding harmless the Indemnitees against all costs and liabilities resulting from such lien or claim for lien and the foreclosure or attempted foreclosure thereof. If Tenant fails to take any of the above actions, Landlord, in addition to its rights and remedies under Article 11, without investigating the validity of such lien or claim for lien, may pay or discharge the same and Tenant shall, as payment of additional Rent hereunder, reimburse Landlord upon demand for the amount so paid by Landlord, including Landlord's expenses and attorneys' fees.

ARTICLE 10
ASSIGNMENT AND SUBLETTING

## 10.1   ASSIGNMENT AND SUBLETTING

(a)   Without the prior written consent of Landlord, which may be withheld in Landlord's sole discretion, Tenant may not sublease, assign, mortgage, pledge, hypothecate or otherwise transfer or permit the transfer of this Lease or the encumbering of Tenant's interest therein in whole or in part, by operation of Law or otherwise or permit the use or occupancy of the Premises, or any part thereof, by anyone other than Tenant; provided, however, that Landlord's consent shall not be unreasonably withheld for the following organizations: Greenwise Sacramento, Dr. Oz's Healthcorps, For Art's Sake Sacramento, STAND UP organization, City Year, Teach for America, and future StudentsFirst affiliates. For clarification purposes, the mission statements of such organizations (other than future affiliates of StudentsFirst) are attached as Exhibit F hereto. Tenant agrees that the provisions governing sublease and assignment set forth in this Article 10 shall be deemed to be reasonable. If Tenant desires to enter into any sublease of the Premises or assignment of this Lease, Tenant shall deliver written notice thereof to Landlord ("Tenant's Notice"), together with the identity of the proposed subtenant or assignee and the proposed principal terms thereof and financial and other information sufficient for Landlord to make an informed judgment with respect to such proposed subtenant or assignee at least forty-five (45) days prior to the commencement date of the term of the proposed sublease or assignment. If Tenant proposes to sublease less than all of the Rentable Area of the Premises, the space proposed to be sublet and the space retained by Tenant must each be a marketable unit as reasonably determined by Landlord and otherwise in compliance with all Laws. Landlord shall notify Tenant in writing of its approval or disapproval of the proposed sublease or assignment or its decision to exercise its rights under Section 10.2 within ten (10) days after receipt of Tenant's Notice (and all required information); provided, however, that if the 10th day lands on either a weekend or a nationally recognized holiday, than the date by which Landlord is required to respond shall be the next business day. In no event may Tenant sublease any portion of the Premises or assign the Lease to any other tenant of the Project. Tenant shall submit for Landlord's approval (which approval shall not be unreasonably withheld) any advertising which Tenant or its agents intend to use with respect to the space proposed to be sublet. Notwithstanding anything the contrary contained in this Section 10, Tenant shall have the right, without Landlord's consent, to sublease the Premises, or any part thereof, to the following

25

SMP000030

affiliates of Tenant: StudentsFirst, Coalition for Great Students, and Coalition for Great Public Schools.

(b)     With respect to Landlord's consent to an assignment or sublease, Landlord may take into consideration any factors that Landlord may deem relevant, and the reasons for which Landlord's denial shall be deemed to be reasonable shall include, without limitation, the following:

(i)     the business reputation or creditworthiness of any proposed subtenant or assignee is not acceptable to Landlord; or

(ii)     in Landlord's reasonable judgment the proposed assignee or sublessee would diminish the value or reputation of the Building or Landlord; or

(iii)     any proposed assignee's or sublessee's use of the Premises would violate Section 7.1 of the Lease or would violate the provisions of any other leases of tenants in the Building; or

(iv)     the proposed sublessee or assignee is a current occupant of the Building or a bona fide prospective tenant of Landlord in the Building as demonstrated by a written proposal dated within ninety (90) days prior to the date of Tenant's request; or

(v)     the proposed sublessee or assignee would materially increase the estimated pedestrian and/or vehicular traffic to and from the Premises and the Building.

(c)     Any sublease or assignment shall be expressly subject to the terms and conditions of this Lease.  Any subtenant or assignee shall execute such documents as Landlord may reasonably require to evidence such subtenant or assignee's assumption of the obligations and liabilities of Tenant under this Lease.  Tenant shall deliver to Landlord a copy of all agreements executed by Tenant and the proposed subtenant and assignee with respect to the Premises. Landlord's approval of a sublease, assignment, hypothecation, transfer or third party use or occupancy shall not constitute a waiver of Tenant's obligation to obtain Landlord's consent to further assignments or subleases, hypothecations, transfers or third party use or occupancy.

(d)     For purposes of this Article 10, an assignment shall be deemed to include a change in the majority control of Tenant, resulting from any transfer, sale or assignment of shares of stock of Tenant occurring by operation of Law or otherwise if Tenant is a corporation whose shares of stock are not traded publicly.  If Tenant is a partnership, any change in the partners of Tenant shall be deemed to be an assignment.

(e)     If any persons or entities other than Tenant or Tenant's employees, officers and/or directors shall occupy all or any portion of the Premises (regardless of whether such persons are subletting such space from Tenant), then Tenant shall cause all such occupiers to comply with all of the rules and regulations required by Landlord under this Lease and the failure of such occupiers to comply with such rules and regulations shall be deemed a Default under the Lease provided that the Tenant fails to cure after five (5) days from receipt of written notification from the Landlord, and further that if Landlord has given Tenant notice of the same violation more

SMP000031

than two times, then any additional violation of the same shall thereafter constitute a Default without any requirement to notify Tenant nor opportunity for Tenant to cure such violation.

10.2   RECAPTURE

Excluding any assignment or sublease contemplated in Section 10.1(e), Landlord shall have the option to exclude from the Premises covered by this Lease ("recapture") the space proposed to be sublet or subject to the assignment, effective as of the proposed commencement date of such sublease or assignment. If Landlord elects to recapture, Tenant shall surrender possession of the space proposed to be subleased or subject to the assignment to Landlord on the effective date of recapture of such space from the Premises, such date being the Termination Date for such space. Effective as of the date of recapture of any portion of the Premises pursuant to this section, the Monthly Base Rent, Rentable Area of the Premises and Tenant's Share shall be adjusted accordingly.

10.3   EXCESS RENT

Tenant shall pay Landlord on the first day of each month during the term of the sublease or assignment, fifty percent (50%) of the amount by which the sum of all rent and other consideration (direct or indirect) due from the subtenant or assignee for such month exceeds: (i) that portion of the Monthly Base Rent and Rent Adjustments due under this Lease for said month which is allocable to the space sublet or assigned; and (ii) the following costs and expenses for the subletting or assignment of such space: (1) brokerage commissions and attorneys' fees and expenses, (2) the actual costs paid in making any improvements or substitutions in the Premises required by any sublease or assignment; and (3) "free rent" periods, costs of any inducements or concessions given to subtenant or assignee, moving costs, and other amounts in respect of such subtenant's or assignee's other leases or occupancy arrangements. All such costs and expenses shall be amortized over the term of the sublease or assignment pursuant to sound accounting principles.

10.4   TENANT LIABILITY; RENEWAL OPTION

In the event of any sublease or assignment, whether or not with Landlord's consent, Tenant shall not be released or discharged from any liability, whether past, present or future, under this Lease, including any liability arising from the exercise of any renewal or expansion option, to the extent such exercise is expressly permitted by Landlord. Tenant's liability shall remain primary, and in the event of default by any subtenant, assignee or successor of Tenant in performance or observance of any of the covenants or conditions of this Lease, Landlord may proceed directly against Tenant without the necessity of exhausting remedies against said subtenant, assignee or successor. After any assignment, Landlord may consent to subsequent assignments or subletting of this Lease, or amendments or modifications of this Lease with assignees of Tenant, without notifying Tenant, or any successor of Tenant, and without obtaining its or their consent thereto, and such action shall not relieve Tenant or any successor of Tenant of liability under this Lease. If Landlord grants consent to such sublease or assignment, Tenant shall pay all reasonable attorneys' fees and expenses incurred by Landlord with respect to such assignment or sublease. In addition, if Tenant has any options to extend the Term or to add other space to the Premises, such options shall not be available to any subtenant or assignee, directly or

27

SMP000032

indirectly without Landlord's express written consent, which may be withheld in Landlord's sole discretion.

## 10.5   ASSUMPTION AND ATTORNMENT

If Tenant shall assign this Lease as permitted herein, the assignee shall expressly assume all of the obligations of Tenant hereunder in a written instrument satisfactory to Landlord and furnished to Landlord not later than fifteen (15) days prior to the effective date of the assignment.   If Tenant shall sublease the Premises as permitted herein, Tenant shall, at Landlord's option, within fifteen (15) days following any request by Landlord, obtain and furnish to Landlord the written agreement of such subtenant to the effect that the subtenant will attorn to Landlord and will pay all subrent directly to Landlord.

## 10.6   PROCESSING EXPENSES{ TC }.

Tenant shall pay to Landlord, as Landlord's cost of processing each proposed assignment or subletting (whether or not the same is ultimately approved by Landlord or consummated by Tenant), an amount equal to the sum of (i) Landlord's reasonable attorneys' and other professional fees, plus (ii) the sum of $750.00 for the cost of Landlord's administrative, accounting and clerical time (collectively, "Processing Costs").   Notwithstanding anything to the contrary herein, Landlord shall not be required to process any request for Landlord's consent to an assignment or subletting until Tenant has paid to Landlord the amount of Landlord's estimate of the Processing Costs.   When the actual amount of the Processing Costs is determined, it shall be reconciled with Landlord's estimate, and any payments or refunds required as a result thereof shall promptly thereafter be made by the parties.

## ARTICLE 11
## DEFAULT AND REMEDIES

## 11.1   EVENTS OF DEFAULT

The occurrence or existence of any one or more of the following shall constitute a "Default" by Tenant under this Lease:

(i)     Tenant fails to pay any installment or other payment of Rent including Rent Adjustment Deposits or Rent Adjustments within five (5) days from receipt of written notice that such sum is due; provided, however, that if Tenant is late in paying any Rent to Landlord more than two (2) times over the term of the Lease, then thereafter, it shall be a Default if Tenant fails to pay any installment or other payment of Rent including Rent Adjustment Deposits or Rent Adjustments within five (5) days from the date when due;

(ii)    Tenant fails to observe or perform any of the other covenants, conditions or provisions of this Lease or the Workletter and fails to cure such default within fifteen (15) days after written notice thereof to Tenant unless (A) such failure cannot reasonably be cured within said fifteen (15) day period, in which case Tenant shall not be in default if Tenant commences such cure within said fifteen (15) day period and thereafter diligently

28

SMP000033

prosecutes the same to completion, (B) the default involves a hazardous condition, in which case it shall be cured forthwith or (C) the failure to perform is a Default for which this Lease specifies there is no cure or grace period;

(iii)    the interest of Tenant in this Lease is levied upon under execution or other legal process;

(iv)    a petition is filed by Tenant to declare Tenant bankrupt or seeking a plan of reorganization or arrangement under any Chapter of the Bankruptcy Act, or any amendment, replacement or substitution therefor, or to delay payment of, reduce or modify Tenant's debts, which in the case of an involuntary action is not discharged within thirty (30) days;

(v)    Tenant is declared insolvent by Law or any assignment of Tenant's property is made for the benefit of creditors;

(vi)    a receiver is appointed for Tenant or Tenant's property, which appointment is not discharged within thirty (30) days;

(vii)    any action taken by or against Tenant to reorganize or modify Tenant's capital structure in a materially adverse way which in the case of an involuntary action is not discharged within thirty (30) days;

(viii)    upon the dissolution of Tenant; or

(ix)    upon the third occurrence during any 12-month period during the Term that Tenant has breached a monetary covenant of this Lease (whether or not such failure or breach is thereafter cured within any stated cure or grace period or statutory period); or

(x)    upon the occurrence of the seventh breach by Tenant of a non-monetary covenant of this Lease which is in violation of any Laws in accordance with Section 11.7 below.

11.2    LANDLORD'S REMEDIES

(a) A Default shall constitute a breach of the Lease for which Landlord shall have the rights and remedies set forth in this Section 11.2 and all other rights and remedies set forth in this Lease or now or hereafter allowed by Law, whether legal or equitable, and all rights and remedies of Landlord shall be cumulative and none shall exclude any other right or remedy now or hereafter allowed by applicable Law.

(b) With respect to a Default, at any time Landlord may terminate Tenant's right to possession by written notice to Tenant stating such election.  Any written notice required pursuant to Section 11.1 shall constitute notice of unlawful detainer pursuant to California Code of Civil Procedure Section 1161 if, at Landlord's sole discretion, it states Landlord's election that Tenant's right to possession is terminated after expiration of any period required by Law or any longer period required by Section 11.1.  Upon the expiration of the period stated in Landlord's written notice of termination (and unless such notice provides an option to cure within such

29

SMP000034

period and Tenant cures the Default within such period), Tenant's right to possession shall terminate and this Lease shall terminate, and Tenant shall remain liable as hereinafter provided. Upon such termination in writing of Tenant's right to possession, Landlord shall have the right, subject to applicable Law, to re-enter the Premises and dispossess Tenant and the legal representatives of Tenant and all other occupants of the Premises by unlawful detainer or other summary proceedings, or as otherwise permitted by Law, regain possession of the Premises and remove their property (including their trade fixtures, personal property and Required Removables pursuant to Article 12), but Landlord shall not be obligated to effect such removal, and such property may, at Landlord's option, be stored elsewhere, sold or otherwise dealt with as permitted by Law, at the risk of, expense of and for the account of Tenant, and the proceeds of any sale shall be applied pursuant to Law. Tenant hereby waives all claims for damages that may be caused by Landlord's removing or storing Tenant's personal property pursuant to this Section or Section 12.1, and Tenant hereby indemnifies, and agrees to defend, protect and hold harmless, the Indemnitees from any and all loss, claims, demands, actions, expenses, liability and cost (including attorneys' fees and expenses) arising out of or in any way related to such removal or storage. Upon such written termination of Tenant's right to possession and this Lease, Landlord shall have the right to recover damages for Tenant's Default as provided herein or by Law, including the following damages provided by California Civil Code Section 1951.2:

(1)     the worth at the time of award of the unpaid Rent which had been earned at the time of termination;

(2)     the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such Rent loss that Tenant proves could reasonably have been avoided;

(3)     the worth at the time of award of the amount by which the unpaid Rent for the balance of the term of this Lease after the time of award exceeds the amount of such Rent loss that Tenant proves could be reasonably avoided; and

(4)     any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including, without limitation, Landlord's unamortized costs of tenant improvements, leasing commissions and legal fees incurred in connection with entering into this Lease. The word "rent" as used in this Section 11.2 shall have the same meaning as the defined term Rent in this Lease. The "worth at the time of award" of the amount referred to in clauses (1) and (2) above is computed by allowing interest at the Default Rate. The worth at the time of award of the amount referred to in clause (3) above is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%). For the purpose of determining unpaid Rent under clause (3) above, the monthly Rent reserved in this Lease shall be deemed to be the sum of the Monthly Base Rent, monthly storage space rent, if any, and the amounts last payable by Tenant as Rent Adjustments for the calendar year in which Landlord terminated this Lease as provided hereinabove.

(c)     Even if Tenant is in Default and/or has abandoned the Premises, this Lease shall continue in effect for so long as Landlord does not terminate Tenant's right to possession by

SMP000035

written notice as provided in Section 11.2(b) above, and Landlord may enforce all its rights and remedies under this Lease, including the right to recover Rent as it becomes due under this Lease.  In such event, Landlord shall have all of the rights and remedies of a landlord under California Civil Code Section 1951.4 (lessor may continue Lease in effect after Tenant's Default and abandonment and recover Rent as it becomes due, if Tenant has the right to sublet or assign, subject only to reasonable limitations), or any successor statute.  During such time as Tenant is in Default, if Landlord has not terminated this Lease by written notice and if Tenant requests Landlord's consent to an assignment of this Lease or a sublease of the Premises, subject to Landlord's option to recapture pursuant to Section 10.2, Landlord shall not unreasonably withhold its consent to such assignment or sublease.  Tenant acknowledges and agrees that the provisions of Article 10 shall be deemed to constitute reasonable limitations of Tenant's right to assign or sublet.  Tenant acknowledges and agrees that in the absence of written notice pursuant to Section 11.2(b) above terminating Tenant's right to possession, no other act of Landlord shall constitute a termination of Tenant's right to possession or an acceptance of Tenant's surrender of the Premises, including acts of maintenance or preservation or efforts to relet the Premises or the appointment of a receiver upon initiative of Landlord to protect Landlord's interest under this Lease or the withholding of consent to a subletting or assignment, or terminating a subletting or assignment, if in accordance with other provisions of this Lease.

(d)     Tenant hereby waives any and all rights to relief from forfeiture, redemption or reinstatement granted by Law (including California Civil Code of Procedure Sections 1174 and 1179) in the event of Tenant being evicted or dispossessed for any cause or in the event of Landlord obtaining possession of the Premises by reason of Tenant's Default or otherwise;

(e)     Notwithstanding any other provision of this Lease, a notice to Tenant given under this Article and Article 24 of this Lease or given pursuant to California Code of Civil Procedure Section 1161, and any notice served by mail, shall be deemed served, and the requisite waiting period deemed to begin under said Code of Civil Procedure Section upon mailing (except as may be required under Code of Civil Procedure Section 1161 et seq.), without any additional waiting requirement under Code of Civil Procedure Section 1011 et seq. or by other Law.  For purposes of Code of Civil Procedure Section 1162, Tenant's "place of residence", "usual place of business", "the property" and "the place where the property is situated" shall mean and be the Premises, whether or not Tenant has vacated same at the time of service.

(f)     The voluntary or other surrender or termination of this Lease, or a mutual termination or cancellation thereof, shall not work a merger and shall terminate all or any existing assignments, subleases, subtenancies or occupancies permitted by Tenant, except if and as otherwise specified in writing by Landlord.

(g)     No delay or omission in the exercise of any right or remedy of Landlord upon any default by Tenant, and no exercise by Landlord of its rights pursuant to Section 25.15 to perform any duty which Tenant fails timely to perform, shall impair any right or remedy or be construed as a waiver.  No provision of this Lease shall be deemed waived by Landlord unless such waiver is in writing signed by Landlord.  The waiver by Landlord of any breach of any provision of this Lease shall not be deemed a waiver of any subsequent breach of the same or any other provision of this Lease.

31

StudentsFirst Lease (10/4/11)

SMP000036

11.3   ATTORNEY'S FEES

In the event any party brings any suit or other proceeding with respect to the subject matter or enforcement of this Lease, the prevailing party (as determined by the court, agency or other authority before which such suit or proceeding is commenced) shall, in addition to such other relief as may be awarded, be entitled to recover attorneys' fees, expenses and costs of investigation as reasonably incurred, including court costs, expert witness fees, costs and expenses of investigation, and all attorneys' fees, costs and expenses in any such suit or proceeding (including in any action or participation in or in connection with any case or proceeding under the Bankruptcy Code, 11 United States Code Sections 101 et seq., or any successor statutes, in establishing or enforcing the right to indemnification, in appellate proceedings, or in connection with the enforcement or collection of any judgment obtained in any such suit or proceeding).

11.4   BANKRUPTCY

The following provisions shall apply in the event of the bankruptcy or insolvency of Tenant:

(a) In connection with any proceeding under Chapter 7 of the Bankruptcy Code where the trustee of Tenant elects to assume this Lease for the purposes of assigning it, such election or assignment, may only be made upon compliance with the provisions of (b) and (c) below, which conditions Landlord and Tenant acknowledge to be commercially reasonable.  In the event the trustee elects to reject this Lease then Landlord shall immediately be entitled to possession of the Premises without further obligation to Tenant or the trustee.

(b) Any election to assume this Lease under Chapter 11 or 13 of the Bankruptcy Code by Tenant as debtor-in-possession or by Tenant's trustee (the "Electing Party") must provide for:

The Electing Party to cure or provide to Landlord adequate assurance that it will cure all monetary defaults under this Lease within fifteen (15) days from the date of assumption and it will cure all nonmonetary defaults under this Lease within thirty (30) days from the date of assumption.  Landlord and Tenant acknowledge such condition to be commercially reasonable.

(c) If the Electing Party has assumed this Lease or elects to assign Tenant's interest under this Lease to any other person, such interest may be assigned only if the intended assignee has provided adequate assurance of future performance (as herein defined), of all of the obligations imposed on Tenant under this Lease.

For the purposes hereof, "adequate assurance of future performance" means that Landlord has ascertained that each of the following conditions has been satisfied:

(i)   The assignee has submitted a current financial statement, certified by its chief financial officer, which shows a net worth and working capital in amounts sufficient to assure the future performance by the assignee of Tenant's obligations under this Lease; and

32

SMP000037

(ii)   Landlord has obtained consents or waivers from any third parties that may be required under a lease, mortgage, financing arrangement, or other agreement by which Landlord is bound, to enable Landlord to permit such assignment.

(d) Landlord's acceptance of rent or any other payment from any trustee, receiver, assignee, person, or other entity will not be deemed to have waived, or waive, the requirement of Landlord's consent, Landlord's right to terminate this Lease for any transfer of Tenant's interest under this Lease without such consent, or Landlord's claim for any amount of Rent due from Tenant.

## 11.5   LANDLORD'S DEFAULT

Landlord shall be in default hereunder in the event Landlord has not commenced and pursued with reasonable diligence the cure of any failure of Landlord to meet its obligations hereunder within thirty (30) days after the receipt by Landlord of written notice from Tenant of the alleged failure to perform.  If a Landlord default is capable of being cured and Landlord does not cure such default within the aforementioned 30-day period (or if such default is not capable of being cured within such 30-day period, if Landlord has not commenced such cure within said 30-day period and diligently prosecute to completion), then Tenant shall have the right to terminate the Lease for a Landlord default capable of being cured which is not cured.  Except as expressly set forth in the preceding sentence, Tenant shall not have the right to terminate or rescind this Lease as a result of Landlord's default as to any covenant or agreement contained in this Lease.  Tenant hereby waives such remedies of termination and rescission and hereby agrees that Tenant's remedies for default hereunder and for breach of any promise or inducement shall be limited to a suit for damages and/or injunction.  In addition, Tenant hereby covenants that, prior to the exercise of any such remedies, it will give the Mortgagee notice and a reasonable time to cure any default by Landlord.

## 11.6   LETTER OF CREDIT

(a)   General Provisions.  As collateral for the expenses incurred by Landlord for the Tenant Improvement Allowance and leasing commissions associated with leasing the Premises to Tenant, the benefit of such leasing Landlord may suffer as a result of Tenant's failure to comply with one or more provisions of the Lease, concurrently with Tenant's execution of this Lease, Tenant shall deliver to Landlord a standby, unconditional, irrevocable, transferable letter of credit (the "Letter of Credit") in the form of Exhibit C to the Lease and containing the terms required herein, in the face amount of One Million Dollars ($1,000,000) (the "Letter of Credit Amount"), naming Landlord as beneficiary, issued (or confirmed) by a financial institution reasonably acceptable to Landlord (the "Issuing Bank"), permitting multiple and partial draws thereon, and otherwise in form acceptable to Landlord in its sole discretion.  Provided the Tenant is not in Default under the Lease, the Letter of Credit Amount shall be reduced to Five Hundred Thousand Dollars ($500,000) at the end of the 48th month of the initial Lease Term.  Tenant shall cause the Letter of Credit to be continuously maintained in effect (whether through replacement, amendment, renewal, amendment or extension) in the Letter of Credit Amount through the date (the "Final LC Expiration Date") that is 100 days after the scheduled expiration date of the Term.  If the Letter of Credit held by Landlord expires earlier than the Final LC Expiration Date (whether by reason of a stated expiration date or a notice of termination or non-renewal given by

33

SMP000038

the Issuing Bank), Tenant shall deliver a new or amended Letter of Credit or certificate of renewal or extension to Landlord not later than thirty (30) days prior to the expiration date of the Letter of Credit then held by Landlord. Any renewal, amended or replacement Letter of Credit shall comply with all of the provisions of this Section 11.6, shall be irrevocable, transferable and shall remain in effect (or be automatically renewable) through the Final LC Expiration Date upon the same terms as the expiring Letter of Credit or such other terms as may be acceptable to Landlord in its sole discretion.

(b)   Drawings under Letter of Credit.   Upon Tenant's Default under the Lease, Landlord may, without prejudice to any other remedy provided in this Lease or by law, draw on the Letter of Credit and use all or part of the proceeds as set forth in Section 11.6(c) below. In addition, if Tenant fails to furnish such renewal or replacement at least thirty (30) days prior to the stated expiration date of the Letter of Credit then held by Landlord, Landlord may draw upon such Letter of Credit and hold the proceeds thereof (and such proceeds need not be segregated) in accordance with the terms of this Section 11.6.  If Tenant is in Default for failure to pay Monthly Base Rent or Rent Adjustments, then Landlord shall have the right to draw from the Letter of Credit in the amount of Tenant's delinquency (including late fees and interest, if any). If Tenant is in Default for failure to pay any other monetary sum other than Monthly Base Rent or Rent Adjustments, then Landlord shall have the right to draw either the actual cost to cure such Default or up to one hundred fifty percent 150% of Landlord's reasonable estimate to cure such Default, provided that any sums over the costs to actually cure such Default shall be returned to Tenant following such cure. If Tenant is in Default for the failure of a non-monetary obligation under this Lease and Landlord elects to terminate the Lease for such Default (in accordance with the terms of this Lease) or if Tenant is in Default for the failure to pay Rent and Landlord elects to terminate the Lease for such Default (in accordance with the terms of the Lease), then Landlord shall have the right to draw from the Letter of Credit in an amount of all remaining Rent for the duration of the Term (excluding that portion of Rent Adjustments attributable to utilities and janitorial services).

(c)   Use of Proceeds by Landlord.   The proceeds of the Letter of Credit shall constitute Landlord's sole and separate property (and not Tenant's property or the property of Tenant's bankruptcy estate) and Landlord may immediately upon any draw permitted under the Lease (and without notice to Tenant except as may be expressly provided in the Lease) to reimburse Landlord for the amortized costs of (i) the Tenant Improvement Allowance (plus interest), and (ii) any leasing commissions or fees paid by Landlord to the Brokers associated with this Lease. The aforementioned leasing commission or fees shall be amortized over a five (5) year period, and the Tenant Improvement Allowance shall be amortized over a ten (10) year period with a six percent (6%) interest. Each amortization period shall commence upon the date that Tenant commences paying Rent under the Lease. Provided Tenant has performed all of its obligations under the Lease, Landlord agrees to pay to Tenant by the Final LC Expiration Date the amount of any proceeds of the Letter of Credit received by Landlord and not applied as allowed above; provided, that if prior to the Final LC Expiration Date a voluntary petition is filed by Tenant, or an involuntary petition is filed against Tenant by any of Tenant's creditors, under the Federal Bankruptcy Code, then Landlord shall not be obligated to make such payment in the amount of the unused Letter of Credit proceeds until either all preference issues relating to payments under this Lease have been resolved in such bankruptcy or reorganization case or such

34

SMP000039

bankruptcy or reorganization case has been dismissed, in each case pursuant to a final court order not subject to appeal or any stay pending appeal.

    (d)    <u>Additional Covenants of Tenant.</u>

    (i)    If, at any time during the Term, Landlord determines that (i) the Issuing Bank fails to meet any of the following three ratings standards as to its unsecured and senior, long-term debt obligations (not supported by third party credit enhancement): (x) "A2" or better by Moody's Investors Service, or its successor, (y) "A" or better by Standard & Poor's Rating Service, or its successor; or (z) "A" or better by Fitch Ratings, or its successor or (ii) the Issuing Bank is no longer considered to be well capitalized under the "Prompt Corrective Action" rules of the FDIC (as disclosed by the Issuing Bank's Report of Condition and Income (commonly known as the "Call Report") or otherwise)  or (iii) the Issuing Bank has been placed into receivership by the FDIC, or (iv) the Issuing Bank has entered into any other form of regulatory or governmental receivership, conservatorship or other similar regulatory or governmental proceeding, or is otherwise declared insolvent or downgraded by the FDIC or closed for any reason, then, within ten (10) calendar days following Landlord's notice to Tenant, Tenant shall deliver to Landlord a new Letter of Credit meeting the terms of this Section 11.6 issued by an Issuing Bank meeting Landlord's credit rating standards  and otherwise acceptable to Landlord, in which event, Landlord shall return to Tenant the previously held Letter of Credit.  If Tenant fails to timely deliver such replacement Letter of Credit to Landlord, such failure shall be deemed a Default under the Lease without the necessity of additional notice or the passage of additional grace periods.

    (ii)    If, as result of any application or use by Landlord of or any part of the Letter of Credit, the amount of the Letter of Credit plus any cash proceeds previously drawn by Landlord and not applied pursuant to Section 11.6(c) above, shall be less than the Letter of Credit Amount, Tenant shall, within five (5) days thereafter, provide Landlord with additional letter(s) of credit in an amount equal to the deficiency (or replacement or amended letter of credit in the total Letter of Credit Amount), and a such additional (or replacement or amended) letter of credit shall comply with all of the provisions of this Section 11.6, and if Tenant fails to comply with the foregoing, notwithstanding anything to the contrary contained in this Lease, the same shall constitute a Default by Tenant. Tenant further covenants and warrants that it will neither assign, nor encumber the Letter of Credit or any part thereof and that neither Landlord nor successors or assigns will be bound by any such assignment, encumbrance, attempt assignment or attempted encumbrance.

    (e)    <u>Nature of Letter of Credit.</u>  Landlord and Tenant (1) acknowledge and agree that in no event or circumstance shall the Letter of Credit or any renewal thereof or substitute therefore or any proceeds thereof be deemed to be or be treated as a "security deposit" and any Law applicable to security deposits in the commercial context including Section 1950.7 of the California Civil Code, as such section now exists or as may be hereafter amended or succeeded ("Security Deposit Laws"), (2) acknowledge and agree that the Letter of Credit (including any renewal thereof or substitute therefor or any proceed thereof) is not intended to serve as a security deposit, and the Security Deposit Laws shall have no applicability or relevancy thereto, and (3) waive any and all rights, duties and obligations either party may now or, in the future, will have relating to or arising from the Security Deposit Laws. Tenant hereby waives the

35

SMP000040

provisions of Section 1950.7 of the California Civil Code and all other provisions of Law, now or hereafter in effect, which (i) establish the time frame by which Landlord must refund a security deposit under lease, and/or (ii) provide that Landlord may claim from the Security Deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by Tenant or to clean the Premises, it being agreed that Landlord may, in addition, claim those sums specified in this Section 11.6 above and/or those sump reasonably necessary to compensate Landlord for any loss or damage caused by Tenant's breach of this Lease or the acts or omission of Tenant or any other Tenant Related Parties, including any damages Landlord suffers following termination of the Lease, all to the extent Landlord is entitled to recover the same from Tenant pursuant to the terms of the Lease.

## 11.7    BREACH OF NON-MONETARY OBLIGATIONS

(a) Breach of Covenants In Violation of Law.  If Tenant is in breach more than three times during any 12-month period during the Term of a violation of the same non-monetary covenant of this Lease which is also in violation of any Law, then (whether or not such failure or breach is thereafter cured within any stated cure or grace period or statutory period): (i) upon the fourth occurrence of a breach by Tenant of the exact same covenant, Tenant shall pay to Landlord a sum equal to one (1) months' Rent; (ii) upon the fifth occurrence of a breach by Tenant of the exact same covenant, Tenant shall pay to Landlord a sum equal to two (2) months' Rent; (iii) upon the sixth occurrence of a breach by Tenant of the exact same covenant, Tenant shall pay to Landlord a sum equal to four (4) months' Rent; and (iv) upon the seventh occurrence of a breach by Tenant of the exact same covenant, such failure shall be deemed a Default under Section 11.1 above.  Landlord shall give notice to Tenant within fifteen (15) days of Landlord's discovery of any such violation, otherwise such violation shall not be subject to the penalty fees set forth herein or the tolling of violations set forth herein.

(b) Breach of Covenants Not In Violation of Law.  If Tenant is in breach more than three times during any 12-month period during the Term of a violation of the same non-monetary covenant of this Lease (other than those subject to 11.7(a) above), then (whether or not such failure or breach is thereafter cured within any stated cure or grace period or statutory period) upon the next occurrence of a breach by Tenant of the exact same covenant, Tenant shall pay to Landlord the sum of $1,000 for such occurrence thereafter and such sum payable to Landlord shall double with each additional occurrence thereof during the 12-month period following Landlord's notice to Tenant of the first violation for which Tenant is fined, provided that for each successive twelve (12) month periods following the Landlord's discovery of said first occurrence after the 3-occurrence grace period, the sum payable to Landlord shall revert to $1,000 for the first violation within such 12-month period. Landlord shall give notice to Tenant within fifteen (15) days of Landlord's discovery of any such violation, otherwise such violation shall not be subject to the penalty fees set forth herein or the tolling of violations set forth herein.

36

SMP000041

ARTICLE 12
SURRENDER OF PREMISES

12.1   IN GENERAL

Upon the Termination Date, Tenant shall surrender and vacate the Premises immediately and deliver possession thereof to Landlord in a clean, good and tenantable condition, ordinary wear and tear, and damage caused by Landlord excepted. Tenant shall deliver to Landlord all keys to the Premises. All improvements in and to the Premises, including any Tenant Alterations (collectively, "Leasehold Improvements") shall remain upon the Premises at the end of the Term without compensation to Tenant. Landlord, however, by written notice to Tenant at least 30 days prior to the Termination Date, may require Tenant, at its expense, to remove (a) any Cable installed by or for the benefit of Tenant, and (b) any Landlord Work or Tenant Alterations that, in Landlord's reasonable judgment, are of a nature that would require removal and repair costs that are materially in excess of the removal and repair costs associated with standard office improvements (collectively referred to as "Required Removables"). Required Removables shall include, without limitation, internal stairways, raised floors, personal baths and showers, vaults, rolling file systems and structural alterations and modifications. The designated Required Removables shall be removed by Tenant before the Termination Date. Tenant shall repair damage caused by the installation or removal of Required Removables. If Tenant fails to perform its obligations in a timely manner, Landlord may perform such work at Tenant's expense. Tenant, at the time it requests approval for a proposed Tenant Alteration, may request in writing that Landlord advise Tenant whether the proposed Tenant Alteration or any portion of the proposed Tenant Alteration is a Required Removable. Within 10 days after receipt of Tenant's request, Landlord shall advise Tenant in writing as to which portions of the proposed Tenant Alterations are Required Removables. If any of the Tenant Additions which were installed by Tenant involved the lowering of ceilings, raising of floors or the installation of specialized wall or floor coverings or lights, then Tenant shall also be obligated to return such surfaces to their condition prior to the commencement of this Lease. In the event possession of the Premises is not delivered to Landlord when required hereunder, or if Tenant shall fail to remove those items described above, Landlord may (but shall not be obligated to), at Tenant's expense, remove any of such property and store, sell or otherwise deal with such property, and undertake, at Tenant's expense, such restoration work as Landlord deems necessary or advisable.

12.2   LANDLORD'S RIGHTS

All property which may be removed from the Premises by Landlord shall be conclusively presumed to have been abandoned by Tenant and Landlord may deal with such property as provided in Section 11.2(b), including the waiver and indemnity obligations provided in that Section. Tenant shall also reimburse Landlord for all costs and expenses incurred by Landlord in removing any Tenant Additions and in restoring the Premises to the condition required by this Lease.

37

SMP000042

ARTICLE 13
HOLDING OVER

In the event that Tenant holds over in possession of the Premises after the Termination Date, for each month or partial month Tenant holds over possession of the Premises, Tenant shall pay Landlord 125% of the monthly Rent payable for the month immediately preceding the holding over (including increases for Rent Adjustments which Landlord may reasonably estimate). Tenant shall also pay all damages sustained by Landlord by reason of such holding over. The provisions of this Article shall not constitute a waiver by Landlord of any re-entry rights of Landlord and Tenant's continued occupancy of the Premises shall be as a tenancy in sufferance.

ARTICLE 14
DAMAGE BY FIRE OR OTHER CASUALTY

14.1   SUBSTANTIAL UNTENANTABILITY

(a) If any fire or other casualty (whether insured or uninsured) renders all or a substantial portion of the Premises or the Building untenantable, Landlord shall, with reasonable promptness after the occurrence of such damage, estimate the length of time that will be required to substantially complete the repair and restoration and shall, by notice advise Tenant of such estimate ("Landlord's Notice"). If Landlord estimates that the amount of time required to substantially complete such repair and restoration will exceed one hundred eighty (180) days from the date such damage occurred, then Landlord, or Tenant if all or a substantial portion of the Premises is rendered untenantable, shall have the right to terminate this Lease as of the date of such damage by delivering written notice to the other at any time within twenty (20) days after delivery of Landlord's Notice, provided that if Landlord so chooses, Landlord's Notice may also constitute such notice of termination.

(b) Unless this Lease is terminated as provided in the preceding subparagraph, Landlord shall proceed with reasonable promptness to repair and restore the Premises to its condition as existed prior to such casualty, subject to reasonable delays for insurance adjustments and Force Majeure delays, and also subject to zoning Laws and building codes then in effect. Landlord shall have no liability to Tenant, and Tenant shall not be entitled to terminate this Lease if such repairs and restoration are not in fact completed within the time period estimated by Landlord so long as Landlord shall proceed with reasonable diligence to complete such repairs and restoration.

(c) Tenant acknowledges that Landlord shall be entitled to the full proceeds of any insurance coverage, whether carried by Landlord or Tenant, for damages to the Premises, except for those proceeds of Tenant's insurance of its own personal property and equipment which would be removable by Tenant at the Termination Date. All such insurance proceeds shall be payable to Landlord whether or not the Premises are to be repaired and restored; provided, however, if this Lease is not terminated and the parties proceed to repair and restore Tenant Additions at Tenant's cost, to the extent Landlord received proceeds of Tenant's insurance covering Tenant Additions, such proceeds shall be applied to reimburse Tenant for its cost of repairing and restoring Tenant Additions.

38

SMP000043

(d) Notwithstanding anything to the contrary herein set forth: (i) Landlord shall have no duty pursuant to this Section to repair or restore any portion of any Tenant Additions or to expend for any repair or restoration of the Premises or Building in amounts in excess of insurance proceeds paid to Landlord and available for repair or restoration; and (ii) Tenant shall not have the right to terminate this Lease pursuant to this Section if any damage or destruction was caused by the act or neglect of Tenant, its agent or employees. Whether or not the Lease is terminated pursuant to this Article 14, in no event shall Tenant be entitled to any compensation or damages for loss of the use of the whole or any part of the Premises or for any inconvenience or annoyance occasioned by any such damage, destruction, rebuilding or restoration of the Premises or the Building or access thereto.

(e) Any repair or restoration of the Premises performed by Tenant shall be in accordance with the provisions of Article 9 hereof.

## 14.2   INSUBSTANTIAL UNTENANTABILITY

If the Premises or the Building is damaged by a casualty but neither is rendered substantially untenantable and Landlord estimates that the time to substantially complete the repair or restoration will not exceed one hundred eighty (180) days from the date such damage occurred, then Landlord shall proceed to repair and restore the Building or the Premises other than Tenant Additions, with reasonable promptness, unless such damage is to the Premises and occurs during the last six (6) months of the Term, in which event either Tenant or Landlord shall have the right to terminate this Lease as of the date of such casualty by giving written notice thereof to the other within twenty (20) days after the date of such casualty. Notwithstanding the aforesaid, Landlord's obligation to repair shall be limited in accordance with the provisions of Section 14.1 above.

## 14.3   RENT ABATEMENT

Except for the negligence or willful act of Tenant or its agents, employees, contractors or invitees, if all or any part of the Premises are rendered untenantable by fire or other casualty and this Lease is not terminated, Monthly Base Rent and Rent Adjustments shall abate for that part of the Premises which is untenantable on a per diem basis from the date of the casualty until Landlord has Substantially Completed the repair and restoration work in the Premises which it is required to perform, provided, that as a result of such casualty, Tenant does not occupy the portion of the Premises which is untenantable during such period.

## 14.4   WAIVER OF STATUTORY REMEDIES

The provisions of this Lease, including this Article 14, constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, the Premises or the Property or any part of either, and any Law, including Sections 1932(2), 1933(4), 1941 and 1942 of the California Civil Code, with respect to any rights or obligations concerning damage or destruction shall have no application to this Lease or to any damage to or destruction of all or any part of the Premises or the Property or any part of either, and are hereby waived.

StudentsFirst Lease (10/4/11)

SMP000044

ARTICLE 15
EMINENT DOMAIN

15.1   TAKING OF WHOLE OR SUBSTANTIAL PART

In the event the whole or any substantial part of the Building or of the Premises is taken or condemned by any competent authority for any public use or purpose (including a deed given in lieu of condemnation) and is thereby rendered untenantable, this Lease shall terminate as of the date title vests in such authority, and Monthly Base Rent and Rent Adjustments shall be apportioned as of the Termination Date.  Notwithstanding anything to the contrary herein set forth, in the event the taking is temporary (for less than the remaining Term of the Lease), then Tenant shall have the right to terminate and Landlord shall also have the right to elect either (i) to terminate this Lease or (ii) permit Tenant to receive the entire award attributable to the Premises in which case Tenant shall continue to pay Rent and this Lease shall not terminate.

15.2   TAKING OF PART

In the event a part of the Building or the Premises is taken or condemned by any competent authority (or a deed is delivered in lieu of condemnation) and this Lease is not terminated, the Lease shall be amended to reduce or increase, as the case may be, the Monthly Base Rent and Tenant's Share to reflect the Rentable Area of the Premises or Building, as the case may be, remaining after any such taking or condemnation.  Landlord, upon receipt and to the extent of the award in condemnation (or proceeds of sale) shall make necessary repairs and restorations to the Premises (exclusive of Tenant Additions) and to the Building to the extent necessary to constitute the portion of the Building not so taken or condemned as a complete architectural and economically efficient unit.  Notwithstanding the foregoing, if as a result of any taking, or a governmental order that the grade of any street or alley adjacent to the Building is to be changed and such taking or change of grade makes it necessary or desirable to substantially remodel or restore the Building or prevents the economical operation of the Building, Landlord and Tenant shall have the right to terminate this Lease upon sixty (60) days prior written notice to Tenant.

15.3   COMPENSATION

Landlord shall be entitled to receive the entire award (or sale proceeds) from any such taking, condemnation or sale without any payment to Tenant, and Tenant hereby assigns to Landlord, Tenant's interest, if any, in such award; provided, however, Tenant shall have the right separately to pursue against the condemning authority a separate award in respect of the loss, if any, to Tenant Additions paid for by Tenant without any credit or allowance from Landlord so long as there is no diminution of Landlord's award as a result.

ARTICLE 16
INSURANCE

16.1   TENANT'S INSURANCE

Tenant, at Tenant's expense, agrees to maintain in force, with a company or companies acceptable to Landlord, during the Term: (a) Commercial General Liability Insurance on a

40

SMP000045

primary basis and without any right of contribution from any insurance carried by Landlord covering the Premises on an occurrence basis against all claims for personal injury, bodily injury, death and property damage, including contractual liability covering the indemnification provisions in this Lease, and such insurance shall be for such limits that are reasonably required by Landlord from time to time but not less than a combined single limit of Two Million and No/100 Dollars ($2,000,000.00); (b) Workers' Compensation and Employers' Liability Insurance to the extent required by and in accordance with the Laws of the State of California; (c) "All Risks" property insurance in an amount adequate to cover the full replacement cost of all Tenant Additions, equipment, installations, fixtures and contents of the Premises in the event of loss; (d) in the event a motor vehicle is to be used by Tenant in connection with its business operation from the Premises, Comprehensive Automobile Liability Insurance coverage with limits of not less than One Million and No/100 Dollars ($1,000,000.00) combined single limit coverage against bodily injury liability and property damage liability arising out of the use by or on behalf of Tenant, its agents and employees in connection with this Lease, of any owned, non-owned or hired motor vehicles; and (e) such other insurance or coverages as Landlord reasonably requires.

If any person or entity other than Tenant, or Tenant's employees, directors, and/or officers, occupies all or a portion of the Premises (regardless of whether such occupiers are subletting such space), such occupiers shall be obligated to comply with the same obligations that Tenant is obligated under this Section 16.1. The failure of such occupiers to comply with the foregoing, including without limitation the failure of such occupiers to maintain insurance or to provide Landlord with evidence thereof, shall be deemed a Default of Tenant under this Lease.

16.2   FORM OF POLICIES

Each policy referred to in 16.1 shall satisfy the following requirements. Each policy shall (i) name Landlord and the Indemnitees as additional insureds (except Workers' Compensation and Employers' Liability Insurance), (ii) be issued by one or more responsible insurance companies licensed to do business in the State of California reasonably satisfactory to Landlord, (iii) where applicable, provide for deductible amounts satisfactory to Landlord and not permit co-insurance, (iv) shall provide that such insurance may not be canceled or amended without thirty (30) days' prior written notice to the Landlord, and (v) each policy of "All-Risks" property insurance shall provide that the policy shall not be invalidated should the insured waive in writing prior to a loss, any or all rights of recovery against any other party for losses covered by such policies. Tenant shall deliver to Landlord, certificates of insurance and at Landlord's request, copies of all policies and renewals thereof to be maintained by Tenant hereunder, not less than ten (10) days prior to the Commencement Date and not less than ten (10) days prior to the expiration date of each policy. If Tenant fails to carry the insurance required under this Article 16 or fails to provide certificates of renewal as and when required hereunder, Landlord may, but shall not be obligated to acquire such insurance on Tenant's behalf or Tenant's sole cost and expense.

16.3   LANDLORD'S INSURANCE

Landlord agrees to purchase and keep in full force and effect during the Term hereof, including any extensions or renewals thereof, insurance under policies issued by insurers of

41

SMP000046

recognized responsibility, qualified to do business in the State of California on the Building in amounts not less than the then full replacement cost (without depreciation) of the Building (above foundations and excluding Tenant Additions) or an amount sufficient to prevent Landlord from becoming a co-insurer under the terms of the applicable policies, against fire and such other risks as may be included in standard forms of all risk coverage insurance reasonably available from time to time. Landlord agrees to maintain in force during the Term, Commercial General Liability Insurance covering the Building on an occurrence basis against all claims for personal injury, bodily injury, death, and property damage, or other coverage as may be required by Landlord's lender. Such insurance shall be for a combined single limit of not less than Three Million and No/100 Dollars ($3,000,000.00) or other limits as may be required by Landlord's lender. Neither Landlord's obligation to carry such insurance nor the carrying of such insurance shall be deemed to be an indemnity by Landlord with respect to any claim, liability, loss, cost or expense due, in whole or in part, to Tenant's negligent acts or omissions or willful misconduct. Without obligation to do so, Landlord may, in its sole discretion from time to time, carry insurance in amounts greater and/or for coverage additional to the coverage and amounts set forth above.

16.4    WAIVER OF SUBROGATION

(a) Landlord agrees that, if obtainable at no, or minimal, additional cost, and so long as the same is permitted under the laws of the State of California, it will include in its "All Risks" policies appropriate clauses pursuant to which the insurance companies (i) waive all right of subrogation against Tenant with respect to losses payable under such policies and/or (ii) agree that such policies shall not be invalidated should the insured waive in writing prior to a loss any or all right of recovery against any party for losses covered by such policies.

(b) Tenant agrees to include, if obtainable at no, or minimal, additional cost, and so long as the same is permitted under the laws of the State of California, in its "All Risks" insurance policy or policies on Tenant Additions, whether or not removable, and on Tenant's furniture, furnishings, fixtures and other property removable by Tenant under the provisions of this Lease appropriate clauses pursuant to which the insurance company or companies (i) waive the right of subrogation against Landlord and/or any tenant of space in the Building with respect to losses payable under such policy or policies and/or (ii) agree that such policy or policies shall not be invalidated should the insured waive in writing prior to a loss any or all right of recovery against any party for losses covered by such policy or policies. If Tenant is unable to obtain in such policy or policies either of the clauses described in the preceding sentence, Tenant shall, if legally possible and without necessitating a change in insurance carriers, have Landlord named in such policy or policies as an additional insured. If Landlord shall be named as an additional insured in accordance with the foregoing, Landlord agrees to endorse promptly to the order of Tenant, without recourse, any check, draft, or order for the payment of money representing the proceeds of any such policy or representing any other payment growing out of or connected with said policies, and Landlord does hereby irrevocably waive any and all rights in and to such proceeds and payments.

(c) Provided that Landlord's right of full recovery under its policy or policies aforesaid is not adversely affected or prejudiced thereby, Landlord hereby waives any and all right of recovery which it might otherwise have against Tenant, its servants, agents and employees, for

42

SMP000047

loss or damage occurring to the Real Property and the fixtures, appurtenances and equipment therein, to the extent the same is covered by Landlord's insurance, notwithstanding that such loss or damage may result from the negligence or fault of Tenant, its servants, agents or employees. Provided that Tenant's right of full recovery under its aforesaid policy or policies is not adversely affected or prejudiced thereby, Tenant hereby waives any and all right of recovery which it might otherwise have against Landlord, its servants, and employees and against every other tenant of the Real Property who shall have executed a similar waiver as set forth in this Section 16.4 (c) for loss or damage to Tenant Additions, whether or not removable, and to Tenant's furniture, furnishings, fixtures and other property removable by Tenant under the provisions hereof to the extent the same is coverable by Tenant's insurance required under this Lease, notwithstanding that such loss or damage may result from the negligence or fault of Landlord, its servants, agents or employees, or such other tenant and the servants, agents or employees thereof.

(d) Landlord and Tenant hereby agree to advise the other promptly if the clauses to be included in their respective insurance policies pursuant to subparagraphs (a) and (b) above cannot be obtained on the terms hereinbefore provided and thereafter to furnish the other with a certificate of insurance or copy of such policies showing the naming of the other as an additional insured, as aforesaid. Landlord and Tenant hereby also agree to notify the other promptly of any cancellation or change of the terms of any such policy that would affect such clauses or naming. All such policies which name both Landlord and Tenant as additional insureds shall, to the extent obtainable, contain agreements by the insurers to the effect that no act or omission of any additional insured will invalidate the policy as to the other additional insureds.

16.5   NOTICE OF CASUALTY

Tenant shall give Landlord notice in case of a fire or accident in the Premises promptly after Tenant is aware of such event.

ARTICLE 17
WAIVER OF CLAIMS AND INDEMNITY

17.1   WAIVER OF CLAIMS

To the extent permitted by Law, Tenant hereby releases the Indemnitees from, and waives all claims for, damage to person or property sustained by the Tenant or any occupant of the Premises or the Property resulting directly or indirectly from any existing or future condition, defect, matter or thing in and about the Premises or the Property or any part of either or any equipment or appurtenance therein, or resulting from any accident in or about the Premises or the Property, or resulting directly or indirectly from any act or neglect of any tenant or occupant of the Property or of any other person, including Landlord's agents and servants, except to the extent caused by the gross negligence or willful and wrongful act of any of the Indemnitees. To the extent permitted by Law, Tenant hereby waives any consequential damages, compensation or claims for inconvenience or loss of business, rents, or profits as a result of such injury or damage, whether or not caused by the negligence or willful and wrongful act of any of the Indemnitees. If any such damage, whether to the Premises or the Property or any part of either, or whether to Landlord or to other tenants in the Property, results from any act or neglect of

43

SMP000048

Tenant, its employees, servants, agents, contractors, invitees or customers, Tenant shall be liable therefor and Landlord may, at Landlord's option, repair such damage and Tenant shall, upon demand by Landlord, as payment of additional Rent hereunder, reimburse Landlord within ten (10) days of demand for the total cost of such repairs, in excess of amounts, if any, paid to Landlord under insurance covering such damages. Tenant shall not be liable for any such damage caused by its acts or neglect if Landlord or a tenant has recovered the full amount of the damage from proceeds of insurance policies and the insurance company has waived its right of subrogation against Tenant.

## 17.2   INDEMNITY BY TENANT

To the extent permitted by Law, Tenant hereby indemnifies, and agrees to protect, defend and hold the Indemnitees harmless, against any and all actions, claims, demands, liability, costs and expenses, including attorneys' fees and expenses for the defense thereof, arising from Tenant's occupancy of the Premises, from the occupancy of any other persons or entities in the Premises, from the undertaking of any Tenant Additions or repairs to the Premises, from the conduct of Tenant's business on the Premises, or from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to the terms of this Lease, or from any willful act or negligence of Tenant, its agents, contractors, servants, employees, customers or invitees, in or about the Premises or the Property or any part of either; provided however that this foregoing indemnity shall not apply to or relieve any liability caused by any willful act or sole negligence on the part of Indemnitees. In case of any action or proceeding brought against the Indemnitees by reason of any such claim, upon notice from Landlord, Tenant covenants to defend such action or proceeding by counsel chosen by Landlord, in Landlord's sole discretion. Landlord reserves the right to settle, compromise or dispose of any and all actions, claims and demands related to the foregoing indemnity. Further, the foregoing indemnity is subject to and shall not diminish any waivers in effect in accordance with Section 16.4 by Landlord or its insurers to the extent of amounts, if any, paid to Landlord under its "All-Risks" property insurance. This Article 17 shall survive the expiration or earlier termination of this Lease.

## ARTICLE 18
## RULES AND REGULATIONS

## 18.1   RULES

Tenant agrees for itself and for its subtenants, employees, agents, and invitees to comply with the rules and regulations listed on Exhibit B attached hereto and with all reasonable modifications and additions thereto which Landlord may make from time to time.

## 18.2   ENFORCEMENT

Nothing in this Lease shall be construed to impose upon the Landlord any duty or obligation to enforce the rules and regulations as set forth on Exhibit B or as hereafter adopted, or the terms, covenants or conditions of any other lease as against any other tenant, and the Landlord shall not be liable to the Tenant for violation of the same by any other tenant, its

44

SMP000049

servants, employees, agents, visitors or licensees. Landlord shall use reasonable efforts to enforce the rules and regulations of the Project in a uniform and non-discriminatory manner.

ARTICLE 19
LANDLORD'S RESERVED RIGHTS

Landlord shall have the following rights exercisable without notice to Tenant and without liability to Tenant for damage or injury to persons, property or business and without being deemed an eviction or disturbance of Tenant's use or possession of the Premises or giving rise to any claim for offset or abatement of Rent: (1) to change the Building's name or street address upon thirty (30) days' prior written notice to Tenant; (2) to install, affix and maintain all signs on the exterior and/or interior of the Building; (3) to designate and/or approve prior to installation, all types of signs, window shades, blinds, drapes, awnings or other similar items, and all internal lighting that may be visible from the exterior of the Premises; (4) upon reasonable notice to Tenant, to display the Premises to prospective purchasers and lenders at reasonable hours at any time during the Term and to prospective tenants at reasonable hours during the last twelve (12) months of the Term; (5) to grant to any party the exclusive right to conduct any business or render any service in or to the Building, provided such exclusive right shall not operate to prohibit Tenant from using the Premises for the purpose permitted hereunder; (6) to change the arrangement and/or location of entrances or passageways, doors and doorways, corridors, elevators, stairs, washrooms or public portions of the Building, and to close entrances, doors, corridors, elevators or other facilities, provided that such action shall not materially and adversely interfere with Tenant's access to the Premises or the Building; (7) to have access for Landlord and other tenants of the Building to any mail chutes and boxes located in or on the Premises as required by any applicable rules of the United States Post Office; and (8) to close the Building after Standard Operating Hours, except that Tenant and its employees and invitees shall be entitled to admission at all times, under such regulations as Landlord prescribes for security purposes.

ARTICLE 20
ESTOPPEL CERTIFICATE

20.1    IN GENERAL

Within ten (10) days after request therefor by Landlord, Mortgagee or any prospective mortgagee or owner, Tenant agrees as directed in such request to execute an Estoppel Certificate in recordable form, binding upon Tenant, certifying (i) that this Lease is unmodified and in full force and effect (or if there have been modifications, a description of such modifications and that this Lease as modified is in full force and effect); (ii) the dates to which Rent has been paid; (iii) that Tenant is in the possession of the Premises if that is the case; (iv) that Landlord is not in default under this Lease, or, if Tenant believes Landlord is in default, the nature thereof in detail; (v) that Tenant has no offsets or defenses to the performance of its obligations under this Lease (or if Tenant believes there are any offsets or defenses, a full and complete explanation thereof); (vi) that the Premises have been completed in accordance with the terms and provisions hereof or the Workletter, that Tenant has accepted the Premises and the condition thereof and of all improvements thereto and has no claims against Landlord or any other party with respect thereto; (vii) that if an assignment of rents or leases has been served upon the Tenant by a Mortgagee,

45

SMP000050

Tenant will acknowledge receipt thereof and agree to be bound by the provisions thereof; (viii) that Tenant will give to the Mortgagee copies of all notices required or permitted to be given by Tenant to Landlord; and (ix) to any other information reasonably requested.

20.2   ENFORCEMENT

In the event that Tenant fails to timely deliver an Estoppel Certificate, then such failure shall be a Default for which there shall be no cure or grace period.

ARTICLE 21
RELOCATION OF TENANT

Intentionally omitted.

ARTICLE 22
REAL ESTATE BROKERS

Tenant represents that, except for the broker(s) listed in Section 1.1(15), Tenant has not dealt with any real estate broker, sales person, or finder in connection with this Lease, and no such person initiated or participated in the negotiation of this Lease, or showed the Premises to Tenant. Tenant hereby agrees to indemnify, protect, defend and hold Landlord and the Indemnitees, harmless from and against any and all liabilities and claims for commissions and fees arising out of a breach of the foregoing representation. Landlord agrees to pay any commission to which the brokers listed in Section 1.1(15) are entitled in connection with this Lease pursuant to Landlord's written agreement with such broker.

ARTICLE 23
MORTGAGEE PROTECTION

23.1   SUBORDINATION AND ATTORNMENT

This Lease is and shall be expressly subject and subordinate at all times to (i) any ground or underlying lease of the Real Property, now or hereafter existing, and all amendments, extensions, renewals and modifications to any such lease, and (ii) the lien of any mortgage or trust deed now or hereafter encumbering fee title to the Real Property and/or the leasehold estate under any such lease, and all amendments, extensions, renewals, replacements and modifications of such mortgage or trust deed and/or the obligation secured thereby, unless such ground lease or ground lessor, or mortgage, trust deed or Mortgagee, expressly provides or elects that the Lease shall be superior to such lease or mortgage or trust deed. If any such mortgage or trust deed is foreclosed (including any sale of the Real Property pursuant to a power of sale), or if any such lease is terminated, upon request of the Mortgagee or ground lessor, as the case may be, Tenant shall attorn to the purchaser at the foreclosure sale or to the ground lessor under such lease, as the case may be, provided, however, that such purchaser or ground lessor shall not be (i) bound by any payment of Rent for more than one month in advance except payments in the nature of security for the performance by Tenant of its obligations under this Lease; (ii) subject to any offset, defense or damages arising out of a default of any obligations of any preceding Landlord; or (iii) bound by any amendment or modification of this Lease made without the written consent of the Mortgagee or ground lessor; or (iv) liable for any security deposits not actually received in

46

SMP000051

cash by such purchaser or ground lessor. This subordination shall be self-operative and no further certificate or instrument of subordination need be required by any such Mortgagee or ground lessor. In confirmation of such subordination, however, Tenant shall execute promptly any reasonable certificate or instrument that Landlord, Mortgagee or ground lessor may request. Tenant hereby constitutes Landlord as Tenant's attorney-in-fact to execute such certificate or instrument for and on behalf of Tenant upon Tenant's failure to do so within fifteen (15) days of a request to do so. Upon request by such successor in interest, Tenant shall execute and deliver reasonable instruments confirming the attornment provided for herein.

23.2    <u>MORTGAGEE PROTECTION</u>

Tenant agrees to give any Mortgagee or ground lessor, by registered or certified mail, a copy of any notice of default served upon the Landlord by Tenant, provided that prior to such notice Tenant has received notice (by way of service on Tenant of a copy of an assignment of rents and leases, or otherwise) of the address of such Mortgagee or ground lessor. Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in this Lease, then the Mortgagee or ground lessor shall have an additional thirty (30) days after receipt of notice thereof within which to cure such default or if such default cannot be cured within that time, then such additional notice time as may be necessary, if, within such thirty (30) days, any Mortgagee or ground lessor has commenced and is diligently pursuing the remedies necessary to cure such default (including commencement of foreclosure proceedings or other proceedings to acquire possession of the Real Property, if necessary to effect such cure). Such period of time shall be extended by any period within which such Mortgagee or ground lessor is prevented from commencing or pursuing such foreclosure proceedings or other proceedings to acquire possession of the Real Property by reason of Landlord's bankruptcy. Until the time allowed as aforesaid for Mortgagee or ground lessor to cure such defaults has expired without cure, Tenant shall have no right to, and shall not, terminate this Lease on account of default. This Lease may not be modified or amended so as to reduce the Rent or shorten the Term, or so as to adversely affect in any other respect to any material extent the rights of the Landlord, nor shall this Lease be canceled or surrendered, without the prior written consent, in each instance, of the ground lessor or the Mortgagee.

ARTICLE 24<br>NOTICES

(a)    All notices, demands or requests provided for or permitted to be given pursuant to this Lease must be in writing and shall be personally delivered, sent by Federal Express or other reputable overnight courier service, or mailed by first class, registered or certified United States mail, return receipt requested, postage prepaid.

(b)    All notices, demands or requests to be sent pursuant to this Lease shall be deemed to have been properly given or served by delivering or sending the same in accordance with this Section, addressed to the parties hereto at their respective addresses listed in Section 1.1.

(c)    Notices, demands or requests sent by mail or overnight courier service as described above shall be effective upon deposit in the mail or with such courier service. However, except with respect to a notice given under Code of Civil Procedure Section 1161 et

47

SMP000052

seq., the time period in which a response to any such notice, demand or request must be given shall commence to run from (i) in the case of delivery by mail, the date of receipt on the return receipt of the notice, demand or request by the addressee thereof, or (ii) in the case of delivery by Federal Express or other overnight courier service, the date of acceptance of delivery by an employee, officer, director or partner of Landlord or Tenant. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given, as indicated by advice from Federal Express or other overnight courier service or by mail return receipt, shall be deemed to be receipt of notice, demand or request sent. Notices may also be served by personal service upon any officer, director or partner of Landlord or Tenant, and shall be effective upon such service.

(d)     By giving to the other party at least thirty (30) days written notice thereof, either party shall have the right from time to time during the term of this Lease to change their respective addresses for notices, statements, demands and requests, provided such new address shall be within the United States of America.

## ARTICLE 25
## MISCELLANEOUS

### 25.1   LATE CHARGES

(a)     All payments required hereunder (other than the Monthly Base Rent, Rent Adjustments, and Rent Adjustment Deposits, which shall be due as hereinbefore provided) to Landlord shall be paid within ten (10) days after Landlord's demand therefor. All such amounts (including Monthly Base Rent, Rent Adjustments, and Rent Adjustment Deposits) not paid when due shall bear interest from the date due until the date paid at the Default Rate in effect on the date such payment was due.

(b)     In the event Tenant is more than five (5) days late in paying any installment of Rent due under this Lease, Tenant shall pay Landlord a late charge equal to five percent (5%) of the delinquent installment of Rent. The parties agree that (i) such delinquency will cause Landlord to incur costs and expenses not contemplated herein, the exact amount of which will be difficult to calculate, including the cost and expense that will be incurred by Landlord in processing each delinquent payment of rent by Tenant, (b) the amount of such late charge represents a reasonable estimate of such costs and expenses and that such late charge shall be paid to Landlord for each delinquent payment in addition to all Rent otherwise due hereunder. The parties further agree that the payment of late charges and the payment of interest provided for in subparagraph (a) above are distinct and separate from one another in that the payment of interest is to compensate Landlord for its inability to use the money improperly withheld by Tenant, while the payment of late charges is to compensate Landlord for its additional administrative expenses in handling and processing delinquent payments.

(c)     Payment of interest at the Default Rate and/or of late charges shall not excuse or cure any default by Tenant under this Lease, nor shall the foregoing provisions of this Article or any such payments prevent Landlord from exercising any right or remedy available to Landlord upon Tenant's failure to pay Rent when due, including the right to terminate this Lease.

48

SMP000053

25.2   NO JURY TRIAL; VENUE; JURISDICTION

To the fullest extent permitted by law, each party hereto (which includes any assignee, successor, heir or personal representative of a party) shall not seek a jury trial, hereby waives trial by jury, and hereby further waives any objection to venue in the County in which the Project is located, and agrees and consents to personal jurisdiction of the courts of the State of California, in any action or proceeding or counterclaim brought by any party hereto against the other on any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, or any claim of injury or damage, or the enforcement of any remedy under any statute, emergency or otherwise, whether any of the foregoing is based on this Lease or on tort law. No party will seek to consolidate any such action in which a jury has been waived with any other action in which a jury trial cannot or has not been waived. It is the intention of the parties that these provisions shall be subject to no exceptions. The provisions of this Section shall survive the expiration or earlier termination of this Lease.

25.3   NO-DISCRIMINATION

Tenant agrees for Tenant and Tenant's heirs, executors, administrators, successors and assigns and all persons claiming under or through Tenant, and this Lease is made and accepted upon and subject to the following conditions: that there shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, national origin or ancestry (whether in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the Premises or otherwise) nor shall Tenant or any person claiming under or through Tenant establish or permit any such practice or practices of discrimination or segregation with reference to the use or occupancy of the Premises by Tenant or any person claiming through or under Tenant.

Landlord agrees for Landlord and Landlord's heirs, executors, administrators, successors and assigns and all persons claiming under or through Landlord, and this Lease is made and accepted upon and subject to the following conditions: that there shall be no discrimination against or segregation of any person or group of persons on account of race, color, creed, religion, sex, marital status, national origin or ancestry (whether in the leasing, subleasing, transferring, use, occupancy, tenure or enjoyment of the Premises or otherwise) nor shall Landlord or any person claiming under or through Landlord establish or permit any such practice or practices of discrimination or segregation with reference to the use or occupancy of the Building by Landlord or any person claiming through or under Landlord.

25.4   FINANCIAL STATEMENTS

Within twenty (20) days after written request from Landlord from time to time during the Term, not to exceed twice yearly, Tenant shall provide Landlord with current financial statements setting forth Tenant's financial condition and net worth for the most recent quarter, including balance sheets and statements of profits and losses. Provided Tenant is StudentsFirst and not in Default under this Lease, Tenant has no obligation to disclose to Landlord the specific names of financial contributors to Tenant. Such statements shall be prepared by an independent accountant and certified by Tenant's president, chief executive officer or chief financial officer.

49

SMP000054

Landlord shall keep such financial information confidential and shall only disclose such information to Landlord's lenders, consultants, purchasers or investors, or other agents (who shall be subject to the same confidentiality obligations) on a need to know basis in connection with the administration of this Lease.

25.5   OPTION

This Lease shall not become effective as a lease or otherwise until executed and delivered by both Landlord and Tenant. The submission of the Lease to Tenant does not constitute a reservation of or option for the Premises, but when executed by Tenant and delivered to Landlord, the Lease shall constitute an irrevocable offer by Tenant in effect for fifteen (15) days to lease the Premises on the terms and conditions herein contained.

25.6   TENANT AUTHORITY; LANDLORD AUTHORITY

Tenant represents and warrants to Landlord that it has full authority and power to enter into and perform its obligations under this Lease, that the person executing this Lease is fully empowered to do so, and that no consent or authorization is necessary from any third party. Landlord may request that Tenant provide Landlord evidence of Tenant's authority.

Landlord represents and warrants to Tenant that it has full authority and power to enter into and perform its obligations under this Lease, that the person executing this Lease is fully empowered to do so, and that no consent or authorization is necessary from any third party. Tenant may request that Landlord provide Tenant evidence of Landlord's authority.

25.7   ENTIRE AGREEMENT

This Lease, the Exhibits, and Riders attached hereto and the Workletter contain the entire agreement between Landlord and Tenant concerning the Premises and there are no other agreements, either oral or written, and no other representations or statements, either oral or written, on which Tenant has relied. This Lease shall not be modified except by a writing executed by Landlord and Tenant.

25.8   MODIFICATION OF LEASE FOR BENEFIT OF MORTGAGEE

If Mortgagee of Landlord requires a modification of this Lease which shall not result in any increased cost or expense to Tenant or in any other substantial and adverse change in the rights and obligations of Tenant hereunder, then Tenant agrees that the Lease may be so modified.

25.9   EXCULPATION

Tenant agrees, on its behalf and on behalf of its successors and assigns, that any liability or obligation under this Lease shall only be enforced against Landlord's equity interest in the Property up to a maximum of Five Million Dollars ($5,000,000.00) and in no event against any other assets of the Landlord, or Landlord's officers or directors or partners, and that any liability of Landlord with respect to this Lease shall be so limited and Tenant shall not be entitled to any judgment in excess of such amount. Notwithstanding anything to the contrary contained herein,

50

SMP000055

in no event shall Landlord be liable to Tenant for consequential, punitive or special damages with respect to this Lease.

## 25.10   ACCORD AND SATISFACTION

No payment by Tenant or receipt by Landlord of a lesser amount than any installment or payment of Rent due shall be deemed to be other than on account of the amount due, and no endorsement or statement on any check or any letter accompanying any check or payment of Rent shall be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such installment or payment of Rent or pursue any other remedies available to Landlord.  No receipt of money by Landlord from Tenant after the termination of this Lease or Tenant's right of possession of the Premises shall reinstate, continue or extend the Term.  Receipt or acceptance of payment from anyone other than Tenant, including an assignee of Tenant, is not a waiver of any breach of Article 10, and Landlord may accept such payment on account of the amount due without prejudice to Landlord's right to pursue any remedies available to Landlord.

## 25.11   LANDLORD'S OBLIGATIONS ON SALE OF BUILDING

In the event of any sale or other transfer of the Building, Landlord shall be entirely freed and relieved of all agreements and obligations of Landlord hereunder accruing which it assigns to new owner or to be performed after the date of such sale or transfer, and any remaining liability of Landlord with respect to this Lease shall be limited to the dollar amount specified in Section 25.9 and Tenant shall not be entitled to any judgment in excess of such amount. Landlord shall have the right to assign this Lease to an entity comprised of the principals of Landlord or any Landlord Affiliate. Upon such assignment and assumption of the obligations of Landlord hereunder, Landlord shall be entirely freed and relieved of all obligations hereunder.

## 25.12   BINDING EFFECT

Subject to the provisions of Article 10, this Lease shall be binding upon and inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and permitted assigns.

## 25.13   CAPTIONS

The Article and Section captions in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such Articles and Sections.

## 25.14   TIME; APPLICABLE LAW; CONSTRUCTION

Time is of the essence of this Lease and each and all of its provisions.  This Lease shall be construed in accordance with the Laws of the State of California.  If more than one person signs this Lease as Tenant, the obligations hereunder imposed shall be joint and several.  If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is

SMP000056

held invalid or unenforceable, shall not be affected thereby and each item, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by Law. Wherever the term "including" or "includes" is used in this Lease, it shall have the same meaning as if followed by the phrase "but not limited to". The language in all parts of this Lease shall be construed according to its normal and usual meaning and not strictly for or against either Landlord or Tenant.

25.15  ABANDONMENT

In the event Tenant vacates or abandons the Premises but is otherwise in compliance with all the terms, covenants and conditions of this Lease, Landlord shall (i) have the right to enter into the Premises in order to show the space to prospective tenants, (ii) have the right to reduce the services provided to Tenant pursuant to the terms of this Lease to such levels as Landlord reasonably determines to be adequate services for an unoccupied premises, and (iii) during the last six (6) months of the Term, have the right to prepare the Premises for occupancy by another tenant upon the end of the Term. Tenant expressly acknowledges that in the absence of written notice pursuant to Section 11.2(b) or pursuant to California Civil Code Section 1951.3 terminating Tenant's right to possession, none of the foregoing acts of Landlord or any other act of Landlord shall constitute a termination of Tenant's right to possession or an acceptance of Tenant's surrender of the Premises, and the Lease shall continue in effect.

25.16  LANDLORD'S RIGHT TO PERFORM TENANT'S DUTIES

If Tenant fails timely to perform any of its duties under this Lease or the Workletter, Landlord shall have the right (but not the obligation), to perform such duty on behalf and at the expense of Tenant with prior notice and opportunity to cure to Tenant. All sums expended or expenses incurred by Landlord in performing such duty shall be deemed to be additional Rent under this Lease and shall be due and payable upon demand by Landlord.

25.17  SECURITY SYSTEM

Landlord acknowledges that the Building is a secured access Building, but Landlord shall not be obligated to provide or maintain any security patrol or security system to the Premises. Tenant is aware of the limitations of a "secured access" building, and Landlord shall only be liable for its gross negligence in maintaining such "secured access" system or for its willful misconduct in regards to providing such "secured access" system. Further, Landlord shall not be responsible for the quality of any such patrol or system which may be provided hereunder or for damage or injury to Tenant, its employees, invitees or others due to the failure, action or inaction of such patrol or system.

25.18  NO LIGHT, AIR OR VIEW EASEMENTS

Any diminution or shutting off of light, air or view by any structure which may be erected on lands of or adjacent to the Project shall in no way affect this Lease or impose any liability on Landlord.

StudentsFirst Lease (10/4/11)

SMP000057

25.19  RECORDATION

Neither this Lease, nor any notice nor memorandum regarding the terms hereof, shall be recorded by Tenant. Any such unauthorized recording shall be a Default for which there shall be no cure or grace period. Tenant agrees to execute and acknowledge, at the request of Landlord, a memorandum of this Lease, in recordable form.

25.20  SURVIVAL

The waivers of the right of jury trial, the other waivers of claims or rights, the releases and the obligations of Tenant under this Lease to indemnify, protect, defend and hold harmless Landlord and/or Indemnitees shall survive the expiration or termination of this Lease, and so shall all other obligations or agreements which by their terms survive expiration or termination of the Lease.

25.21  OFAC REPRESENTATION, WARRANTY AND COVENANT

Tenant represents, warrants and covenants that:

(1) Tenant and its principals are not acting, and will not act, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control;

(2) Tenant and its principals are not engaged, and will not engage, in this transaction, directly or indirectly, on behalf of, or instigating or facilitating, and will not instigate or facilitate, this transaction, directly or indirectly, on behalf of, any such person, group, entity, or nation; and

(3) Tenant acknowledges that the breach of this representation, warranty and covenant by Tenant shall be an immediate Default under this Lease.

Landlord represents, warrants and covenants that:

(1) Landlord and its principals are not acting, and will not act, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control;

(2) Landlord and its principals are not engaged, and will not engage, in this transaction, directly or indirectly, on behalf of, or instigating or facilitating, and will not instigate or facilitate, this transaction, directly or indirectly, on behalf of, any such person, group, entity, or nation; and

SMP000058

(3) Landlord acknowledges that the breach of this representation, warranty and covenant by Landlord shall be an immediate default under this Lease.

## 25.22  COUNTERPARTS

This Lease may be executed in any number of counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Telecopied signatures or signatures transmitted by electronic mail in so-called "pdf" format may be used in place of original signatures on this Lease. Landlord and Tenant intend to be bound by the signatures on the telecopied or e-mailed document, are aware that the other party will rely on the telecopied or e-mailed signatures, and hereby waive any defenses to the enforcement of the terms of this Lease based on such telecopied or e-mailed signatures. Promptly following request by either party, the other party shall provide the requesting party with original signatures on this Lease.

## 25.23  RIDERS

All Riders attached hereto and executed both by Landlord and Tenant shall be deemed to be a part hereof and hereby incorporated herein.

## 25.24  SECURITY AGREEMENT

This section shall constitute a security agreement as that term is used in the Uniform Commercial Code of California (the "UCC"), and Tenant hereby grants to Landlord, as additional collateral for its obligations under this Lease ("Secured Obligations"), a security interest in all of the Tenant's furniture, fixtures, and equipment used in connection with its use of the Premises that may be personal property (collectively, the "Personal Property" or "Collateral"). Tenant shall use diligent, good faith efforts to procure any documents, including without limitation mortgage or other waivers or subordination agreements, in form and substance reasonably satisfactory to Landlord, with respect to any and all Personal Property (or fixtures which are a part of the Collateral), deliver to Landlord any instrument, mark any chattel paper, give any notice and take any other actions which are reasonably necessary or desirable to perfect or to continue the perfection and priority of the security interest created hereunder, or to protect the Personal Property or fixtures against the rights, claims or interests of third parties, and to pay all costs incurred in connection therewith. Tenant hereby appoints Landlord as Tenant's true attorney-in-fact, coupled with an interest, to perform (but without any obligation to do so) any of the foregoing acts should Tenant fail to do so, irrevocable until such time as the Secured Obligations have been indefeasibly satisfied, to be exercised from time to time and at any time by Landlord following a Default hereunder. Notwithstanding anything to the contrary contained in this Lease, Tenant agrees that Landlord is, and shall be deemed to be, the "secured party" as that term is defined the UCC, and Landlord shall have all of the rights and remedies of a secured party under the UCC as well as any and all other rights and remedies available at law or in equity. Tenant hereby irrevocably authorizes Landlord to file at any time such financing statement(s) indicating its security interest in the Collateral as Landlord deems appropriate, and Tenant shall sign any such financing statement upon request by Landlord if required by applicable law. Tenant, upon demand of Landlord, shall assemble the Personal Property and make it available to Landlord at the Property or a place which is reasonably convenient to

54

SMP000059

Landlord, and Landlord's expense in retaking, holding, preparing for sale, selling or the like shall be borne by Tenant, such expenses to include Landlord's and any trustee's attorneys' fees incurred in connection therewith.

IN WITNESS WHEREOF, this Lease has been executed as of the date set forth in Section 1.1(4) hereof.

TENANT:                                          LANDLORD:

STUDENTSFIRST INSTITUTE,                         HALE BROS INVESTMENT COMPANY,
a District of Columbia nonprofit corporation     LLC, a California limited liability company

By: _____                      By: _____
    Enoch Woodhouse, Vice President, Operations       Paul S. Petrovich, Manager

STUDENTSFIRST,
a District of Columbia nonprofit corporation

By: _____
    Enoch Woodhouse, Vice President, Operations

55

SMP000060

EXHIBIT A

WORKLETTER AGREEMENT
(Landlord Build / Allowance)

This Workletter Agreement ("Workletter") is attached to and a part of a certain Office Lease dated as of October  7 , 2011, executed concurrently herewith by HALE BROS INVESTMENT COMPANY, LLC, a California limited liability company, as Landlord, and STUDENTSFIRST, a District of Columbia nonprofit organization, as Tenant, for the Premises as described therein (the "Lease").

    1.    Defined Terms. Capitalized terms used in this Workletter shall have the same meanings set forth in the Lease except as otherwise specified herein and except for terms capitalized in the ordinary course of punctuation. For purposes of this Workletter the following capitalized terms have the following meanings:

    1.1    "Construction Documents" means the final architectural plans and specifications, and engineering plans and specifications, for the real property improvements to be constructed by Landlord in the Premises in sufficient detail to be submitted for governmental approvals and building permits and to serve as the detailed construction drawings and specifications for the contractor, and shall (i) include, among other things, all partitions, doors, HVAC (heating, ventilating and air conditioning systems) distribution, ceiling systems, light fixtures, plumbing installations, electrical installations and outlets, telephone installations and outlets, any other installations required by Tenant, fire and life-safety systems, wall finishes and floor coverings, whether to be newly installed or requiring changes from the as-is condition of the Premises as of the date of execution of the Lease; and (ii) comply with all Law as applicable and as interpreted at the time of construction of the Tenant Improvements (defined below), including all building codes and the ADA;

    1.2    "Final Construction Documents" means collectively (i) the Construction Documents dated May 4, 2011 with the typed annotations thereon, a copy of which is attached hereto as Exhibit D-1 and incorporated herein, and (ii) the Construction Documents with handwritten annotations attached hereto as Exhibit D-2 and incorporated herein;

    1.3    "Tenant Improvements" means all real property improvements to be constructed by Landlord as shown on the Construction Documents, as they may be modified as provided herein; and

    1.4    "Landlord Work" means the construction and installation of the Tenant Improvements.

    2.    Design Matters.

    2.1.    Landlord and Tenant each approve of the Final Construction Documents. The parties acknowledge that Tenant's architect, Lionakis, prepared the Final Construction Documents with the assistance of its associated consultants. Landlord makes no representation or warranty as to the design of the Final Construction Documents, including without limitation, the absence of any errors or omissions in the Final Construction Documents, the constructability

A-1

SMP000061

of the Final Construction Documents, or the suitability of the Final Construction Documents for Tenant's use.

2.2.    Tenant shall be responsible for the suitability for the Tenant's needs and business of the design and function of all Tenant Improvements.  Tenant, at its own expense, shall devote such time and provide such instructions as may be necessary to enable Landlord to complete the matters described below.  Tenant hereby approves of the estimate ("Landlord's Estimate") of the probable costs of constructing the Tenant Improvements shown on the Final Construction Documents, a copy of which estimate is attached hereto as Exhibit E and incorporated herein.

3.    Construction; Landlord's Contribution; Tenant Improvement Costs.

3.1.    Construction; Landlord's Contribution.  Landlord, through its contractor, shall complete the construction of the Tenant Improvements in a good and workmanlike manner, up to a maximum cost to Landlord of the Tenant Improvement Allowance.

3.2.    Tenant Improvement Costs.  The cost of the Tenant Improvements ("Tenant Improvement Costs") to be paid by Landlord from, but not in excess of, Tenant Improvement Allowance shall include:

(a)    Intentionally omitted;

(b)    All costs of obtaining from the City of Sacramento and any other governmental authority, approvals, building permits and occupancy permits, if any;

(c)    All direct and indirect costs of procuring, installing and constructing the Tenant Improvements, including: (i) the construction administration fee to Landlord's contractor in the amount of 7% of the costs of the Tenant Improvements, the cost of all on-site supervisory and administrative staff, office, equipment and temporary services rendered or provided by Landlord's contractor in connection with construction of the Tenant Improvements; and (ii) the cost of any services or utilities made available by Landlord; and

(d)    Without limiting the generality of the foregoing, the Tenant Improvement Costs include all costs of designing, procuring, constructing and installing Tenant Improvements in compliance with Law as applicable and as interpreted at the time of construction of the Tenant Improvements, including with all building codes and the ADA, provided, however, that the Tenant Improvement Costs shall not include any fees payable to Lionakis for preparing the Final Construction Documents or any Change Order requested by Tenant, which costs shall be solely paid by Tenant.

In no event shall the Tenant Improvement Costs include (i) any costs of procuring or installing in the Premises any trade fixtures, equipment, furniture, furnishings, telephone equipment, cabling for any of the foregoing, or other personal property ("Personal Property") to be used in the Premises by Tenant, and the cost of such Personal Property shall be paid by Tenant, (ii) except as explicitly provided for in this Workletter, any costs or expenses of any consultants retained by Tenant with respect to design, procurement, installation or construction of the Tenant Improvements, or (iii) any costs or expenses of any consultants retained by Tenant with respect to design, procurement, installation or construction of improvements or installations,

SMP000062

whether real or personal property, for the Premises in connection with any approved Change Order or the redesign of any portion of the Tenant Improvements from that shown on the Final Construction Documents.

      3.3.   <u>Limitations of Landlord's Obligations</u>.  Upon Substantial Completion of the Tenant Improvements, Landlord shall have no further obligation to construct improvements or construct modifications to or changes in the Tenant Improvements, except to complete the punchlist of Landlord Work remaining to be completed or correct any part thereof not in compliance with the Final Construction Documents and any approved modifications thereof, as provided in the Lease.  If the Tenant Improvement Allowance exceeds the Tenant Improvement Costs, then Landlord shall retain such excess and shall have no obligation or liability to Tenant with respect to such excess.  Notwithstanding anything to the contrary contained in the Final Construction Documents, Landlord shall not be responsible for providing telephone data or television cabling as part of the Tenant Improvements.

      4.   <u>Costs of Tenant Improvements in Excess of Tenant Improvement Allowance</u>. Tenant hereby authorizes Landlord to complete the Tenant Improvements in accordance with the Final Construction Documents.  The costs of the Tenant Improvement are shown on Landlord's Estimate and Tenant hereby agrees to pay Landlord the amount in excess of the Tenant Improvement Allowance required to complete construction of the Premises in accordance with the Final Construction Documents (as such may be modified pursuant to this Workletter). Landlord and Tenant agree that the total cost of constructing the Tenant Improvements shall not exceed the Landlord's Estimate unless Tenant requests a Change Order (defined below).  Upon execution of the Lease, Tenant shall deliver to Landlord a good check made payable to the order of Landlord in the amount of the excess cost authorized by Tenant of the Tenant Improvements over  Tenant Improvement Allowance.  Tenant may, pursuant to the provisions of this Workletter, request a Change Order (defined below) to the Final Construction Documents, but any delay in completion of the Premises resulting from such request for a Change Order or from the changes so made or necessitated shall be chargeable as Tenant Delay.  If such check (if applicable) is not received by Landlord, Landlord shall not be obligated to commence work on the Premises and any resulting delay in the completion of the Premises shall be chargeable against Tenant as Tenant delay as provided in Section 6 of this Workletter and in the Lease.

      5.   <u>Changes</u>.  If Tenant shall request any change, addition or alteration in the Final Construction Documents, Landlord shall give Tenant a written estimate of (a) the cost of engineering and design services and the construction contractor services to prepare a change order (the "Change Order") in accordance with such request, (b) the cost of work to be performed pursuant to such Change Order, and (c) the time delay expected because of such requested Change Order.  Within three (3) business days following Tenant's receipt of the foregoing written estimate, Tenant shall notify Landlord in writing whether it approves such written estimate.  If Tenant approves such written estimate and if such cost is in excess of Tenant Improvement Allowance, Tenant shall accompany such approval with a good check made payable to the order of Landlord in the amount of the estimated cost of preparing the Change Order and performing the work thereto, and the foregoing shall constitute Landlord's authorization to proceed.  If such written authorization, and check if required, are not received by Landlord within such three (3) business day period, Landlord shall not be obligated to prepare the Change Order or perform any work in connection therewith and any resulting delay in completion of the Premises shall be chargeable against Tenant as a Tenant Delay as provided in

Section 6 of this Workletter and in the Lease. Upon completion of the work of the Change Order and submission of the final cost thereof by Landlord to Tenant, Tenant shall promptly pay to Landlord any such additional amounts in excess of Tenant Improvement Allowance.

6.    <u>Tenant Delay</u>.  If the Substantial Completion of the Tenant Improvements in the Premises is delayed due to Tenant Delay (defined in the Lease), then Tenant shall be responsible for all costs and any expenses occasioned by such delay, including but not limited to any costs and expenses attributable to increases in labor or materials, and the provisions of Article 2 of the Lease shall apply.  Without limiting the foregoing, if any Tenant Delay materially delays the construction timeline, then Tenant shall be responsible for any lost rental income occasioned by such Tenant Delay.

7.    <u>Entry by Tenant and Tenant Agent</u>.  Tenant may, with Landlord's written consent, which will not unreasonably be withheld, enter the Premises during construction and prior to the Commencement Date for the Premises solely for the purpose of installing Tenant's Personal Property (defined in Section 3.2 above) as long as such entry will not interfere with the timely and orderly construction and completion of the Premises.  Tenant shall notify Landlord of its desired time(s) of entry and shall submit for Landlord's approval the scope of the work to be performed and the name(s) of the contractor(s) who will perform such work.  Such work and such contractors shall be subject to Landlord's approval in the same manner as for work subject to Section 9.1(a) of the Lease.  Such entry shall be without payment of Base Monthly Rent or Rent Adjustments, but such entry and all acts and omissions in connection with it are subject to and governed by all other provisions of the Lease, including Tenant's indemnification obligations, insurance obligations, obligations under Article 7 and the provisions of Section 9.2.

8.    <u>Regular Meetings/Project Management</u>.  Contractor shall schedule and administer meetings throughout the progress of work at intervals Contractor and Landlord deem appropriate.  Lionakis and a representative of Landlord shall be in attendance.  Contractor shall distribute agenda and prepare all meeting minutes.  Contractor shall provide and maintain project schedule and distribute to Lionakis.

9.    <u>Submittals</u>.  Contractor shall provide submittals of all products specified on the Final Construction Documents.  Four (4) copies of material and specifications for Lionakis' approval prior to ordering and or fabrication that shall include material or equipment description and technical specification reference.  Due to the time frame of the project, approval required herein shall be given within three (3) business days of the request thereof.  Failure of Lionakis to timely respond shall be deemed its approval thereof.

10.    <u>Requests for Information, Clarification or Additional Instructions</u>.  Should the Contractor discover conflicts, omissions, or errors in the Final Construction Documents or have any questions concerning interpretation or clarifications of the Final Construction Documents, the contractor shall promptly submit to the Landlord and Lionakis in writing a request for information ("RFI") in standard RFI format.  RFI's shall be numbered sequentially.  Responses to RFI's must be submitted in a timely manner in order that they may be researched and resolved.  Due to the timeframe of the project, responses to RFI's shall be made within five (5) business days unless the Contractor requires an urgent response in which the Lionakis and Landlord will respond in a timely manner, but in no case longer than five (5) business days.  Any

A-4

SMP000064

increase in the construction costs which are due to any errors, omissions, or ambiguities in the Final Construction Documents shall be paid solely by Tenant.

11.     Shop Drawings.   Contractor shall provide shop drawings for all millwork/casework, doors, storefront (if any) to Lionakis for review and approval prior to ordering and or fabrication.  Due to the timeframe of the project, approval required herein shall be given within three (3) business days of the request thereof.  Failure of Lionakis to timely respond shall be deemed its approval thereof.

12.     Force and Effect.   The terms and conditions of this Workletter supplement the Lease and shall be construed to be a part of the Lease and are incorporated in the Lease.  Without limiting the generality of the foregoing, any default by any party hereunder shall have the same force and effect as a default under the Lease.  Should any inconsistency arise between this Workletter and the Lease as to the specific matters that are the subject of this Workletter, the terms and conditions of this Workletter shall control.

A-5

SMP000065

EXHIBIT B

RULES AND REGULATIONS

1.     No sidewalks, entrance, passages, courts, elevators, vestibules, stairways, corridors or halls shall be obstructed or encumbered by Tenant or used for any purpose other than ingress to and egress to and from the Premises and if the Premises are situated on the ground floor of the Project, Tenant shall further, at Tenant's own expense, keep the sidewalks and curb directly in front of the Premises clean and free from rubbish.

2.     No awning or other projection shall be attached to the outside walls or windows of the Project without the prior written consent of Landlord. No curtains, blinds, shades, drapes or screens shall be attached to or hung in, or used in connection with any window or door of the Premises, without the prior written consent of Landlord. Such awnings, projections, curtains, blinds, shades, drapes, screens and other fixtures must be of a quality, type, design, color, material and general appearance approved by Landlord, and shall be attached in the manner approved by Landlord, including without limitation the requirement that such coverings (i) are to building standard and (ii) are uniform in design and color throughout the Premises. All lighting fixtures hung in offices or spaces along the perimeter of the Premises must be of a quality, type, design, bulb color, size and general appearance approved by Landlord, including without limitation the requirement that all such fixtures meet the "gold" level of LEED certification.

3.     No sign, advertisement, notice, lettering, decoration or other thing shall be exhibited, inscribed, painted or affixed by Tenant on any part of the outside or inside of the Premises or of the Project, without the prior written consent of Landlord. In the event of the violation of the foregoing by Tenant, Landlord may remove same without any liability, and may charge the expense incurred by such removal to Tenant.

4.     The sashes, sash doors, skylights, windows and doors that reflect or admit light or air into the halls, passageways or other public places in the Project shall not be covered or obstructed by Tenant, nor shall any bottles, parcels or other articles be placed on the window sills or in the public portions of the Project.

5.     No showcases or other articles shall be put in front of or affixed to any part of the exterior of the Project, nor placed in public portions thereof without the prior written consent of Landlord.

6.     The water and wash closets and other plumbing fixtures shall not be used for any purposes other than those for which they were constructed, and no sweepings, rubbish, rags or other substances shall be thrown therein. All damages resulting from any misuse of the fixtures shall be borne by Tenant to the extent that Tenant or Tenant's agents, servants, employees, contractors, visitors or licensees shall have caused the same.

7.     Tenant shall not mark, paint, drill into or in any way deface any part of the Premises or the Project. No boring, cutting or stringing of wires shall be permitted, except with the prior written consent of Landlord, and as Landlord may direct.

SMP000066

8.     No animal or bird of any kind shall be brought into or kept in or about the Premises or the Project, except seeing-eye dogs or other seeing-eye animals.

9.     Prior to leaving the Premises for the day, Tenant shall draw or lower window coverings and extinguish all lights.

10.     Tenant shall not make, or permit to be made, any unseemly or disturbing noises or disturb or interfere with occupants of the Project, or neighboring buildings or premises, or those having business with them.  Tenant shall not throw anything out of the doors, windows or skylights or down the passageways.

11.     Neither Tenant nor any of Tenant's agents, servants, employees, contractors, visitors or licensees shall at any time bring or keep upon the Premises any flammable, combustible or explosive fluid, chemical or substance.

12.     No additional locks, bolts or mail slots of any kind shall be placed upon any of the doors or windows by Tenant, nor shall any change be made in existing locks or the mechanism thereof.  Tenant must, upon the termination of the tenancy, restore to Landlord all keys of stores, offices and toilet rooms, either furnished to, or otherwise procured by Tenant, and in the event of the loss of any keys so furnished, Tenant shall pay to Landlord the cost thereof.

13.     All removals, or the carrying in or out of any safes, freight, furniture, construction material, bulky matter or heavy equipment of any description must take place during the hours which Landlord or its agent may determine from time to time.  Landlord reserves the right to prescribe the weight and position of all safes, which must be placed upon two-inch thick plank strips to distribute the weight.  The moving of safes, freight, furniture, fixtures, bulky matter or heavy equipment of any kind must be made upon previous notice to the Building Manager and in a manner and at times prescribed by him, and the persons employed by Tenant for such work are subject to Landlord's prior approval.  Landlord reserves the right to inspect all safes, freight or other bulky articles to be brought into the Project and to exclude from the Project all safes, freight or other bulky articles which violate any of these Rules and Regulations or the Lease of which these Rules and Regulations are a part.

14.     Tenant shall not purchase janitorial or maintenance or other like service from any company or persons not approved by Landlord.  Landlord shall approve a sufficient number of sources of such services to provide Tenant with a reasonable selection, but only in such instances and to such extent as Landlord in its judgment shall consider consistent with security and proper operation of the Project.

15.     Landlord shall have the right to prohibit any advertising or business conducted by Tenant referring to the Project which, in Landlord's opinion, tends to impair the reputation of the Project or its desirability as a first class building for offices and/or commercial services and upon notice from Landlord, Tenant shall refrain from or discontinue such advertising.

16.     Landlord reserves the right to exclude from the Project between the hours of 6:00 p.m. and 7:00 a.m. Monday through Friday, and at all hours on Saturdays, Sundays and legal holidays, all persons who do not present a pass to the Project issued by Landlord.  Landlord may furnish passes to Tenant so that Tenant may validate and issue same.  Tenant shall

B-2

SMP000067

safeguard said passes and shall be responsible for all acts of persons in or about the Project who possess a pass issued to Tenant.

17.     Tenant's contractors shall, while in the Premises or elsewhere in the Project, be subject to and under the control and direction of the Building Manager (but not as agent or servant of said Building Manager or of Landlord).

18.     If the Premises is or becomes infested with vermin as a result of the use or any misuse or neglect of the Premises by Tenant, its agents, servants, employees, contractors, visitors or licensees, Tenant shall forthwith at Tenant's expense cause the same to be exterminated from time to time to the satisfaction of Landlord and shall employ such licensed exterminators as shall be approved in writing in advance by Landlord.

19.     The requirements of Tenant will be attended to only upon application at the office of the Landlord's property manager.  Project personnel shall not perform any work or do anything outside of their regular duties unless under special instructions from the office of the Landlord.

20.     Canvassing, soliciting and peddling in the Project are prohibited and Tenant shall cooperate to prevent the same.

21.     No water cooler, air conditioning unit or system or other apparatus shall be installed or used by Tenant without the written consent of Landlord.

22.     There shall not be used in any premises, or in the public halls, plaza areas, lobbies, or elsewhere in the Project, either by Tenant or by jobbers or others, in the delivery or receipt of merchandise, any hand trucks or dollies, except those equipped with rubber tires and sideguards.

23.     Tenant, Tenant's agents, servants, employees, contractors, licensees, or visitors shall not park any vehicles in any driveways, alleyways, service entrances, or areas posted "No Parking" and shall comply with any other parking restrictions imposed by Landlord from time to time.

24.     Tenant shall keep its window coverings closed during any period of the day when the sun is shining directly on the windows of the Premises.

25.     Tenant shall not use the name of the Project for any purpose other than as the address of the business to be conducted by Tenant in the Premises, nor shall Tenant use any picture of the Project in its advertising, stationery or in any other manner without the prior written permission of Landlord.  Landlord expressly reserves the right at any time to change said name without in any manner being liable to Tenant therefor.

26.     Tenant shall not prepare any food nor do any cooking, operate or conduct any restaurant, luncheonette or cafeteria for the sale or service of food or beverages to its employees or to others, except that food and beverage preparation by Tenant's employees using microwave ovens or coffee makers shall be permitted provided no odors of cooking or other processes

B-3

SMP000068

emanate from the Premises. Tenant shall not install or permit the installation or use of any vending machine without approval in advance in writing by Landlord.

27.   The Premises shall not be used as an employment agency, a public stenographer or typist, a labor union office, a physician's or dentist's office, a dance or music studio, a school, a beauty salon, or barber shop, the business of photographic, multilith or multigraph reproductions or offset printing (not precluding using any part of the Premises for photographic, multilith or multigraph reproductions solely in connection with Tenant's own business and/or activities), a restaurant or bar, an establishment for the sale of confectionery, soda, beverages, sandwiches, ice cream or baked goods, an establishment for preparing, dispensing or consumption of food or beverages of any kind in any manner whatsoever, or news or cigar stand, or a radio, television or recording studio, theatre or exhibition hall, or manufacturing, or the storage or sale of merchandise, goods, services or property of any kind at wholesale, retail or auction, or for lodging, sleeping or for any immoral purposes.

28.   Business machines and mechanical equipment shall be placed and maintained by Tenant at Tenant's expense in settings sufficient in Landlord's judgment to absorb and prevent vibration, noise and annoyance. Tenant shall not install any machine or equipment which causes noise, heat, cold or vibration to be transmitted to the structure of the building in which the Premises are located without Landlord's prior written consent, which consent may be conditioned on such terms as Landlord may require. Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot that such floor was designed to carry and which is allowed by Law.

29.   Tenant shall not bring any Hazardous Materials onto the Premises except for those that are in general commercial use and are incidental to Tenant's business office operations and only in quantities suitable for immediate use.

30.   Tenant shall not store any vehicle within the parking garage area. Tenant's parking rights are limited to the use of parking spaces for short-term parking, of up to twenty-four (24) hours, of vehicles utilized in the normal and regular daily travel to and from the Project. Tenants who wish to park a vehicle for longer than a 24-hour period shall notify the Building Manager for the Project and consent to such long-term parking may be granted for periods up to two (2) weeks. Any motor vehicles parked without the prior written consent of the Building Manager for the Project for longer than a 24-hour period shall be deemed stored in violation of this rule and regulation and shall be towed away and stored at the owner's expense or disposed of as provided by Law.

31.   Smoking is prohibited in the Premises, the Building and all enclosed Common Areas of the Project, including all lobbies, all hallways, all elevators and all lavatories.

32.   Any moving or transportation of equipment, furniture, or any other items into the Premises shall be coordinated with Landlord, including without limitation checking out elevator keys. Such moving and/or transportation shall be done in a manner to not cause any damage to the Building, the Premises, any Common Areas of the Building, any elevators of the Building, or the garage of the Building. Without limiting the generality of the foregoing, such appropriate steps shall including the use of dollies, elevator pads, and elevator hold keys. Further, such

B-4

SMP000069

moving and/or transportation shall be done in such manner and at such times as to not interfere with Landlord or any other tenants in the Building. All damages resulting from such moving or transportation shall be borne by Tenant to the extent that Tenant or Tenant's agents, servants, employees, contractors, visitors, or licensees have caused the same.

B-5

SMP000070

EXHIBIT C

FORM OF LETTER OF CREDIT

(Attached)

C-1

SMP000071



Wells Fargo Bank, N.A.
U. S. Trade Services
Standby Letters of Credit
MAC D4004-012
401 Linden Street, 1st Floor
Winston-Salem, NC 27101
Phone: 1(800) 776-3862 Option 2
E-Mail: trade.coustandbys@wachovia.com

## Irrevocable Standby Letter Of Credit

**Number :** IS0005035
**Issue Date :** October 26, 2011

| BENEFICIARY | APPLICANT |
|---|---|
| HALE BROS INVESTMENT COMPANY, LLC | STUDENTSFIRST |
| 825 K STREET, 3RD FLOOR | 3400 3RD AVENUE |
| SACRAMENTO, CALIFORNIA   95814 | SACRAMENTO, CALIFORNIA   95817 |

| LETTER OF CREDIT ISSUE AMOUNT | USD  1,000,000.00 | EXPIRY DATE | OCTOBER 26, 2012 |
|---|---|---|---|

LADIES AND GENTLEMEN:

WE HEREBY OPEN OUR IRREVOCABLE STANDBY LETTER OF CREDIT IN YOUR FAVOR FOR THE ACCOUNT OF THE ABOVE REFERENCED APPLICANT IN THE AGGREGATE AMOUNT OF ONE MILLION AND 00/100 UNITED STATES DOLLARS ($1,000,000.00) WHICH IS AVAILABLE BY PAYMENT UPON PRESENTATION OF THE FOLLOWING DOCUMENTS:

1. A DRAFT AT SIGHT DRAWN ON WELLS FARGO BANK, N.A., DULY ENDORSED ON ITS REVERSE SIDE THEREOF BY THE BENEFICIARY, SPECIFICALLY REFERENCING THIS LETTER  OF CREDIT NUMBER.

2. THE ORIGINAL LETTER OF CREDIT AND ANY AMENDMENTS ATTACHED THERETO.

3. A DATED STATEMENT ISSUED ON THE LETTERHEAD OF THE BENEFICIARY AND PURPORTEDLY SIGNED BY AN AUTHORIZED OFFICER OF HALE BROS INVESTMENT COMPANY, LLC. HEREBY CERTIFYING:
(1) THAT STUDENTSFIRST IS IN DEFAULT OF SECTION (INSERT) OF THE OFFICE LEASE BEYOND ANY APPLICABLE NOTICE AND FAILED TO CURE SUCH DEFAULT WITHIN THE TIME SET FORTH IN THE OFFICE LEASE PERIODS AND (2) THE DEFAULT HAS NOT BEEN CURED AND THE BENEFICIARY IS DRAWING UPON THE LETTER OF CREDIT IN AN AMOUNT EQUAL TO (INSERT AMOUNT).
(2) THAT THE AMOUNT DRAWN (SEE SECTION (2)) IS EQUAL TO (CHECK ONE):

____ ALL REMAINING RENT OWING UNDER THE OFFICE LEASE (EXCLUDING THAT PORTION OF RENT ADJUSTMENTS ATTRIBUTABLE TO UTILITIES AND JANITORIAL SERVICES).

____ 150% OF THE REASONABLE ESTIMATE OF LANDLORD TO CURE THE DEFAULT.

____ DELINQUENT RENT (INCLUDING LATE FEES AND INTEREST, IF ANY).
AND
(4) THAT HALE BROS INVESTMENT COMPANY, LLC HAS SENT A COPY OF THIS CERTIFICATE TO STUDENTSFIRST EITHER VIA PERSONAL DELIVERY OR VIA OVERNIGHT REPUTABLE COURIER SERVICE.  SUCH

---

Page 1 of 2

Together we'll go far



SMP000072



COPY HAS EITHER BEEN ACTUALLY DELIVERED TO STUDENTSFIRST (OR STUDENTSFIRST HAS REFUSED DELIVERY THEREOF) AT LEAST THREE (3) BUSINESS DAYS PRIOR TO THE DATE HEREOF.

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT WRITTEN AMENDMENT FOR ONE YEAR PERIODS FROM THE PRESENT OR ANY FUTURE EXPIRY DATE UNLESS AT LEAST THIRTY (30)DAYS PRIOR TO SUCH EXPIRATION DATE, WE SEND THE BENEFICIARY NOTICE AT THE ABOVE STATED ADDRESS BY OVERNIGHT COURIER THAT WE ELECT NOT TO EXTEND THIS LETTER OF CREDIT BEYOND THE INITIAL OR ANY EXTENDED EXPIRY DATE THEREOF.

THIS IRREVOCABLE LETTER OF CREDIT SETS FORTH IN FULL THE TERMS OF OUR UNDERTAKING. THIS UNDERTAKING IS INDEPENDENT OF AND SHALL NOT IN ANY WAY BE MODIFIED, AMENDED, AMPLIFIED, OR INCORPORATED BY REFERENCE TO ANY DOCUMENT, CONTRACT, OR AGREEMENT REFERENCED HEREIN.

WE HEREBY AGREE WITH YOU THAT DRAFT(S) DRAWN UNDER AND IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS CREDIT SHALL BE DULY HONORED IF PRESENTED TOGETHER WITH DOCUMENT(S) AS SPECIFIED ABOVE AT OUR OFFICE LOCATED AT 401 LINDEN STREET, MAIL CODE D4004-017, WINSTON-SALEM, NC 27101, ATTENTION: STANDBY LETTER OF CREDIT DEPT. ON OR BEFORE THE ABOVE STATED EXPIRY DATE, OR ANY EXTENDED EXPIRY DATE IF APPLICABLE.

EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN, THIS LETTER OF CREDIT IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES 1998, INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NO. 590 ("ISP98").

Very Truly Yours,

**WELLS FARGO BANK, N.A.**

By: _____
*Authorized Signature*

*The original of the Letter of Credit contains an embossed seal over the Authorized Signature.*

Please direct any written correspondence or inquiries regarding this Letter of Credit, always quoting our reference number, to Wells Fargo Bank, National Association, Attn: U.S. Standby Trade Services

*at either*  One Front Street   *or*   401 Linden Street
MAC A0195-212,                     MAC D4004-017,
San Francisco, CA  94111           Winston-Salem, NC 27101

| Phone inquiries regarding this credit should be directed to our Standby Customer Connection Professionals |
|---|
| 1-800-798-2815 Option 1          1-800-776-3862 Option 2 |
| (Hours of Operation: 8:00 a.m. PT to 5:00 p.m. PT)    (Hours of Operation: 8:00 a.m. EST to 5:30 p.m. EST) |

Together we'll go far

Each page of this multipage document is an integral part
of this Irrevocable Standby Letter of Credit Number IS0005035



SMP000073

EXHIBIT D-1

FINAL CONSTRUCTION DOCUMENTS

(Attached)

StudentsFirst Lease (10/4/11)

SMP000074

EXHIBIT D-1 (Eoo)

LIONĀKIS

# 825 K STREET, SUITE 200, SACRAMENTO, CA 95814
## TENANT IMPROVEMENT

### CONSTRUCTION DOCUMENTS
### PERMIT RESUBMISSION / MAY 4, 2011

SYMBOL LEGEND

LIST OF ABBREVIATIONS

SHEET INDEX

PROJECT DIRECTORY

PROJECT DATA

VICINITY MAP

TENANT IMPROVEMENT

825 K STREET, SUITE 200
SACRAMENTO, CA 95814

COVER SHEET

G-001

SMP000075

GENERAL NOTES

LIONAKIS

TENANT IMPROVEMENT

G-002

GENERAL NOTES

SMP000076

SMP000077

FLOOR PLAN - SECOND FLOOR
A-112

TENANT IMPROVEMENT

555 K STREET, SUITE 200
SACRAMENTO, CA 95814

GENERAL NOTES

GENERAL SHEET NOTES

SHEET KEYNOTES

LEGEND

SMP000078



SMP000079

LEGEND

TENANT IMPROVEMENT

LIONAKIS

A-132

FINISH PLAN



SMP000081



SMP000082



SMP000083



SMP000084

LIONAKIS

TENANT IMPROVEMENT

825 S. SUNSET, SUITE 200
SACRAMENTO, CA 95814

INTERIOR DETAILS

A-522



CEILING DETAILS

A-523

TENANT IMPROVEMENT
815 STREET, SUITE 200
SACRAMENTO, CA 95814

LIONAKIS

SMP000086



SMP000087

**LIONAKIS**

TENANT IMPROVEMENT

DOOR/FINISH SCHEDULE

A-622

DOOR & FRAME SCHEDULE

ROOM FINISH SCHEDULE

HARDWARE GROUPS

LEGEND

DOOR REMARKS

DOOR TYPES

FRAME TYPES

FINISH LEGEND

KEY NOTES

MATERIALS LEGEND

GENERAL NOTES

CASEWORK LEGEND

SMP000088

FURNITURE PLAN
FOR REFERENCE ONLY

I-112

TENANT IMPROVEMENT

LIONAKIS

SMP000089



SMP000091

SECOND FLOOR
PARTIAL FLOOR PLAN - PLUMBING

KITCHEN

OFFICE 4

PLUMBING LEGEND

PLUMBING FIXTURES:

PLUMBING NOTES:

WATER PIPING CHART

REVISIONS

REVISIONS

STUDENT
FIRST

SECOND FLOOR

FLOOR PLAN
- PLUMBING
- COORDINATE

P1.0







SMP000094





SMP000095

TITLE 24

DATE
04 / 04 / 2001

STUDENTS FIRST
6825 GIRARD DEER FLOOR
SACRAMENTO, CA. 95814

ENERGY LOCK
HEATING & AIR

# REXMOORE

# ELECTRICAL SYSTEMS FOR:
# STUDENTS FIRST

DESIGN BUILD NOTES:

SYMBOL LIST

ELECTRICAL SPECIAL SYMBOLS

NOTES / ABBREVIATIONS

SHEET INDEX / COORDINATION MATRIX

ELECTRICAL

SYMBOL LEGEND

| SHEET | DESCRIPTION | SHEET(S) ISSUED |
|---|---|---|
| E0.0.0 | ELECTRICAL COVER SHEET | |
| E1.0.0 | | |
| E1.0.1 | | |
| E2.0.0 | | |
| E3.0.0 | | |
| E4.1.1 | | |

SUBCONTRACTOR COORDINATION

STUDENTS FIRST

926 K STREET
SACRAMENTO, CA. 95816

RMCC #1100055

ELECTRICAL COVER SHEET

E0.0.0



SMP000098



SMP000099

PARTIAL ONE LINE DIAGRAM

ONE LINE DIAGRAM & PANEL SCHEDULES

E2.0.0

STUDENTS FIRST

620 X STREET
SACRAMENTO, CA 95814

FLOOR PLAN - LIGHTING

STUDENTS FIRST

FLOOR PLAN
LIGHTING

E4.1.1

SMP000101



SMP000102

FLOOR PLAN - ELECTRICAL (HVAC CONNECTION)



SMP000104

EXHIBIT D-2

FINAL CONSTRUCTION DOCUMENTS

(See attached)

StudentsFirst Lease (10/4/11)

SMP000105





SMP000107



SMP000108



▲ DATA & PHONE
⊘ POWER

ADDITIONAL REQUIREMENTS

1. Provide power and data and cable (TV) t.v to locations indicated on plan. Power/data/cable @ 60" A.F.F (final location on wall/dimensions shall be provided to Contractor.)

2. Provide 2 Walls in Quiet Rooms with MDC - Idea Paint / Tabrasa Color TABSOWH - White. Walls shall be smooth in texture per specifications of MDC/Tabrasa. Walls shall be North and West Walls only.

3. Provide Data to all Quiet Rooms As shown on plan. Provide phone also

4. Provide additional power as shown on plan

5. Remove (3) outlets in Breakroom final locations t.b d.

SMP000109

EXHIBIT E

LANDLORD'S ESTIMATE

(Attached)

SMP000110

# CONSTRUCTION COST

ESTIMATED JOB COSTS WORKSHEET

ITEM PROJECT: StudentsFirst

Revised 09.23.2011

| Item No. | Spec. No. | Item | 08.18.2011 | Comments |
|---|---|---|---|---|
| 1 | 1000 | SUPERVISION/PROJECT MANAGEMENT | $30,000.00 | |
| 2 | | STAFF OUT Trash Chute | $50.00 | |
| 3 | 1710 | CLEAN UP PROGRESSIVE | $2,000.00 | |
| 4 | | CLEAN UP FINAL | $2,500.00 | |
| 5 | 1715 | SECURITY PATROL | $4,000.00 | |
| 6 | 1720 | MATERIAL HANDLING | $0.00 | |
| 7 | | Steel & Sidewalk closure | $0.00 | |
| 8 | | DUMPSTERS | $7,300.00 | |
| 9 | 5100 | STRUCTURAL STEEL | | |
| 10 | | Roof Structure Steel for HVAC Enclosure | $5,425.00 | |
| 11 | | Structural steel for conference room | $10,000.00 | |
| 12 | 7200 | INSULATION | $1,500.00 | |
| 13 | 7900 | MEMBRANE ROOFING | $1,400.00 | |
| 14 | 8200 | WOOD DOORS | $35,000.00 | |
| 15 | 8400 | STOREFRONT/GLAZING | $34,000.00 | |
| 16 | | 1/2" Butt glazed wall (Entry Wall) | $4,000.00 | |
| 17 | | Entry Glass Wall Film | $8,500.00 | |
| 18 | | Entry Glass Wall Film | $2,500.00 | Price per Lite/lite at printed meeting |
| 19 | 9250 | METAL STUD/DRYWALL | $58,700.00 | |
| 20 | 9680 | FLOORING (includes underlayment) | $117,300.00 | Price for rug carpet same as for red vinyl |
| 21 | 9900 | PAINTING | $7,415.00 | |
| 22 | 9950 | WALL COVERINGS | $935.00 | |
| 23 | 10440 | SIGNS (Code signs only) | $1,400.00 | |
| 24 | 11900 | APPLIANCES | $3,500.00 | |
| 25 | 12300 | CABINETS | $0.00 | |
| 26 | | Level Complete | $0.00 | |
| 27 | | Structure for microwave counter | $2,070.14 | Allowance |
| 28 | 12560 | ECCO Product ltg & gen cont rm receptacle | $18,800.00 | Not shown |
| 29 | 15400 | WINDOW TREATMENT | $4,125.00 | |
| 30 | 15400 | PLUMBING | $2,000.00 | |
| 31 | 15550 | FIRE PROTECTION | $7,480.00 | |
| 32 | 15550 | EXTINGUISHERS/CABINETS | $1,100.00 | |
| 33 | 15900 | HVAC (includes conference rooms) | $25,000.00 | |
| 34 | 16000 | ELECTRICAL | $75,875.00 | |
| 35 | | (Lighting) | $30,524.31 | |
| 36 | 16700 | COMMUNICATIONS | | |
| 37 | | Cable trays (building standard) | $3,000.00 | Communications/data cabling to be serviced by tenant's communications contractor |
| 38 | | ASBESTOS | $0.00 | Could be provided by communications/data cabling company |
| 39 | | SMOKE DETECTION SYS | $10,700.00 | |
| 40 | | VFD used receptacle wood are aisle | $9,000.00 | |
| 41 | | ADDITIONAL POWER AND BACKING FOR TVS | $9,000.00 | |
| | | PAINTING UP 2 WALLS at QUIET ROOMS WITH IDEA PAINT | $1,120.00 | |
| 42 | | | | |
| 43 | | TOTALS | $600,968.91 | |
| 44 | | | | |
| 45 | | PROFIT & OVERHEAD 7% | $36,057.06 | |
| 46 | | INSURANCE 1% | $6,009.66 | |
| 47 | | | | |
| 48 | | TOTAL CONSTRUCTION PRICE | $665,334.67 | |
| 49 | | | | |
| 50 | | PERMIT FEES | $5,800.00 | |
| 51 | | | | |
| 52 | | GRAND TOTAL with PERMIT FEES | $671,834.67 | |
| 53 | | Landlord Tenant Improvement Contribution | $ 632,365.00 | |
| 54 | | Over/Under TI Contribution | $41,469.67 | |

EXHIBIT E

SMP000111

EXHIBIT F

POTENTIAL SUBLESSEE MISSION STATEMENTS

(See Attached)

StudentsFirst Lease (10/4/11)

SMP000112

# EXHIBIT F

Home   City Year Locations   Alumni   Contact Us

What We Do    The Corps Experience    Join the Corps    Special Events    Ways to Give    About City Year

[ Search ]

- Culture
- Our Leadership
- Pressroom
- Annual Report
- Partners
- Special Initiatives
- Jobs

## ABOUT CITY YEAR

City Year was founded on the belief that young people can change the world. City Year's vision is that one day the most commonly asked question of a young person will be, "Where are you going to do your service year?"

City Year supports this vision in four primary ways:

- **Full-Time Youth Service Corps**

City Year unites young people of all backgrounds for a year of full-time service, giving them the skills and opportunities to change the world. These diverse young leaders help turn around high-need schools and get students back on track to graduation.

At City Year's 21 locations across the United States, young adults ages 17-24 serve full-time for 10 months and apply the power of national service to help close the education achievement gap by working directly with at-risk children throughout the entire school year to improve student attendance, behavior and course performances. As near-peers who begin their service before the first bell rings and stay until the last child leaves the after-school program, corps members are uniquely able to help students and schools succeed.



- **Inspiring Citizen Service Through High-Impact Community Events**

City Year seeks to be a catalyst, a mechanism to engage people and institutions in the citizen service movement. Events such as city-wide service days and Martin Luther King, Jr. Service Day bring together thousands of people from City Year communities each year to complete critical projects. These projects revitalize schools and communities, and foster a spirit of civic engagement by bringing together community members from all walks of life.

- **Leading Discussion and Development of National Service Policies and Initiatives**



City Year's vision is pursued not only through action, but also through public policy outreach and international initiatives, promoting the concept of citizen service, engaging policymakers, providing leadership to Voices for National Service and securing support for AmeriCorps. By generating new, innovative policy ideas and leading discussion around these ideas, City Year seeks to build awareness and support for citizen service among leaders and key stakeholders across the country and the world.



City Year is a proud member of the Voices for National Service coalition.

- **Expanding Service Opportunities Around the World**

City Year aims to inspire and support citizen service across the globe to unite people from all races, religions, cultures and ethnicities in building a more just world.

In 2005, City Year launched its first international location, City Year South Africa. Located in Johannesburg, corps members serve in schools through after-school programs in literacy, life skills and tutoring, as well as service projects to reclaim and brighten school spaces. In 2010, City Year launched City Year London, where City Year service leaders deliver a full-time school program that provides academic support, mentoring and extra-curricular activities during and after the school day.

Learn more about:

- Our Culture
- Our Leadership
- Press
- Annual Report
- Jobs at City Year
- Becoming a Partner

### Apply Now

Applying is easy with our online application process!

[ Apply Online ]

**Returning Applicant**

Complete an application you've already started.

[ Continue ]

### Donate Now!

Donate now and make a difference.

[ Donate Now ]

### Recent Headlines

Volunteering Spirit Catches Fire

Boston Globe Features City Year on Front Page

learn more

e-News

Read our latest Newsletter!

[ Sign Up ]

### Stay Connected

Facebook      Twitter

Blog

### National Partners



Photos by Jennifer Cogswell, Andy Dean, John Gillooly(?), Kevin Jenkins, Jim Hanlon and Todd Shapera.

http://www.cityyear.org/about.aspx

8/22/2011

SMP000113

City Year

Home   City Year Locations   Alumni   Contact Us

What We Do    The Corps Experience    Join the Corps    Special Events    Ways to Give    About City Year

Search

- Culture
- Our Leadership
- Pressroom
- Annual Report
- Partners
- Special Initiatives
- Jobs

## SPECIAL INITIATIVES




**Upcoming Events**

Save Service
National service funding is at risk. Help save service today.

learn more

**Donate Now!**

Donate now and make a difference.

Donate Now

**Recent Headlines**

- Boston Globe Features City Year on Front Page

learn more

**e-News**

Read our latest Newsletter!

Sign Up

**Stay Connected**

Facebook    Twitter
Blog

**National Partners**



### In School & On Track: A National Challenge

City Year leverages the talent, energy and idealism of corps members who serve as tutors, mentors and role models to help students stay on track — and get back on track — to graduate.

City Year's In School & On Track initiative is designed to bring City Year corps members to 80% of all of the students falling off track in City Year's 21 U.S. locations, which will require expanding the number of corps members to 6,000 and engaging school districts, the private sector and the federal government through AmeriCorps as partners.

Learn more about City Year's strategy to address the dropout crisis.

Diploma Now



Diploma Now is an innovative school turnaround model that unites three experienced non-profit organizations — City Year, Communities in Schools, and Talent Development — to work with the nation's most challenged middle and high schools to deliver the right interventions to the right students at the right time.

The partnership combines evidence-based, comprehensive school improvement with an early warning system, national service and integrated student services that are dedicated to helping students at-risk of dropping out get back on track and stay on track to high school graduation and be ready for college and career.

Learn more about Diplomas Now.



Home | What We Do | The Corps Experience | Join the Corps | Special Events | Ways to Give | About City Year
City Year Locations | Alumni | Contact Us | Privacy Policy
© 2011 City Year, Inc.   287 Columbus Ave, Boston MA, 02116

Photos by Jennifer Cogswell, Andy Deer, John Gillooly/PEI, Kevin Jenkins, Jim Harrison and Todd Shapera.

http://www.cityyear.org/initiatives.aspx

8/22/2011

SMP000114

Home   City Year Locations   Alumni   Contact Us

What We Do    The Corps Experience    Join the Corps    Special Events    Ways to Give    About City Year

[                                                    ] [Search]

▸ Our Purpose
▸ Our Work
▸ Our Impact

## OUR PURPOSE

City Year was founded in 1988 on the belief that young people can change the world.

### give a year.

At City Year's locations across the United States and in South Africa, young people – called "corps members" – serve full time for 10 months.

City Year's vision is that one day the most commonly asked question of a young person will be, "Where are you going to do your service year?"

### change the world.

Every 26 seconds, a student gives up on school in America.

City Year corps members serve as tutors, mentors and role models to help students stay on track – and get back on track – to graduate.

By giving corps members the skills and opportunities to serve in schools and neighborhoods across the country, City Year seeks to:

- Help students and schools succeed
- Build stronger communities
- Break down social barriers
- Develop young leaders
- Foster active citizenship

  

**Apply Now**

- Applying is easy with our online application process!

[Apply Online]

**Returning Applicant**

Complete an application you've already started.

[Continue]

**Donate Now!**

- Donate now and make a difference.

[Donate Now]

**Recent Headlines**

Volunteering Spirit Catches Fire

Boston Globe Features City Year on Front Page

learn more

**e-News**

Read our latest Newsletter!

[Sign Up]

**Stay Connected**

 Facebook    Twitter

Blog

**National Partners**

Home | What We Do | The Corps Experience | Join the Corps | Special Events | Ways to Give | About City Year

City Year Locations | Alumni | Contact Us | Privacy Policy

© 2011 City Year, Inc.   287 Columbus Ave, Boston MA, 02116

Photos by Jennifer Cogswell, Andy Dean, John Gillooly/PEI, Kevin Jenkins, Jim Harrison and Todd Shapera.



### GOAL 1: STRENGTHEN OUR CULTURAL I

Improve public funding

Increase private sector giving

Help arts and cultural spaces flourish

### GOAL 2: IMPROVE ACCESS AND ARTS EI

Increase participation in the arts

Strengthen and support arts education

Build the brand

### GOAL 3: INVEST IN TALENT AND THE CR

Support artists

Develop professionally

Buy local

SMP000116

For Arts' Sake

© 2011 For Arts' Sake. All rights reserved.     Privacy Policy | Sponsors | Contact Us



8/22/2011

SMP000117



# FOR ARTS' SAKE SACRAMENTO

Creative Action Plan for the Sacramento Metropolitan Region
www.forartssake.org



CREATE

PARTICIPATE

CELEBRATE



PRESENTED BY
Mayor Kevin Johnson
For Arts' Sake Coalition
Sacramento Metropolitan Arts Commission
Sacramento Convention and Visitors Bureau

**OUR GOALS**

1 STRENGTHEN OUR CULTURAL INFRASTRUCTURE

2 IMPROVE ACCESS TO THE ARTS AND ARTS EDUCATION

3 INVEST IN CREATIVE TALENT

SMP000118

FOR
## ARTS' SAKE
SACRAMENTO

# WELCOME

## WHEN THE ARTS THRIVE, A CITY COMES ALIVE

Arts are an integral part of the fabric of our community. Arts are a convener of people, a conveyer of culture and an outlet for expression and innovation. Arts not only provide residents with recreational and entertainment options, arts act as a unifying force and lead to greater civic engagement. Arts also contribute significantly to economic vitality, quality of life and the education of our children.

In Sacramento, we know the desire to support the arts runs deep, even in these difficult economic times. We also know that effectively supporting the arts requires a strategic approach that bridges city and county boundaries.

Michael Kaiser, president of the Kennedy Center for the Performing Arts in Washington, D.C., said it best when he addressed a packed audience of community leaders last May. When it comes to strengthening the arts community, it is all about unity.

In June 2009, based on Mr. Kaiser's inspiration and my own passion for the arts, I launched a regional arts initiative called "For Arts' Sake."

I challenged arts organizations, artists, civic leaders, businesses and residents from across the Sacramento community to be bold, to work collaboratively and reinvent the way the arts are defined and supported.

The purpose of "For Arts' Sake" is to raise the profile of Sacramento's arts scene locally and nationally, establishing Sacramento as a major metropolitan destination while strengthening the local community. More specifically, the initiative seeks to unify the arts community around a shared vision and goals for strengthening the region's cultural infrastructure, improving access to arts and arts education, and investing in talent and the creative economy.

## THE CREATIVE CAPITAL



California's capital region encourages all people to create, all citizens to participate, and all stakeholders to celebrate and support the arts in order to improve both cultural and economic vitality for all its residents.

Over the last year, more than 400 citizens came together to express their passion and dedication to revitalizing Sacramento arts. The Action Plan you are holding is the product of their unified dream and efforts – a clear set of recommended goals and steps for moving forward over the next three years.

Despite the struggling economy, now is not the time to become timid. Arts can be a catalyst for economic recovery. By failing to address the challenges facing our arts community, we place our creative sector at risk.

Thank you to everyone who participated in Phase One of "For Arts' Sake." Now that we have our vision and goals, there is much work ahead. I ask residents to help fulfill the Action Plan that follows in these pages. Let's come together to strengthen arts and culture, improve the quality of life and build regional pride and economic vitality in our Creative Capital.




Mayor
**Kevin Johnson**
City of Sacramento

SMP000119

CONTENTS SPRING 2010

## SUMMARY – FOR ARTS' SAKE SACRAMENTO

pg 4



pg 6

## GOAL 1 — STRENGTHEN OUR CULTURAL INFRASTRUCTURE

**A — IMPROVE PUBLIC FUNDING**
Assure the long-term sustainability of arts and culture in the region through a dedicated public funding mechanism that will yield $15-20 million per year.

**B — INCREASE PRIVATE SECTOR GIVING**
Leverage public funds to stimulate more giving from the private sector; build awareness of the values and benefits of the arts throughout our community.

**C — HELP ARTS & CULTURE SPACES FLOURISH**
Support public and private efforts that make our region's performance and exhibition venues, rehearsal and office spaces, studios, and live/work sites more exciting, more attractive and more accessible.



pg 8

## GOAL 2 — IMPROVE ACCESS TO THE ARTS AND ARTS EDUCATION

**A — ACCESS TO THE PUBLIC**
Promote wide participation, including offering more free and reduced cost arts and culture experiences for the citizens of the region.

**B — STRENGTHEN & SUPPORT ARTS EDUCATION**
Integrate arts learning into the education of every student in the region and broaden arts learning throughout the community, thereby cultivating lifelong connections to the arts.

**C — BUILD THE BRAND**
Position the Sacramento metropolitan region as a center of excellence for the arts.



pg 10

## GOAL 3 — INVEST IN TALENT AND THE CREATIVE ECONOMY

**A — SUPPORT ARTISTS**
Eliminate barriers and support the basic needs of artists and other creative professionals so that the region will become a mecca for artists. Capitalize on the arts as an economic and creative driver.

**B — DEVELOP PROFESSIONALLY**
Create opportunities for artists to network with other creative professionals, supporters, and consumers – locally, nationally and internationally.

**C — BUY LOCAL**
Increase the purchase of locally produced art and create more cultural consumers. Support collaborations that help the entire creative services sector thrive.

## APPENDIX AND CREDITS

pg 11

printing donated by: The Sacramento Bee | 3

**FOR ARTS' SAKE**
Sacramento

# SUMMARY

Sacramento has a robust arts and cultural landscape responsible for a multi-million dollar "creative economy" and contributes significantly to the well-being of the Sacramento region. However, due to the challenging economic times, many of Sacramento's artists and arts organizations are at risk.

In May 2009, Michael Kaiser, the president of the Kennedy Center for the Performing Arts, shared his insight with the Sacramento community about how to keep arts organizations healthy. It was obvious from the audience's enthusiastic reaction that now is the time to create a unified approach to ensuring arts and culture not only survive, but thrive.

Based on this call to action, Mayor Kevin Johnson launched "For Arts' Sake" as a means to bring the community together to develop a collective vision and direction for arts across the region. The initiative was guided by a leadership team that represented large, medium and small arts organizations and reflected the diversity of arts, including visual, performing, and literary arts. Business, philanthropy and artists were also included.

**ARTS ORGANIZATIONS AND ARTISTS ARE SUFFERING SIGNIFICANTLY FROM THE ECONOMIC CRISIS**

Over the last eleven months, more than 400 people attended monthly meetings and participated in one of five committees: Funding, Facilities, Arts Education, Marketing and Film. The meetings served to convene key stakeholders and monitor the initiative's progress. Additionally, the Mayor showcased artistic talent, bringing in nationally renowned performers Wynton Marsalis and Lee Greenwood as well as featuring local artists.

The committees met monthly as well. They started by collecting input from artists, business leaders, educators and creative professionals to better understand the local challenges and opportunities. The committees next researched best practices and national models. Finally, they synthesized their learning into a set of goals and recommendations for the Sacramento region, which were posted on the "For Arts' Sake" website for public comment. Staff from arts organizations and government entities across the region also reviewed the information.

## ORGANIZING FOR SUCCESS

Successful implementation of this Action Plan is a collective responsibility. However, support structures are being put in place to manage the process, coordinate efforts and progress to results.

Co-Chairs will lead this effort with continued support from the Mayor.

A Leadership Team and Three Committees, one for each goal, will meet bi-monthly. Ad hoc committees will be established as needed.

A Project Manager will be hired to drive implementation, monitor progress and align work.

Baseline data will be collected and tracked. Yearly benchmarks will be set for each goal.

A midterm assessment will be conducted after 12 – 18 months. At this point, goals and strategies will be re-evaluated.

An updated Action Plan will be released at the two-year mark based on the midterm assessment.

Based on feedback, the goals and recommendations were further refined, resulting in this Action Plan.

Work is currently underway to identify the organizations and structures that will play a critical role in attaining the goals highlighted in this Action Plan and insure regional collaboration. Don Roth, executive director of the Mondavi Center, and Garry Maisel, president and CEO of Western Health Advantage, have volunteered to serve as co-chairs. They will be supported by a newly formed Leadership Team and three committees of skilled volunteers. A project manager is also being hired who will work out of Mayor Johnson's office. The project manager will oversee and support execution of the Action Plan, coordinate the efforts of participating entities and monitor progress.

Central to success will be the establishment of yearly benchmarks and measurable results for each goal. To this end, baseline data will be collected and after 12 – 18 months, a midterm assessment will occur. The assessment will be the foundation for re-evaluating the goals and strategies, producing a progress report and releasing an updated Action Plan at the two year point. To follow the progress of "For Arts' Sake" and the implementation of the Action Plan, please visit www.forartsake.org.

## WHO'S WHO

**Americans for the Arts (AFTA)** www.artsusa.org
AFTA is focused on building environments where arts and arts education can flourish, creating meaningful public and private sector policies for the arts, and spreading arts awareness and appreciation.

**Arts and Business Council of Sacramento (ABC)** www.artsabc.com
As a member of Americans for the Arts, ABC promotes partnerships between businesses and arts organizations to enhance the economy and reach quality of life.

**California Arts Council (CAC)** www.cac.ca.gov
With the mission to advance California through creativity and the arts, CAC supports arts awareness, arts participation in the arts, local arts organizations, professional development in arts leaders, and arts programs for children and communities.

**Department of Economics, Culture and Leisure (DOCL)** www.cityofsacramento.org/dcl
The mission of the DOCL is to promote and preserve Sacramento's unique culture and heritage by delivering accessible arts, leisure and educational experiences that enrich people's lives and enhance the metropolitan area.

**For Arts' Sake Sacramento (FAS)** www.forartsake.org
FAS is a regional initiative launched by Mayor Kevin Johnson in June 2009. The mission of the initiative is to create a collective vision and approach for realizing the full potential of the arts across Sacramento, ensuring cultural vibrancy for the region's cultural assets.

**Metropolitan Arts Partnership (MAP)** www.mapplace.net
MAP is an arts and cultural initiative that increases awareness and raises funds for its 40+ affiliate members through its workplace giving programs.

**National Endowment for the Arts (NEA)** www.nea.gov
NEA is a public agency and the nation's largest annual funder of the arts. It is dedicated to supporting excellence in the arts, providing leadership in arts education and bringing the arts to all Americans.

**Regional Arts Collaborative**
With four arts organizations and government offices across the six county region met to discuss "For Arts' Sake." The group affirmed the need for regional cooperation and their desire to participate in the efforts moving forward.

**Sacramento Arts Commerce and Trade Organization (SACTO)** www.sacto.org
SACTO facilitates economic development in Sacramento, bringing together organizations, industries, and resources to generate and expand jobs, trade, and investment needed to ensure regional prosperity and global competitiveness.

**Sacramento Convention and Visitors Bureau (SCVB)** www.discovergold.org
SCVB strives to strengthen the positive awareness of the City and County of Sacramento as a convention and visitor destination to increase revenues and stimulate economic development and growth for the community.

**Sacramento Metropolitan Arts Commission (SMAC)** www.sacmetroarts.org
SMAC is a public agency devoted to supporting, promoting and advancing arts in the Sacramento region. SMAC provides partnerships, funding, and other resources for artists and arts organizations.

**Sacramento Metropolitan Chamber of Commerce** www.metrochamber.org
The Metro Chamber connects economic strength and serves as a critical voice of business throughout Sacramento. Their office brings business interests to the forefront of civic and community leaders' agendas, inspiring economic development projects, important public policy issues, and business growth.

**Sacramento Region Community Foundation (SRCF)** www.sacregcf.org
SRCF connects people who care with charitable causes through charitable trusts and enabling people to achieve a variety of current and long-term community desires.

**The John F. Kennedy Center for the Performing Arts** www.kennedy-center.org
The Kennedy Center hosts a variety of arts performances, educational programs, and national arts opportunities with the vision of advancing performance, nurturing new artists, and serving the nation as a leader in arts education.

SMP000121

# ARTS SUPPORT

## SOURCES
*Average arts organization funding*



- 7% Government
- 43% Contributed Income
- 50% Earned Income

## FUNDING NEED

# $15-20 MILLION

Public funding to support the region's $350 million nonprofit arts and culture economy. (Current amount is 1.35 million.)

## NATIONAL
SOURCE: National Endowment for the Arts

California receives the least public funding for the arts in the United States and these monies are on the decline. In 2009, local and state government funding fell 3.0 percent and 4.6 percent, respectively.

## PUBLIC INTEREST

# 64%

Rapid growth in program activity suggests high demand for cultural programming and services. 64% of Sacramentans polled believe that arts and creative learning are both essential to our community.

Source: SMAC 2006-2007 Business Plan



- 1% Government
- 37% Contributed Income
- 62% Earned Income

## GREATER SACRAMENTO
SOURCE: Creative Vitality Index

Contributed income includes funding from corporations, foundations and individuals. Government includes local, state and federal funding.

## ARTS BUSINESSES

# 1,515

Number of arts related businesses in the Greater Sacramento area as of 2008, employing more than 7,051 people.

Source: Americans for the Arts Creative Industries Report

SMP000122

# STATUS

Though the demand for creative excellence in the Sacramento area is great, funding is insufficient. Private sector giving and government investments are significantly less than the national average.

## GOVERNMENT SUPPORT

Amount local governments invest per person in seven metropolitan regions



$2.60 — Sacramento
$6.32 — Portland
$13.18 — Seattle
$15.93 — San Francisco

## PRIVATE SECTOR

Percentage of the average arts budget that is received from charitable sources



37% — GREATER SACRAMENTO
13% — NATIONAL

## PUBLIC ART

The arts are visible throughout our community. In 1977, City and County ordinances established 2% of eligible City and County capital improvement project budgets be set aside for the commission, purchase, and installation of artworks.

Number of permanent and portable public artworks throughout the city and county

250 — 1980s
450 — 2003
650 — Today

---

# GOAL 1
# STRENGTHEN OUR CULTURAL INFRASTRUCTURE



## CREATE

A vibrant area community will inspire public and private support by individuals and organizations that fosters continued expression and creation.

### WHERE WE ARE



| STRATEGY | ACTION BY FALL 2012 | RESULT BY 2014 |
|---|---|---|

**4 — IMPROVE PUBLIC FUNDING**

Establish plans for a dedicated, sustainable public funding mechanism, which generates $15-20 million per year.

**B — INCREASE PRIVATE SECTOR GIVING**

Increase total private sector giving to the arts by 10-20%. Generate $500K or more annually through workplace giving.

**C — HELP ARTS AND CULTURE SERVICES FLOURISH**

25% of vacant spaces in master plans are occupied by arts organizations, art and/or performances.

SMP000123



# GOAL 2: IMPROVE ACCESS TO THE ARTS AND ARTS EDUCATION

## WHERE WE ARE

Sacramento Market Statistical (MSA) data indicates that Sacramento has positive market conditions for strong community participation in the arts. Sacramento have higher than average education levels, which is the number one predictor of participation in the arts, and household incomes are just slightly below the State median, which is the number two predictor of participation in the arts. Additionally Sacramento residents have a higher passion of cultural-aged children, indicating a fairly strong family market. Despite a good core of support for the arts, survey data indicates that the region has limited awareness of arts activities, organizations and opportunities.

Sacramento arts organizations are committed to providing more access to the arts, offering many free and reduced-cost arts opportunities including free concert days, performances in parks, and discount tickets underwritten by corporate sponsors. Arts organizations are also doing their part to

ensure that Sacramento's landscape includes artistic elements. In addition, the region's arts organizations offer a wide variety of effective arts education programming that has resulted some schools that schools can no longer afford to provide.

Arts Open Daily is a recently launched public service campaign run by SMAC. The campaign includes ads on super city bus sides, on billboards, at street banners, print ads, electronic, and television spots.

SMAC oversees the Art in Public Places (PPP) program, which uses a portion of construction dollars from City, County or Redevelopment projects for public art. The collection currently includes 650 pieces. There are 24 artists in some stage of development, including 10 works for the Sacramento International Airport.

SCVB offers the Sacramento Gold Card free to visitors staying at participating hotels. The Sacramento Gold Card provides exclusive discounts for dining, shopping and entertainment.

The Kennedy Center selected Sacramento as the inaugural city for its arts education program the "Any Given Child." The program was launched in October 2009 in two school districts – Sacramento City Unified and Twin Rivers Unified. The program, for students in grades K-8, seeks to bring access, balance and equity to each child's arts education, using an affordable model that combines the resources of two school district, local arts groups and the Kennedy Center.

SMAC offers model arts education programs in schools and provides opportunities as well as microgrants to artist residencies and professional development for teaching artists. SMAC's Arts Workshops for Educators and Arts Partners Fairs, co-sponsored by the Sacramento County Office of Education and California State University Sacramento, offers classes taught by local artists. The Arts Education Resource Directory on the SMAC website is a searchable database of arts education programs.

## STRATEGY / ACTION BY FALL 2012



### A — ACCESS TO THE PUBLIC

Identify and promote affordable arts opportunities to the public and explore options to expand public arts programs in the region by 10%.

SMAC: Inventory and create a comprehensive listing of free and reduced-cost arts events. Promote these events on Sacramento365.com and other event calendars throughout the region.

Project Managers: Work with SMAC to measure current levels of public participation in arts programs and establish baseline data for growth measurement.

Arts Access Committee: Work with arts organizations and artists to increase free and affordable arts and cultural opportunities. Work with SMAC, cities and counties to explore incentives for private developers to participate in the Art in Public Places program. Explore creation of an "Arts Card" and/or "Arts Samples." Arts Access Committee: Develop a coordinated marketing plan that includes: creating or utilizing an existing central information sites; expanding online capabilities of existing resources such as SMAC and the SCVB; connecting to new audiences through interactive, digital and online media; and supporting SMAC's multi-media marketing campaign Arts Open Daily.



### B — STRENGTHEN & SUPPORT ARTS EDUCATION

Integrate arts learning into the education of every K-8 student in the region and support arts education throughout the community.

Kennedy Center, "Any Given Child" Steering Committee, School Districts and SMAC: Successfully implement "Any Given Child" in pilot schools. Evaluate program impact, report findings and select six expansion schools.

SMAC: Work with local arts organizations to inventory and promote all existing arts education programs being offered in the region.

Arts Access Committee: Increase visibility of arts education offerings across the region by: developing an Arts Advocacy Council; creating an arts education advocacy plan; and establishing a website for sharing best practices and a calendar of activities.

Arts Access Committee and SMAC: Strengthen the capacity of arts educators and providers by promoting professional development for teaching artists, classroom teachers, administrators and arts providers; exploring the creation of an arts resource center and library and reinstating an Arts Education Conference & Symposium in conjunction with an "Arts Week" or "Arts Month." Expand teaching artist workshop series.



### C — BUILD THE BRAND

Establish the Sacramento Region as a center for arts excellence and promote this status broadly. Increase cultural tourism and media visibility.

Arts Access Committee, DCCL, SCVB, SMAC and other partners: Create a comprehensive marketing plan that promotes Sacramento as a national arts and cultural destination, an artist-friendly community and a prime location for film production.

Leadership Team, SCVB, SMAC and other partners: Create a month-long festival of creativity. Identify a steering committee, develop a business plan in collaboration with key partners including SCVB and seek funding. Consider bringing film festivals together into a coordinated annual event.

Film Commissions: Establish a regular ongoing meeting to coordinate, align and leverage efforts.

SCVB and SMAC: Seek to have statewide and national arts and arts education organizations hold annual meetings and conferences in Sacramento.

SCVB, Arts Access Committee and arts organizations: Expand the arts and cultural offerings included on the Sacramento Gold Card and the number of visitors utilizing the card.

SMP000124



## PARTICIPATE

Community-centered activities will make arts and culture more accessible to citizens; increasing participation, building social connections and fostering neighborhood pride.

*RESULT BY 2014*
Expand public participation by 25% in arts and cultural activities by increasing the number of free and reduced-cost opportunities.

Double the number of regional K-8 schools that offer the "Any Given Child" program.

Increase participation in arts education programs by 20%.

Increase local, national, and international unpaid media and tourism revenue related to arts and cultural events by 20%.

# STATUS

Accessibility is a top priority in making arts and culture more visible in our community. Most importantly, it begins in the classroom with our children. Today's youth are tomorrow's arts patrons. A complete education that includes arts learning experiences is critical to a child's success, both socially and academically.

## ART IN SCHOOLS



93% of teachers believe integrating more arts into education will help them meet some of their classroom challenges.



71% of schools surveyed through "Any Given Child" do not provide arts education programs.

## AUDIENCE



Sacramento is a convener for the arts in our region. 47% of performing arts attendees come from outside the City of Sacramento.

SOURCE: Economic Research Associates

SMP000125



# GOAL 3: INVEST IN TALENT AND THE CREATIVE ECONOMY

**WHERE WE ARE**

Artists struggle with many of the same challenges that affect other citizens in our community – finding affordable health insurance, being priced out of their residence, understanding safety codes and navigating permitting procedures. Additionally, regional artists report having limited opportunities to network, share knowledge and effectively market their products.

SMAC and the SCVB are positioning to expand the capabilities of Sacramento's arts to help meet the needs of artists in the city, county and region. SMAC and CAC offer a listing of local, regional and national funding, management and professional development resources on their websites.

Cities throughout the region have flourishing gallery scenes and monthly "arts nights" in select communities. Sacramento's "Second Saturday" is a popular outlet for galleries and artists to show their work within the community.

SRCF offers capacity building workshops that help artists learn to sell their products and services and run sustainable businesses through the Achieving Sacramento Arts initiative.

SMAC provides funding, fellowships, residencies and technical assistance to city and county arts and cultural organizations such as the Teaching Artist Workshop series, Artist Residency and ArtScape. SMAC established the Sacramento Poet Laureate Program in 2000 to celebrate the high caliber of talent among Sacramento's poets.

SmudioWorks is a unique artist live/work project located in North Sacramento. SmudioWorks is comprised of 11 affordable single family homes with detached studios. The project aims to create a dynamic environment suited to making high quality visual art and generate wide-spread positive attention for the participating artists.

CAC has arranged about the topic of health insurance for artists and others employed in creative industries. SMAC is working to secure

Artists insurance company's membership in the Bay area, working with the Index and Heinz? Foundations. The Actors Fund recently published a health care guide by Sacramento that explains health care options in the area and services specifically geared towards artists.

---

## STRATEGY — ACTION BY FALL 2012



### A
**SUPPORT ARTISTS**

Eliminate barriers and support the basic needs of artists and other creative professionals in the region.

**SMAC:** Survey artists and creative professionals to learn about barriers, unmet needs, tools and resources desired.

**SMAC and FAS:** Identify and prioritize the challenges facing creative individuals. Create a comprehensive plan to address barriers and unmet needs, which includes strategies for helping artists achieve savings on housing and other basic living expenses.

**City and County Governments:** Explore incentives for working artists (e.g. subsidies). Establish collaborations between housing organizations to identify opportunities for more live/work spaces and to address other artist housing needs.



### B
**DEVELOP PROFESSIONALLY**

Help the creative services sector thrive by offering professional learning, networking and recognition opportunities.

**FAS, SMAC, SRCF and Nonprofit Resource Center:** Evaluate technical assistance needs of artists and creative individuals in the region. Create more professional development, fellowship, residency and grant opportunities. Research the feasibility of a scholarship program and travel fund to send artists to learn from other artists and communities.

**SMAC and ABC:** Consider development of a real and/or virtual networking forum for artists to connect with their peers as well as arts supporters and consumers. Expand programs that already exist such as Sacramento365.com.

**Film Commission:** Develop opportunities for appraising with out-of-town film crews.

**SMAC, FAS and Regional Elected Officials:** Explore expansion of Resolution program, reinstatement of SMAC's artist merit award program and increased awards from elected officials for arts excellence.



### C
**BUY LOCAL**

Stimulate the creative economy by creating more cultural consumers and cultural tourism, increasing the purchase of locally produced art and growing arts businesses.

**SMAC, SCVB and SACTO:** Develop metrics to track the impact of the creative sector on the economy.

**Leadership Team, ABC, Metro Chamber and City and County Development/Planning Departments:** Facilitate stronger connections and ongoing discussions linking arts with economic development and community revitalization.

**Access Committee, SCVB, SMAC and other partners:** Include strategies to promote local artists and the purchase of their work as part of the comprehensive marketing plan. Include creative businesses and professionals in technology solutions.

**SMAC and ABC:** Promote hiring of regional artists first, including encouraging regional corporations to choose local artists as part of events, celebrations, meetings and conferences and for creation of marketing materials.

**Office of the Mayor:** Establish an annual award recognizing a regional business that has made exemplary use of the creative sector.

**FAS:** Help galleries learn to use "Second Saturday" as a means to strengthen their businesses.

**SCVB, Film Commission and City and County Governments:** Increase film production by exploring incentives, actively pursuing opportunities, and marketing Sacramento's assets and competitive advantages. Build a website that identifies labor resources and skills existing in the region.

---

10 | design by: www.cwdotmarketing.com

SMP000126



## CELEBRATE

Sacramento will nurture creativity and celebrate artistic and cultural endeavors by providing economic opportunities, offering professional development and encouraging innovation for artists and the private sector.

### RESULT BY 2014

Implement new strategies for helping artists achieve savings on housing and other basic living expenses.

Create a menu of professional development, technical assistance and networking opportunities for artists and art organizations.

Document a measurable increase in revenue for artists and arts organizations as well as revenue generated by arts businesses.

# APPENDIX

## Local, Regional and State

Arts & Culture in the Sacramento Region A Summary of Research and Planning Documents, 1990-2010
http://www.sacmetroarts.com/documents/Research_MasterArtsPlan_002.pdf

A Snapshot View of Nonprofit Organizations in the Sacramento Region
http://www.cpmaloln.org/downloadlNonprofit%20Organization%20Odyssey%20Business%20Region%20Digest%2002009.pdf

For Arts' Sake Sacramento
http://www.forartsake.org

For Arts' Sake – Education Initiative Survey, by Moja Research, Inc.

For Arts' Sake – Sacramento School Resource Survey, by Metz Research, Inc.

Sacramento 365: The Year-Round Source for Sacramento Events http://www.sacramento365.com/

Sacramento Region Economic Profile 2009-2010
http://www.sacto.org/Flash/formID=40542001-9F64-3BG3-ENEFB017v12941C0B9&emontlocal.md

The Arts: A Competitive Advantage for California II
http://www.cac.ca.gov/artsinfo/Economic%20Impact%20Bd/Fact2.pdf

The Creative Industries in Sacramento, California 2010
http://www.sacmetroarts.com/arts-research.html

## National and International

Art-Goers in Their Communities: Patterns of Civic and Social Engagement
http://www.nea.gov/research/AGIV/06.pdf

Arts & the Economy: Using Arts and Culture to Stimulate State Economic Development
http://www.nga.org/Files/pdf/0901ARTSANDECONOMY.PDF

Arts Participation 2008: Highlights from a National Survey
http://www.sacmetroarts.com/documents/Research_SurveyFairParticipation2008.pdf

How the United States Funds the Arts
http://www.arts.gov/pub/how.pdf

National Arts Index 2009: An Annual Measure of the Vitality of Arts and Culture in the United States
http://www.americansforthearts.org/pdf/information_services/Art_index/NAI_Art_report_print_quality.pdf

Soul of the Community
http://www.soulofthecommunity.org/

The Qualities of Quality: Understanding Excellence in Arts Education
http://www.americansforthearts.com/documents/Research_QualityEducationArtsEdu.2009.pdf

# CREDITS

## "For Arts' Sake" Leadership Team

Gerry Metzel, Western Health Advantage
– Marketing Chair
Dennis Mangers, Community Activist
– Funding Chair
Ruth Rosenberg, Arts Consultant
– Arts Education Chair
Ken Roth, The Mondavi Center for the Performing Arts
– Plan Chair
Dave Wetzel, Sacramento County Office of Education
– Facilitator Chair
Bill Blake, B Street Theatre
Barb Blank, Sacramento Region Community Foundation
Buck Busfield, B Street Theatre
Lisa Foti, FM Family Restaurants
Mamie Gutierrez, de Gerardo, empresas
Lial Jones, Crocker Art Museum
Peggy Shannon, Sacramento Theatre Company/UC Davis
Bob Slobe, Sacramento Poet Laureate

## Financial Sponsors

AT&T
Sacramento Region Community Foundation
Wells Fargo
Western Health Advantage

## In-Kind Sponsors

The Sacramento Bee
Metz Research
Advantage Presentations
Copini Graphics

Morici Marketing
NIO Graphics
LucyCo
R3verview Media Photography
www.redsquid.com
Hyatt Hotel
Top Notch Limo

## Meeting Venue Sponsors

KVIE
Vespa Bakery
Capital Public Radio
Sacramento Ballet
Hot Italian
Sacramento Theatre Company
Sojourner Truth Museum
California Railroad Museum
The Guild Theater
The Mondavi Center for the Performing Arts
The B Street Theatre
California State University, Sacramento

## Consultants

Sharon Gerber, Six Degrees
Jane Hill, deSMART
Jann Barbour
Dane Gonzalez

# NEXT STEP

### GET INVOLVED!
Visit us at www.forartsake.org

SMP000127



- Home
- ABOUT US
- EVENTS
- RESOURCES
- CONTACT US
- SPONSORS

Greenwise
Sacramento

## ABOUT US



In May 2010, Mayor Kevin launched Greenwise Sacramento and welcomed over a dozen remarkable leaders to the Sacramento region to speak at eight monthly meetings to share their ideas on how to grow the Sacramento region's green economy while improving its environment.

Greenwise Sacramento convened 275 experts and community leaders who worked diligently through five Policy Committees: Energy; Waste & Recycling; Water & Nature; Urban Design & Green Building; and Green & Clean Technology. Combined, these experts volunteered thousands of hours to develop the Greenwise Sacramento Regional Action Plan — a plan that will transform Sacramento into the Emerald Valley – the greenest region in the country and a hub for clean technology.

Three Greenwise Transformational Goals are included in the Regional Action Plan. These are supported by a number of objectives for implementation through 2020.

1. Create a Self-Sustaining Sector - ECONOMY

2. Become the Greenest Region in the Country - ENVIRONMENT

3. Brand the Sacramento Region as the Emerald Valley - ENGAGEMENT

Implementation will occur, starting immediately, through the Greenwise Joint Venture. The purpose of Greenwise Joint Venture is to convene stakeholders and coordinate efforts, implement the Plan, and brand the region. Our short-term focus will be on signature projects where we control both the supply and market

http://greenwisesacramento.org/about-us

8/22/2011

SMP000129

About Us

demand. And, from now until 2020, we will
engage as many community members as
possible to take personal responsibility for a
better future.

| Select Language ▾ |

Powered by Google™ Translate





Website development and sustainable hosting on wind-powered servers by The Mobius Network.

Photos by Kyle Monk, Copyright © 2011. All Rights Reserved.

http://greenwisesacramento.org/about-us

8/22/2011

SMP000130

# healthcorps®

## Vision

**HealthCorps®**, a proactive health movement co-founded by heart surgeon Dr. Mehmet Oz and his wife Lisa, is fighting the obesity and mental resilience crisis by getting American students and communities across the country to take charge of their health.  Our three priorities are:



1. **Educating the Student Body**– our in-school program to empower and educate youth and faculty about their bodies, their environments and their abilities to affect them.

Like a *Peace Corps for Health*, HealthCorps is a national service and peer mentoring initiative. In high schools, HealthCorps "Coordinators" empower teens in underserved populations to make simple lifestyle changes to enhance their well-being and resilience and take the message to friends, families and neighbors.

Recent college graduates become HealthCorps "Coordinators" for two years and defer medical school or graduate health program studies to peer-mentor as public service - helping teens, their teachers and their families become health activists through:

- Our fun, experiential curriculum, developed with leading health and integrative medicine experts; Nutrition, Fitness and Mental Resilience in-school seminars and after school clubs.
- Pedometer contests for students and teachers
- Tools to create educated consumers: food label, portion and ingredient label deciphering
- Tools to build mental resilience: stress reducers, self esteem and hope builders
- Practical exercise like walking, yoga and simple strength building routines
- Service learning projects to teach other students HealthCorps lessons
- Field trips to organic farms, hospitals, museums
- Teen Iron Chef cooking lessons and competitions
- Parent's Nights

2. **Creating a FitTown**– Our **community outreach** to connect and empower citizens and organizations to bring about awareness and affect change through community based projects and events such as:
- Our photovoice projects to explore and document community life
- Built-environment improvements
- Highway to Health Fair & Festivals

HealthCorps Coordinators form important ties with public health departments, school systems, community foundations, the business community, city food banks and other community service organizations to

8/22/2011

SMP000131

coalesce efforts. FitTown efforts are guided by key tools developed by the Center for Disease controls: the School Health Index (SHI) and the Community Health Index (CHI).

3. **Advocacy:** Our public outreach at the national, state and city levels to:

- Advocate for policy shifts that put health and physical education back into the core curriculum for the American education system;
- Advocate for policy shifts that move us towards safer environments affecting health (food systems, transportation systems, public space design systems, more nature) that encourage and enable people to be more physically active.



Stories of hardship, resolution and triumph reach HealthCorps every day.

## Stand Up Organization







* ACCOMPLISHMENTS
* EVENTS
    * UPCOMING EVENTS
    * PAST EVENTS
* SACRAMENTO READS! RSVP
* RESOURCES
* TAKE ACTION
    * JOIN
    * DONATE
    * SIGN-UP FOR UPDATES
* CONTACT US

**ABOUT STANDUP**

STAND UP is an education nonprofit dedicated to ensuring every child has the opportunity to attend an excellent public school.

STAND UP was launched on the Oprah Winfrey Show in 2006. In 2009, STAND UP became a featured initiative of new Sacramento Mayor Kevin Johnson. Since then, STAND UP has embarked on an ambitious agenda to reform failing public schools in the Sacramento region.

STAND UP focuses on five priority areas:

**HUMAN CAPITAL**

* Improve teacher and principal quality

**ACCOUNTABILITY**

* Enhance transparency around school performance and quality

**SCHOOL CHOICE**

* Increase the range of school options available to parents and students

**PARENT ENGAGEMENT**

http://www.standup.org/about/

- Equip parents with the tools to advocate for their children's success

EFFECTIVE POLICY

- Promote local, state and national reforms that catalyze systemic change





5843 14TH AVENUE
SACRAMENTO, CA 95820

Email: Info@StandUp.org

- OUR PURPOSE
- About StandUp
- Accomplishments
- Leadership
- The Need

- Take Action
- Become a Member
- Contribute Today!
- Contact StandUp.org

- Stay Connected
- Facebook
- Twitter
- Latest News
- Interactive Blog
- Sign-up for Updates

© Copyright 2011 Stand Up Organization. All Rights Reserved
Design and Developed by Sacramento Web Design & Development Firm Petrakos Communications

http://www.standup.org/about/

8/22/2011

SMP000134

## Stand Up Organization







- LEADERSHIP
  - ACCOMPLISHMENTS
- EVENTS
  - UPCOMING EVENTS
  - PAST EVENTS
- SACRAMENTO READS! RSVP
- RESOURCES
- TAKE ACTION
  - JOIN
  - DONATE
  - SIGN-UP FOR UPDATES
- CONTACT US

LEADERSHIP

Mayor Kevin Johnson, Chairman of the Board

Kevin Johnson is the 55th mayor of Sacramento. He is the first native Sacramentan, and the first African American to be elected to the office. His vision is for Sacramento to become "a city that works for everyone."

Johnson's dedication to public service began long before he started his tenure as mayor. To address a shortage of quality schools in his native Oak Park, Johnson founded St. HOPE Public Schools in 1989, during his second season as a professional basketball player for the NBA's Phoenix Suns. St. HOPE grew to a network of four high quality charter schools. Collectively these schools serve students from pre-school through twelfth grade.

Upon retiring from the NBA after 12 seasons with the Phoenix Suns in 2000, he returned to his Oak Park neighborhood in Sacramento to serve as the CEO of St. HOPE. Over 20 years, St. HOPE has dramatically improved the community of Oak Park through its holistic community development approach and excellent public schools.

A graduate of UC Berkeley, Johnson has held roles with the UC Berkeley Foundation and Harvard Divinity School. Johnson has also and earned numerous accolades including President George Bush's 411th "Point of Light"; the Caring Institute's "Most Caring American" award; the NBA's J. Walter Kennedy Citizenship Award; and induction into the Pac-10 Hall of Fame.

Other Board Members

- John Finegan, CEO Beck Ag
- Jim Lunich

- Mary Rotelli
- Caprice Young

Staff

- Executive Director (TBD)
- Andrea Corso, Deputy Director





5843 14TH AVENUE
SACRAMENTO, CA 95820

Email: Info@StandUp.org

- OUR PURPOSE
- About StandUp
- Accomplishments
- Leadership
- The Need

- Take Action
- Become a Member
- Contribute Today!
- Contact StandUp.org

- Stay Connected
- Facebook
- Twitter
- Latest News
- Interactive Blog
- Sign-up for Updates

© Copyright 2011 Stand Up Organization. All Rights Reserved
Design and Developed by Sacramento Web Design & Development Firm Petrakos Communications

FOR

Our Mission | Whom We Work | Why Teach For America? | Get Involved | Search

APPLY TO THE CORPS

# OUR MISSION

A Solvable Problem (/our-mission/a-solvable-problem)  |  Enlisting Committed Individuals (/our-mission/enlisting-committed-individuals)  |  Investing in Leaders (/our-mission/investing-in-leaders)

Fueling Long-Term Impact (/our-mission/fueling-long-term-impact)

## Teach For America is growing the movement of leaders who work to ensure that kids growing up in poverty get an excellent education.

### Today, poverty limits educational opportunity – but it doesn't have to be that way

Although 16 million American children face the extra challenges of poverty, an increasing body of evidence shows that they can achieve at the highest levels.

Read More » (/Our-Mission/The-Problem)



Just 8% of kids growing up in low-income communities graduate from college by age 24    source: postsecondary.org

### Teach For America is working to solve this problem by:

**Enlisting Committed Individuals**
We recruit a diverse group of leaders with a record of achievement who work to expand educational opportunity, starting by teaching for two years in a low-income community.

Read More » (/Our-Mission/Enlisting-Talented-Individuals)

**Investing in Leaders**
We provide intensive training, support and career development that helps these leaders increase their impact and deepen their understanding of what it takes to close the achievement gap.

Read More » (/Our-Mission/Investing-in-Leaders)

**Accelerating Impact**
A growing movement of leaders, now 33,000 strong, works at every level of education, policy and other professions, to ensure that all children can receive an excellent education.

Read More » (/Our-Mission/Fueling-Long-Term-Impact)





Teach For America corps members and alumni are helping lead an educational revolution in low-income communities across the country.

SMP000137



Houston, TX

   3



Washington, D.C.

|  | OUR MISSION | WHY TEACH FOR AMERICA | GET INVOLVED | CONNECT |
|---|---|---|---|---|
| Join Our Staff | The Problem | Who We Look For | Action Center | |
| Apply to the Corps | Committed Individuals | Where and What You'll Teach | Sponsor a Teacher | 50673 likes. Sign Up to see what your friends like. |
| Donate | Investing in Leaders | Training and Support | Refer a Friend | |
| Meet Us | Fueling Impact | Compensation and Benefits | WHERE WE WORK | @TeachForAmerica |
| Shop | | How to Apply | | |

 
Subscribe to Our Channel
Subscribe to Our Newsletter

Press Room  Español  Contact Us  Privacy Policy

Copyright 2011 Teach For America, Inc. All rights reserved
Teach For America logos are trademarks or registered trademarks of Teach For America, Inc.

TEACH FOR AMERICA THANKS OUR NATIONAL
PARTNERS FOR THEIR GENEROUS SUPPORT.    cisco.


TEACH FOR AMERICA WAS NAMED ONE OF FORTUNE
MAGAZINE'S TOP 100 EMPLOYERS TO WORK FOR.

TEACH FOR AMERICA WAS NAMED ONE OF AMERICA'S
TOP 100 IDEAL EMPLOYERS IN UNIVERSUM'S 2011
AMERICAN STUDENT SURVEY.



RIDER 1

COMMENCEMENT DATE AGREEMENT

Hale Bros Investment Company, LLC, a California limited liability company ("Landlord"), and StudentsFirst Institute, a District of Columbia nonprofit corporation and StudentsFirst, a District of Columbia nonprofit corporation, jointly and severally (collectively, "Tenant"), have entered into a certain Office Lease dated as of October ___, 2011 (the "Lease").

WHEREAS, Landlord and Tenant wish to confirm and memorialize the Commencement Date and Expiration Date of the Lease as provided for in Section 2.2(b) of the Lease;

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants contained herein and in the Lease, Landlord and Tenant agree as follows:

1.      Unless otherwise defined herein, all capitalized terms shall have the same meaning ascribed to them in the Lease.

2.      The Commencement Date (as defined in the Lease) of the Lease is _____.

3.      The Expiration Date (as defined in the Lease) of the Lease is _____.

4.      Tenant hereby confirms the following:

        (a)     That it has accepted possession of the Premises pursuant to the terms of the Lease; and

        (b)     That the Lease is in full force and effect.

5.      Except as expressly modified hereby, all terms and provisions of the Lease are hereby ratified and confirmed and shall remain in full force and effect and binding on the parties hereto.

6.      The Lease and this Commencement Date Agreement contain all of the terms, covenants, conditions and agreements between the Landlord and the Tenant relating to the subject matter herein. No prior other agreements or understandings pertaining to such matters are valid or of any force and effect.

TENANT:                                          LANDLORD:

STUDENTSFIRST INSTITUTE,                         Hale Bros Investment Company, LLC,
a District of Columbia nonprofit corporation     a California limited liability company

By: _____                     By: _____
Print Name: _____                         Paul S. Petrovich, Manager
Its: _____

STUDENTSFIRST, a D.C. nonprofit corporation

By: _____
Print Name: _____
Its: _____

SMP000139

Exhibit No. B

## PARKING AGREEMENT

This Parking Agreement (the "**Parking Agreement**") by and between Hale Bros Investment Company, LLC ("**Landlord**") and StudentsFirst Institute and StudentsFirst (together, "**Tenant**") is entered into as of this 26th day of October, 2011.

WHEREAS, Tenant leases office space in the building commonly known as 825 K Street, Sacramento, California (the "**Building**") from Landlord under an Office Lease dated as of October 26, 2011 (the "**Office Lease**"); and

WHEREAS, the Building contains a garage for automobile parking (the "**Parking Garage**"); and

WHEREAS, Tenant desires to lease from Landlord and Landlord desires to lease to Tenant parking spaces in the Parking Garage.

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.       Notwithstanding anything to the contrary contained in this Section 1, so long as Tenant is not in Default (as defined in the Office Lease) of the Office Lease or in default of any of its obligations of this Parking Agreement, Tenant shall have the right to use up to 12 spaces free of charge for the duration of the Abatement Period (as defined in the Office Lease).  From the Commencement Date (as defined in the Office Lease) until the Expiration Date (as defined in the Office Lease) (the "**Term**"), Tenant agrees to lease from Landlord and Landlord agrees to lease to Tenant twelve (12) parking spaces (each a "**Space**" and collectively the "**Spaces**") in the Parking Garage.  Tenant shall have the right but not the obligation to lease from Landlord additional spaces in the Parking Garage by request in writing on a month-to-month basis ("**Additional Spaces**"), subject to the availability, and subject to the terms and conditions of this Parking Agreement except that the same shall be terminable by either party upon thirty (30) days' notice (the term Spaces shall include any Additional Spaces).  Landlord shall use its best efforts to comply with Tenant's request in a timely manner. The rent for such Spaces (including any Additional Spaces) will be as follows:

| Time Period of Initial Term | Monthly Rate per Space |
| --- | --- |
| Commencement Date - end of 18th month of Term | $175 |
| 19th month of Term – end of 30th month of Term | $180 |
| 31st month of Term – end of 42nd month of Term | $185 |
| 43rd month of Term – end of 54th month of Term | $190 |
| 55th month of Term – end of 66th month of Term | $195 |
| 67th month of Term | $200 |

| Option Period of Term (if exercised pursuant to terms of the Office Lease) | Monthly Rate per Space |
| --- | --- |

1

SMP000140

| | |
|---|---|
| 68th month of Term – end of 78th month of Term | $205 |
| 79th month of Term – end of 90th month of Term | $210 |
| 91st month of Term – end of 102nd month of Term | $215 |
| 103rd month of Term – end of 114th month of Term | $220 |
| 115th month of Term – end of 126th month of Term | $225 |
| 127th month of Term | $230 |

Such rent shall be payable in advance to Landlord or such other entity as designated by Landlord, and shall be sent concurrent with Tenant's payment of Monthly Base Rent (as defined in the Office Lease) to the address set forth in the Office Lease, as the same may be modified in accordance with the terms of the Office Lease. Except as otherwise set forth herein below, no deductions from such rent shall be made for days on which the Parking Garage is not used by Tenant.. If the Commencement Date starts on any day other than the 1st of a month, rent for that month shall be prorated. Each month of the Term shall be a full calendar month, provided that any partial month from the Commencement Date until the end of the calendar month in which the Commencement Date occurs shall be added to the first calendar month following the Commencement Date. Notwithstanding the foregoing, if any rent is due for such initial partial month, then Tenant shall still be required to pay its prorate share for such partial month.

2.      Tenant shall at all times comply with all applicable ordinances, rules, regulations, codes, laws, statutes and requirements of all federal, state, county and municipal governmental bodies or their subdivisions respecting the use of the Parking Garage. Landlord reserves the right to adopt, modify and enforce reasonable rules ("**Rules**") governing the use of the Parking Garage from time to time. Landlord shall provide Tenant with one (1) garage access remote for each of the Spaces, provided that (i) Tenant has provided Landlord with an acknowledgment for such employee, director, or officer assigned to such garage access remote, (ii) Tenant shall place a deposit on each such garage access remote, and (iii) Tenant agrees to pay a replacement fee for any lost or damaged garage access remote. Landlord may refuse to permit any person who violates such Rules to park in the Parking Garage, and any violation of the Rules shall subject the car to removal from the Parking Garage following reasonable notice. Tenant shall comply with and cause all of its employees to comply with all the Rules as well as all reasonable additions and amendments thereto. Tenant shall have access to the Parking Garage, 24 hours a day/7 days per week.

3.      The Spaces hereunder shall be provided on a non-designated "first come-first serve" basis. Landlord reserves the right to assign other specific parking spaces, and to reserve other parking spaces for visitors, small cars, handicapped persons and for other tenants, guests of tenants or other parties, which assignment and reservation or spaces may be relocated as determined by Landlord from time to time, and Tenant and persons designated by Tenant hereunder shall not park in any such location designated for such assigned or reserved parking spaces.

4.      Tenant shall not store or permit its employees to store any automobiles in the Parking Garage without the prior written consent of Landlord.  Except for emergency repairs, Tenant and its employees shall not perform any work on any automobiles while located in the Parking Garage. Tenant or its employees may leave an automobile in the Parking Garage overnight.

2

5.     Landlord shall have the right to temporarily close the Parking Garage, or certain areas therein in order to perform necessary repairs, maintenance and improvements to the Parking Garage, and in such events, Landlord shall refund any prepaid parking fee hereunder for any Spaces affected by such closure, prorated on a per diem basis. Landlord shall provide Tenant with notice of any such temporary closure at least 48 hours in advance; provided that in the case of an emergency, Landlord shall only be required to provide Tenant with as much notice as is reasonable given the circumstances.

6.     TENANT ACKNOWLEDGES THAT THE PARKING GARAGE IS AN ADAPTIVE SPACE WITH COLUMNS CREATING SPACES THAT MAY FALL OUTSIDE THE TYPICAL WIDTH FOR PARKING SPACES. LANDLORD SHALL NOT BE LIABLE FOR ANY LOSS, INJURY OR DAMAGE TO PERSONS USING THE PARKING GARAGE OR AUTOMOBILES OR OTHER PROPERTY THEREIN, IT BEING AGREED THAT, TO THE FULLEST EXTENT PERMITTED BY LAW, THE USE OF THE SPACES SHALL BE AT THE SOLE RISK OF TENANT AND ITS EMPLOYEES. WITHOUT LIMITING THE FOREGOING, TENANT HEREBY VOLUNTARILY RELEASES, DISCHARGES, WAIVES AND RELINQUISHES ANY AND ALL ACTIONS OR CAUSES OF ACTION FOR PERSONAL INJURY OR PROPERTY DAMAGE OCCURRING TO TENANT ARISING AS A RESULT OF PARKING IN THE PARKING GARAGE, OR ANY ACTIVITIES INCIDENTAL THERETO, WHEREVER OR HOWEVER THE SAME MAY OCCUR, AND FURTHER AGREES THAT TENANT WILL NOT PROSECUTE ANY CLAIM FOR PERSONAL INJURY OR PROPERTY DAMAGE AGAINST LANDLORD OR ANY OF THE LANDLORD RELATED PARTIES FOR ANY SAID CAUSES OF ACTION. IN ALL EVENTS, TENANT AGREES TO LOOK FIRST TO ITS INSURANCE CARRIER AND TO REQUIRE THAT TENANT'S EMPLOYEES LOOK FIRST TO THEIR RESPECTIVE INSURANCE CARRIERS FOR PAYMENT OF ANY LOSSES SUSTAINED IN CONNECTION WITH ANY USE OF THE PARKING GARAGE. TENANT HEREBY WAIVES ON BEHALF OF ITS INSURANCE CARRIERS ALL RIGHTS OF SUBROGATION AGAINST LANDLORD OR LANDLORD RELATED PARTIES.

7.     Tenant shall be responsible for any damage to the Parking Garage caused by Tenant or anyone parking thereunder (including Tenant's employees, directors, and officers), including without limitation any damage to the overhead pipes or columns in the Parking Garage.

8.     Tenant shall not assign its rights under this Parking Agreement or sublease any Space without the consent of Landlord.

9.     Tenant acknowledges that the Spaces are for the exclusive use of Tenant's directors, officers, and employees. Tenant shall cause any director, officer, or employee who uses a Space under this Parking Agreement to execute the acknowledgment attached as Exhibit A hereto prior to Landlord being obligated to issue such person a garage access remote; provided that such party's signature shall not in any way be deemed to create any inference that Landlord may collect more than the total sum per month for such Space as listed in Section 1 above. Tenant shall promptly notify Landlord when any director, officer, or employee ceases using such Space and either (i)

3

SMP000142

provide Landlord with an acknowledgment for a replacement director, officer, or employee for such garage access remote, or (ii) return the garage access remote to Landlord.

10.    All obligations of the parties under this Parking Agreement shall be deemed obligations under the Office Lease such that the failure of any party to fulfill its obligations hereunder shall be deemed a "Default" under the Office Lease subject to the notice and cure periods set forth in the Office Lease for such a failure to be deemed a "Default" thereunder.

11.    Landlord hereby reserves the right to enter into a management agreement or lease with another entity for the operation of the Parking Garage ("**Operator**"). In such event, Tenant, upon request of Landlord, shall enter into a parking agreement upon the same terms hereunder with the Operator and pay the Operator the monthly charge established hereunder, and Landlord shall have no liability for claims arising through acts or omissions of the Operator except in the case of gross negligence. It is understood and agreed that the identity of the Operator may change from time to time during the Term. Landlord shall provide Tenant with at least seven days notice of any change of the Operator. In connection therewith, any parking lease or agreement entered into between Tenant and any Operator shall be freely assignable by such Operator or any successors thereto. If the Landlord assigns its interest in the Office Lease pursuant to the terms thereof, then, at Landlord's election, Landlord's interest in this Parking Agreement shall be assigned as well.

12.    In the event of any conflict between the terms of this Parking Agreement and the terms of the terms of the Office Lease or particular attachment to thereto the terms of this Office Lease shall control, unless explicitly designated otherwise in writing.

13.    The terms of this Parking Agreement may be modified or waived only by written agreement, signed by both of the parties.

*(Signatures on following page)*

4

SMP000143

IN WITNESS WHEREOF, the parties hereto have executed this Parking Agreement as of the date first above written.

LANDLORD:

HALE BROS INVESTMENT COMPANY, LLC,
a California limited liability company

By: _____
    Paul S. Petrovich, Manager

TENANT:

STUDENTSFIRST INSTITUTE, a District of Columbia non-profit organization

By: _____
    Enoch Woodhouse, Vice President, Operations

STUDENTSFIRST, a District of Columbia non-profit organization

By: _____
    Enoch Woodhouse, Vice President, Operations

5

SMP000144

Exhibit No. C

John Cox

| | |
|---|---|
| From: | Deanna Lord <dlord@studentsfirst.org> |
| Sent: | Tuesday, April 26, 2016 10:28 AM |
| To: | Kellen Arno |
| Cc: | Paul Petrovich; Ken King; Lisa Montagnino |
| Subject: | Re: StudentsFirst |

Sorry I'm so late to the party.  Friday at 11:00 works for me.

On Mon, Apr 25, 2016 at 6:50 PM, Kellen Arno <karno@studentsfirst.org> wrote:
Thanks for the quick response and times Paul. Friday at 11:00 am works for me. Deanna, does that work for you?

Thanks again,

Kellen

On Mon, Apr 25, 2016 at 6:42 PM, Paul Petrovich <Paul@petrovichdevelopment.com> wrote:
Ken just informed me he can't make Thursday, but he can Friday - which works for me from 11:00 on. I have to leave the office by 3:00. I am pretty sure Lisa can make it.

Paul

Petrovich Development Company, LLC
825 K Street
Third Floor
Sacramento, CA 95814

916.442.4600 (O)
916.442.6313 (F)

www.petrovichdevelopment.com<http://www.petrovichdevelopment.com>

Sent from my iPhone
Please excuse typos due to voice dictation

On Apr 25, 2016, at 5:57 PM, Kellen Arno <karno@studentsfirst.org<mailto:karno@studentsfirst.org>> wrote:

Hi Paul,

I hope you are well. We've had some changes to our organization recently and as a result it is our intent to vacate the building prior to the termination of our lease. We were hoping we can schedule a meeting or a call with you and your team shortly - hopefully this week - to talk this through so we can find resolution. On our end we'd like to include our Vice-President of Finance Deanna Lord as well as our legal counsel, if this is ok with you.

Please let me know if you and anyone else you'd like to have join are available and when it would be convenient for you.

Exhibit 49
Witness _____
Date _____
K. Baca, CSR #10267

1

SMP000258

Best regards,

Kellen

--
Kellen Arno
Vice-President of Strategy and Communications
karno@studentsfirst.org<mailto:karno@studentsfirst.org>
825 K Street, Second Floor
Sacramento, CA 95814
T: 916-710-1573
F: 916-842-3939


[https://sites.google.com/a/studentsfirst.org/intranet/resources/tools-to-use/sf_logo_color185_3025_small%20%281%29.jpg?attredirects=0&d=1]



--
Kellen Arno
Vice-President of Strategy and Communications
karno@studentsfirst.org
825 K Street, Second Floor
Sacramento, CA 95814
T: 916-710-1573
F: 916-842-3939


[x]_____



--
**Deanna Lord, CPA**

StudentsFirst
825 K Street, Second Floor
Sacramento, CA 95814
tel: 916.287.9220
cell: 832.563.3981
www.studentsfirst.org

2

Exhibit No. D

## StudentsFirst and StudentsFirst Institute
### Cash Projections

| | April | May | June | Total |
|---|---|---|---|---|
| Beginning Cash | $ 2,886,712 | $ 2,596,370 | $ 1,876,999 | $ 2,886,712 |
| **Projected Cash Receipts** | | | | |
| Contributions | 611,500 | - | - | 611,500 |
| Management fees | 22,000 | 22,000 | - | 44,000 |
| Release of standby LOC related to HQ office lease* | 500,000 | - | - | 500,000 |
| Total Cash Receipts | 1,133,500 | 22,000 | - | 1,155,500 |
| **Projected Cash Disbursements** | | | | |
| Payroll during transition | 456,471 | 206,745 | 176,482 | 839,698 |
| Payroll related to termination of employees | 193,959 | 347,968 | 257,066 | 798,993 |
| Professional fees - lobbyists, consultants, tax and accounting | 158,876 | 78,089 | 81,777 | 318,741 |
| Rent & office expenses** | 48,590 | 47,715 | 47,715 | 144,021 |
| All other operational expenses | 80,946 | 60,854 | 60,854 | 202,654 |
| Tax return preparation for FY 2016 | | | 32,000 | 32,000 |
| Ongoing IRS examination to completion | | | 30,000 | 30,000 |
| Consulting fees to handle EDD audit | | | 10,000 | 10,000 |
| Remaining contracts on computer equipment | | | 20,000 | 20,000 |
| Remaining consulting expense reimbursement | | | 59,000 | 59,000 |
| Transfers to PACs | 300,000 | | 900,000 | 1,200,000 |
| Transfers to 50CAN for resticted contributions | 185,000 | | - | 185,000 |
| Total Cash Disbursements | 1,423,842 | 741,371 | 1,674,895 | 3,840,107 |
| Ending Cash | $ 2,596,370 | $ 1,876,999 | $ 202,104 | $ 202,104 |

*Remaining $500,000 not released until mid-February 2018 (100 days after 10/31/2017)

**Remaining HQ lease payments at July 1, 2016 will be $652,660

SMP000339

StudentsFirst and StudentsFirst Institute
Consolidated Statements of Activities

| | For the Month Ended | | | For the Three Months Ended |
| --- | --- | --- | --- | --- |
| | Jan 31, 2016 | Feb 29, 2016 | Mar 31, 2016 | Mar 31, 2016 |
| Contribution revenue | $ 1,302,033 | $ 36,660 | $ 503 | $ 1,339,196 |
| Other revenue | 22,008 | 22,000 | 22,075 | 66,083 |
| | 1,324,041 | 58,660 | 22,578 | 1,405,279 |
| Personnel costs | 559,955 | 514,994 | 515,445 | 1,590,394 |
| Bank, brokerage, merchant fees | 186 | 126 | 123 | 435 |
| Consulting | 68,444 | 88,102 | 74,939 | 231,486 |
| Depreciation | 7,752 | 7,822 | 7,752 | 23,326 |
| Events | 9,476 | 553 | 834 | 10,863 |
| Grants & contributions | 10,000 | 15,250 | 1,250 | 26,500 |
| Information technology | 19,170 | 28,424 | 33,004 | 80,599 |
| Lobbying | 50,874 | 60,200 | 42,480 | 153,554 |
| Occupancy | 49,375 | 48,475 | 48,534 | 146,384 |
| Other operating expenses | 5,500 | - | - | 5,500 |
| Other programmatic expense | 3,399 | 7,450 | 1,250 | 12,100 |
| Shipping & supplies | 1,531 | 4,907 | 1,285 | 7,723 |
| Travel & entertainment | 24,754 | 22,153 | 8,735 | 55,642 |
| Subscriptions & fees | 11,419 | 6,134 | 3,865 | 21,419 |
| | 821,836 | 804,590 | 739,498 | 2,365,925 |
| | $ 502,205 | $ (745,930) | $ (716,920) | $ (960,646) |

SMP000340

StudentsFirst and StudentsFirst Institute
Consolidated Statement of Financial Position
March 31, 2016

**ASSETS**

| | | |
|---|---|---|
| Cash | $ | 2,886,712 |
| Prepaid insurance | | 26,929 |
| Other prepaids | | 70,963 |
| Property & equipment, net | | 94,889 |
| Rent deposit | | 45,950 |
| Restricted cash (WF CD) | | 1,000,908 |
| **Total Assets** | $ | 4,126,351 |

**LIABILITIES & NET ASSETS**

| | | |
|---|---|---|
| Accounts payable | $ | 122,111 |
| Accrued expenses | | 98,454 |
| Deferred rent payable | | 111,008 |
| 401k employee withholding liability | | 9,682 |
| Vacation payable | | 210,523 |
| Other short-term liabilities | | 4,995 |
| **Total Liabilities** | | 556,773 |
| Net Assets | | 3,569,578 |
| **Total Liabilities and Net Assets** | $ | 4,126,351 |

SMP000341

Exhibit No. E



1625 K Street NW, Suite 400   Info@50can.org
Washington, DC 20006   www.50can.org

 

FOR IMMEDIATE RELEASE

**50CAN and StudentsFirst Merge to Strengthen Support for Local Education
Leaders Across the Country**

*Organization Is Dedicated to Delivering High-Quality Education to All
Children, Regardless of Address*

March 29, 2016

**Washington D.C.** - 50CAN: The 50-State Campaign for Achievement Now and
StudentsFirst, two leading education advocacy networks, announced today a merger to
establish a stronger and more influential nationwide network of state advocacy
campaigns. The merger will build upon the locally led campaigns and leadership
development efforts pioneered over the past five years.

Marc Porter Magee, Ph.D., founder and CEO of 50CAN, will serve as the CEO of the
combined organization with 50CAN's Vallay Varro serving in the role of president. Sandy
Vargas, president and CEO of the Minneapolis Foundation, will serve as the board chair.

"This merger is the next phase of an evolution in our movement where local leaders in
communities across the country work together to create an education system where all
children receive a high-quality education, regardless of their address," said 50CAN CEO
Marc Porter Magee. "We are grateful to StudentsFirst for their tireless work over the last
five years towards this shared mission. We believe kids across the country will benefit
from this merged organization's focus on advocacy campaigns that are locally grown,

SMP000940

locally led and locally sustained."

The combined network brings together local education advocates from across the country, supported by a national team of policy, communications and advocacy experts. The national organization will go by the name 50CAN, with state affiliates of StudentsFirst continuing to use their local brands.

Jim Blew, who has served as president of StudentsFirst for the past year, will serve as a senior advisor to the organization. He will focus on integrating StudentsFirst's political and electoral skill set into the 50CAN network and building a locally led effort in California, his home state. Michelle Rhee, the founder of StudentsFirst and a leading voice in education advocacy, will be working with Marc, Vallay and Jim to provide strategic guidance grounded in her lifelong career in public education.

"This merger is a significant opportunity for the education reform movement to improve state policy affecting millions of students across the country," said Jim Blew. "In the new federal policy environment under ESSA, where state policy is more important than ever, this merger ensures we'll be able to represent student interests as effectively and efficiently as possible. I've known and worked with Marc Porter Magee for nearly 10 years and I'm confident he is the right person to guide this network into this exciting new era."

"I am very proud of the work we are accomplishing at StudentsFirst," said Michelle. "Over the past five years we have succeeded in doing exactly what the organization was created to do: change the education landscape for kids everywhere. From my earliest days as a teacher in Baltimore, I have seen first-hand the importance of building local leadership that is capable of partnering with the communities our classrooms are meant to serve. I look forward to helping Marc, Vallay and the entire team on the important work ahead."

50CAN will announce more details of the merger in the coming weeks, including additions to the 50CAN board of directors and details about the organization's strategic vision for the road ahead.

**About 50CAN**
Marc Porter Magee, Ph.D., founded 50CAN in January 2011 after serving as ConnCAN's chief operating officer since its founding year in 2005, to bring the success of ConnCAN's campaigns to other states around the country. 50CAN has grown into a nationwide network with local advocacy campaigns and education advocacy fellowships across 12 states, powered by more than 40 full-time staff and over 50 local advisory board members. With support from over 150 philanthropists and dozens of coalition and partner organizations, 50CAN has built truly locally grown and sustained advocacy campaigns that have secured 47 policy victories that positively impact the lives of

SMP000941

millions of children, especially those who are traditionally underserved. 50CAN has also deepened the bench of education advocacy by training over 500 citizen advocates in education advocacy and policy through its popular advocacy fellowship programs and courses.

**About StudentsFirst**

Michelle Rhee founded StudentsFirst in December 2010 after resigning as the Chancellor of D.C. Public Schools, where she and the AFT's Randi Weingarten negotiated a revolutionary teacher contract that rewards highly effective teachers, moves ineffective teachers out of the classroom, and helps all teachers perfect their craft. StudentsFirst was launched because students deserve an organization that will champion their interests above all. Since its founding, the organization has helped pass over 220 policies across 18 states, dramatically changing the way more than 23 million children will receive their public education. They have also changed the political landscape by helping elect 135 pro-reform leaders and built a movement of parents, teachers, students and everyday citizens who have become a significant presence in key state houses.

**Contact**

Lisa Gibes: lisa.gibes@50can.org, (586) 805-1115
Kellen Arno: karno@studentsfirst.org, (916) 710-1573

SMP000942